## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IRANIAN AMERICAN LEGAL DEFENSE FUND,
 1901 Pennsylvania Ave. NW, Suite 900
 Washington, DC 20006,

        *Plaintiff*,

v.

MARCO RUBIO, in his official capacity as Secretary
of State,
 2201 C Street NW
 Washington, DC 20520,

U.S. DEPARTMENT OF STATE,
 2201 C Street NW
 Washington, DC 20520,

MARKWAYNE MULLIN, in his official capacity as
Secretary of Homeland Security,
 2707 Martin Luther King Jr Ave. SE
 Washington, DC 20528,

U.S. DEPARTMENT OF HOMELAND SECURITY,
 2707 Martin Luther King Jr Ave. SE
 Washington, DC 20528,

DAVID VENTURELLA, in his official capacity as
Acting Director of U.S. Immigration and Customs
Enforcement,
 500 12th Street SW
 Washington, DC 20536,

and

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
 500 12th Street SW
 Washington, DC 20536,

        *Defendants*.

Civil Action No. 26-2375

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

1.      In furtherance of its mass deportation agenda, in March of 2025, the Trump administration adopted a policy of providing the Islamic Republic of Iran (Iranian Government) with confidential information from the immigration files of Iranians seeking asylum in the United States. Many of the asylum seekers are pro-democracy protestors, members of religious minorities such as Evangelical Christians, or members of the LGBTQ community who seek refuge in the United States because of the grave dangers they face in Iran. Disclosing their confidential information to the Iranian Government violates the asylum seekers' confidentiality rights, endangers their family members and acquaintances who may still be residing in Iran, and puts those who are subject to removal to Iran, directly or through chain refoulement via third countries, at risk of persecution, torture, and death following their arrival in Iran.

2.      The new policy has continued notwithstanding the June 2025 military strikes by the United States, the massacre of tens of thousands of Iranian protestors by the Iranian Government in January 2026, and the war launched by the United States on February 28, 2026.

3.      Plaintiff brings this action under the Administrative Procedure Act (APA) requesting that the Court declare the policy unlawful and order that it be vacated. Plaintiff further requests that the Court order that those whose information was unlawfully shared with the Iranian Government be provided notice of the breach so that they can move to reopen their immigration cases to determine whether they are entitled to asylum or other relief based on the violation of their confidentiality rights.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States, namely, the APA, 5 U.S.C. § 551, *et seq*.

2

5.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because Defendants are agencies of the United States and agency officials sued in their official capacity, Defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**PARTIES**

6.      Plaintiff Iranian American Legal Defense Fund (IALDF) is a non-partisan, non-profit organization engaged in empowering, protecting, and defending people of Iranian descent in America through legal advocacy and impact litigation, government oversight, legal support, and public education. IALDF provides pro bono immigration and asylum legal services through its legal-services team, which maintains an intake system, connects Iranian asylum seekers with local pro bono counsel, and visits detained asylum seekers in detention. Seeking release and protection for people of Iranian descent escaping from the country has been a priority of the IALDF, especially after the United States started mass deportation flights to Iran in late September 2025.

7.      Defendant Marco Rubio is Secretary of State and is sued in his official capacity.

8.      Defendant U.S. Department of State is an agency of the United States.

9.      Defendant Markwayne Mullin is Secretary of Homeland Security and is sued in his official capacity.

10.      Defendant U.S. Department of Homeland Security (DHS) is an agency of the United States.

11.      Defendant David Venturella is Acting Director of Immigration and Customs Enforcement and is sued in his official capacity.

12.      Defendant U.S. Immigration and Customs Enforcement (ICE) is an agency of the United States and a component of DHS.

3

**FACTS**

13.     Individuals in the United States who fear persecution if returned to their country of origin may apply for asylum, withholding of removal, and relief under the Convention Against Torture (CAT).

14.     Applications for asylum, withholding, and CAT relief often contain sensitive information that, if revealed, could place applicants at increased risk of persecution upon return to their country of origin. Disclosure of such information also poses a risk of harm to any family or associated community members who still reside in the country of origin.

15.     Federal regulations protect the confidentiality of information contained in or pertaining to applications for asylum, withholding, or CAT relief.

16.     In carrying out removals, the United States government may coordinate logistics with government officials of the receiving country, but federal regulations prohibit sharing of information that would reveal or infer that the individual to be removed had applied for asylum in the United States.

17.     Specifically, DHS regulations at 8 C.F.R. § 208.6(a) provide that information contained in or pertaining to any application for refugee admission, asylum, withholding of removal under section 241(b)(3) of the Immigration and Nationality Act, or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Secretary.

18.     State Department regulations at 8 C.F.R. § 236.1(e) provide that, when notifying consular or diplomatic officials, Service officers shall not reveal the fact that any detained alien has applied for asylum or withholding of removal.

19.     These DHS and State Department confidentiality regulations focus on preventing the disclosure of information that would link an individual's identity with the fact that they have applied for asylum or similar forms of relief in the United States, because disclosure of such information could subject the individual to persecution upon repatriation or endanger the applicant's family members who may still be residing in the country of origin.

20.     The Iranian Government and the United States have been adversaries since the 1979 hostage crisis and have had no formal diplomatic relations for nearly half a century.

21.     Because there is no Iranian consulate within the United States, consular functions for Iran are handled by the Iranian Interest Section housed within the Embassy of Pakistan.

22.     In March 2025, the United States government contacted the Iranian Interest Section through the Embassy of Pakistan and requested a meeting. A meeting was arranged and held at the U.S. Department of State.

23.     The March 2025 meeting was attended by a senior official from the Iranian Interest Section and U.S. State Department representatives. A U.S. State Department representative stated that the United States wanted to deport Iranian nationals, including those in ICE detention, from the United States to Iran.

24.     During the March 2025 meeting, the senior official from the Iranian Interest Section requested a list of the detained Iranian nationals that the United States wished to deport. A United States government representative at the meeting provided a list of about 150 names to the official from the Iranian Interest Section.

25.    The March 2025 meeting produced an agreement between the U.S. government and the Iranian Government under which ICE and Iranian Government officials have been holding monthly meetings to share the immigration files and information of Iranians in ICE custody. In addition, since the March 2025 meeting, U.S. government officials have periodically mailed or hand delivered immigration files of Iranians in ICE custody to the Iranian Government.

26.    During the monthly meetings, ICE officials have provided the Iranian Interest Section with immigration documents pertaining to individual detainees and asked the Interest Section to consider accepting the return of the detainees to Iran.

27.    The documents provided to Iranian Government officials include detainees' immigration records, such as final orders of removal, applications for relief, and asylum applications and related information.

28.    ICE officials have sometimes mailed records to the Iranian Interest Section. Other times, ICE officials have hand delivered the documents directly to Iranian Government representatives at the Iranian Interest Section.

29.    On information and belief, the last in-person meeting between ICE officials and the Iranian Interest Section took place in the month before the U.S.–Iran war began on February 28, 2026. Although the monthly in-person meetings stopped, ICE has continued to mail or hand deliver document packages to the Iranian Interest Section.

30.    The U.S. government has provided Iranian Interest Section officials with detailed information on hundreds of Iranian detainees seeking asylum, including information protected from disclosure by 8 C.F.R. § 208.6(a) and 8 C.F.R. § 236.1(e).

31.    ICE has provided officials from the Iranian Interest Section in-person access to Iranian asylum seekers in ICE detention facilities. ICE officials and the Iranian Interest Section

have worked in tandem to pressure Iranian detainees to forgo their rights and to coerce them to agree to return to Iran without assurances for their safety upon return.

32.    ICE coordinated the in-person meetings between the Iranian Government officials and Iranians in ICE custody. Iranian Government officials have met with dozens of Iranian detainees at ICE detention facilities.

33.    In connection with their immigration cases, the Iranian detainees had previously disclosed detailed information about their identities, families, political opinions, religions, and the reasons they feared the Iranian Government. The detainees contributed this information to their asylum application files in reliance on the confidentiality protections provided by federal regulations, with the understanding that the information would not be shared with the Iranian Government.

34.    Many of the Iranian detainees did not consent to meet with the Iranian Interest Section officials but were required to do so by ICE.

35.    According to Iranian detainees who met with an Iranian Interest Section official, the official had knowledge of their immigration cases, including the details of their asylum applications. These nonconsensual meetings with the Interest Section official solidified the detainees' belief that they had been identified to the very same repressive government that they had fled.

36.    According to the U.S. State Department, the Iranian Government engages in unlawful killings, forced disappearances, torture, arbitrary detention, and persecution of political dissidents, religious minorities, and LGBTQ individuals. *See* U.S. Dep't of State, *2024 Country Reports on Human Rights Practices: Iran*.

7

37. Pursuant to the new policy and agreement, the U.S. government and the Iranian Government have worked together to deport asylum seekers fleeing Iran, resulting in at least three mass deportation flights.

38. On about September 30, 2025, a deportation flight departed from Alexandria, Louisiana, traveling through Qatar to Iran. Approximately 50 to 60 individuals were deported to Iran on the flight.

39. On about December 7, 2025, another deportation flight departed from Mesa, Arizona, traveling through Kuwait to Iran. Approximately 50 individuals were deported to Iran on the flight.

40. On about January 25, 2026, another deportation flight departed with about 15 Iranian detainees on board. This flight occurred less than three weeks after the Iranian Government massacred tens of thousands of protesters and injured or imprisoned many more.

41. According to public reporting, upon arrival in Tehran, some of the deportees were made to fill out forms explaining why they had left Iran and sought asylum in the United States. Some of the deportees were called in for interrogation by the intelligence wing of the Islamic Revolutionary Guard Corps.

42. The U.S. government allowed the Iranian Government to select the Iranians deported to Iran.

43. Many of the Iranians deported to Iran were asylum seekers, and their status as asylum seekers was known to the Iranian Government.

44. According to public reporting, officials of the Iranian Government have stated that the deportees include those who sought asylum in the United States.

45.     On information and belief, the mass deportation flights have included asylum seekers who face grave risks upon return to Iran because they participated in the 2022 Woman, Life, Freedom movement, belong to religious minorities, converted to or promoted Christianity, or are members of the LGBTQ community. Each of these groups faces a well-documented risk of imprisonment, torture, or execution upon return to the Islamic Republic of Iran.

46.     The United States did not ask the Iranian Government or its Interest Section for any protections for the deportees, did not provide any protocol regarding their treatment, and did not request any assurances regarding their safety or well-being upon their arrival in Iran.

47.     On February 11, 2026, twelve U.S. Senators led by Senator Tim Kaine of Virginia wrote to Secretary of State Marco Rubio raising concerns that the administration is returning individuals to a country where they may face persecution or torture, in violation of U.S. and international law.

48.     One day before the United States launched a war with Iran, a State Department official responded by letter of February 27, 2026, admitting that the Iranian Government engages in persecution of religious minorities and has systematically oppressed its citizens through arbitrary detention, coerced confessions, and killing. The State Department did not respond to the substance of the Senators' letter and instead referred the Senators to the Department of Homeland Security and the White House.

49.     On March 18, 2026, during his confirmation hearing to lead DHS, then-Senator Markwayne Mullin was questioned by Senator Richard Blumenthal of Connecticut about the mass deportation flights to Iran. Then-Senator Mullin vowed to look into the issue. Upon information and belief, Secretary Mullin has taken no action to terminate the policy adopted in March 2025 under which the United States provides confidential information about asylum seekers to the

Iranian Government. Upon information and belief, the United States is working with the Iranian Government on another mass deportation flight to Iran in the coming weeks.

50.     By disclosing sensitive information about asylum seekers to the Iranian Government, facilitating meetings with Iranian Interest Section officials, and allowing the Iranian Government a role in selecting those to be deported, the U.S. government has materially increased the likelihood that Iranian asylum seekers will be detained, interrogated, tortured, or killed upon return. This policy has also exposed the Iranian asylum seekers' family members and acquaintances to retaliation in the form of arrest, interrogation, torture, and death.

### Harm to IALDF

51.     Since 2025, Plaintiff IALDF has provided legal support and assistance to a substantial number of detained Iranian asylum seekers. IALDF visits ICE detention facilities across the United States and supports detainees and asylum seekers with services directed at ensuring legal protection.

52.     These services include confidential intake and screening; meetings to build the trust necessary to obtain sensitive facts required for an asylum or CAT claim; confidentiality and safety planning; preparation of, or assistance with, declarations and supporting evidence; referral to local pro bono counsel; coordination or provision of interpretation services; and other related support.

53.     The foundation of IALDF's ability to deliver these services is its capacity to elicit complete and candid information from its current and prospective clients, particularly the details of the persecution they fled and the risks they face if returned to Iran.

54.     Defendants' policy of providing the government of Iran with confidential information regarding Iranian asylum seekers considerably impairs IALDF's ability to provide legal services and has induced structural operational changes.

55.     When a client withholds facts, IALDF attorneys cannot obtain the complete information necessary to assess an asylum or CAT claim, cannot prepare accurate declarations, cannot reliably evaluate the risk a client would face on return, and cannot give sound advice about the client's options.

56.     To do its substantive work, IALDF must now spend considerable additional time and effort attempting to retain or repair their clients' trust. It must conduct additional individualized risk screening, advise clients about the risk that their information may be disclosed to Iran, prepare or consider emergency and protective filings, and engage in safety planning for clients whose family members and acquaintances remain exposed to retaliation inside Iran.

57.     Defendants' policy has additionally forced IALDF to implement operational and structural changes that will persist as long as the policy is in effect. IALDF has revised its intake scripts and questions, expanded its staff and volunteer training to cover disclosure-risk counseling and safety planning, and modified its referral protocols so that local pro bono counsel are alerted to the disclosure risk when a matter is referred.

58.     Substantial IALDF staff and attorney time has been and continues to be expended on addressing the repercussions of Defendants' policy, which has made it harder, and in some instances impossible, for IALDF to deliver the specific legal services—confidential intake, asylum screening, detention visits, and referral—that it was providing to the people it serves.

## CLAIM FOR RELIEF

59.     Under the Administrative Procedure Act, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

11

60. Defendants' policy of providing to the Iranian Government confidential information protected by 8 C.F.R. § 208.6 and 8 C.F.R. § 236.1(e) is final agency action for which there is no adequate remedy.

61. Defendants' policy of providing to the Iranian Government confidential information protected by 8 C.F.R. § 208.6 and 8 C.F.R. § 236.1(e) is contrary to law.

62. Defendants' policy of providing to the Iranian Government confidential information protected by 8 C.F.R. § 208.6 and 8 C.F.R. § 236.1(e) is arbitrary and capricious.

63. Defendants' policy of providing to the Iranian Government confidential information protected by 8 C.F.R. § 208.6 and 8 C.F.R. § 236.1(e) is an abuse of discretion.

64. Unless this Court enters an order stating that Defendants are forbidden from providing to the Iranian Government confidential information within the scope of 8 C.F.R. § 208.6 and 8 C.F.R. § 236.1(e), Defendants are likely to continue providing such information to the Iranian Government.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

a. Enjoin Defendants' policy of providing the Iranian Government confidential information within the scope of 8 C.F.R. § 208.6 and 8 C.F.R. § 236.1(e);

b. Declare that Defendants' policy is unlawful because it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

c. Vacate and set aside Defendants' policy;

d. Appoint a Special Master to review the files of Iranian ICE detainees shared with the Iranian Government and to identify for the Court and IALDF which detainees have had their confidential information compromised;

e. Order Defendants to provide notice of the breach to IALDF and Iranian asylum seekers

whose information was unlawfully shared with the Iranian Government;

f.  Enjoin Defendants from deporting any Iranian ICE detainees until the work of the Special

Master is completed;

g.  Award Plaintiff its attorneys' fees and costs; and

h.  Grant any other preliminary or permanent relief that this Court concludes is appropriate to

protect the confidentiality of the immigration records of Iranian asylum seekers.

Dated: July 7, 2026

Ali Rahnama (DC Bar No. 1032695)
Bardia Arasteh (pro hac vice forthcoming)
Iranian American Legal Defense Fund
1901 Pennsylvania Ave NW, STE 900
Washington, DC 20006
(202) 339-1255
ali.rahnama@ialdf.org
barasteh@ialdf.org

Respectfully submitted,

/s/ Michael T. Kirkpatrick
Michael T. Kirkpatrick
    (DC Bar. No. 486293)
Hoyeon Kelly Lew
    (DC Bar No. 90028415)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
(202) 588-7728
mkirkpatrick@citizen.org
klew@citizen.org