**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IRANIAN AMERICAN LEGAL DEFENSE FUND, <br><br>     *Plaintiff*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, et al., <br><br>     *Defendants*. | Civil Action No. 26-2375-ACR |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR STAY**
**UNDER 5 U.S.C. § 705 AND FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**PAGES**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................1

    A.  Information regarding asylum and similar applications is protected from disclosure ... 1

    B.  Defendants have adopted a new policy of sharing information about Iranian asylum seekers with the Iranian Government ...................................................................2

        1.  Mass Deportations of Iranian Asylum Seekers..........................................................2

        2.  Policy Divulging Asylum-Related Information with Iranian Government .............5

        3.  Confirmation of Policy by Iranian Asylum Seekers in ICE Custody ......................6

        4.  Confirmation of Policy by Senior Official of Iranian Interest Section....................9

        5.  Policy's Increase of Risk of Harm to Iranian Asylum Seekers ..............................9

    C.  Plaintiff IALDF challenges this new information-sharing policy ...............................11

LEGAL STANDARDS ....................................................................................................12

ARGUMENT..................................................................................................................12

    I.     IALDF is likely to succeed on the merits. ..........................................................12

    A.  IALDF has shown a substantial likelihood of standing. .......................................12

    B.  IALDF is likely to succeed on the merits of its claim. ..........................................17

        1.  The new policy is final agency action..............................................................17

        2.  The new policy is contrary to law....................................................................18

    II.    IALDF will suffer irreparable injury unless this Court stays the new policy........19

    III.   The balance of equities and the public interest favor IALDF...............................22

    IV.   The Court should stay Defendants' policy under Section 705 and issue appropriate injunctive relief...................................................................................24

CONCLUSION...............................................................................................................25

i

**TABLE OF AUTHORITIES**

**Cases**

**Pages**

*Advocates for Human Rights v. DHS,*
  825 F. Supp. 3d 858, 880 (D. Minn. 2026)................................................................ 15

*Altschuld v. Raimondo,*
  No. 21-Cv-02779, 2021 WL 6113563 (D.D.C. Nov. 8, 2021).................................... 24

*Amica Center for Immigrant Rights v. EOIR,*
  822 F. Supp. 3d 119 (D.D.C. 2026)........................................................................... 16

*Anim v. Mukasey,*
  535 F.3d 243 (4th Cir. 2008) ..................................................................................... 2

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................................... 17

*Cabrera v. DOL,*
  792 F. Supp. 3d 91 (D.D.C. 2025).............................................................................. 12

*Carpenters Industrial Council v. Zinke,*
  854 F.3d 1 (D.C. Cir. 2017)........................................................................................ 13

*Catholic Legal Immigration Network, Inc. v. EOIR,*
  2021 WL 3609986 (D.D.C. Apr. 4, 2021)................................................................... 21

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006)................................................................................... 12

*Coalition for Humane Immigrant Rights v. Noem,*
  805 F. Supp. 3d 48 (D.D.C. 2025).............................................................................. 24

*Department of Commerce v. New York,*
  588 U.S. 752 (2019) ................................................................................................... 13

*District of Columbia v. USDA,*
  444 F. Supp. 3d 1 (D.D.C. 2020)......................................................................... 12, 20

*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024) ................................................................................................... 13

*Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017)..................................................................................... 13

*Immigrant Defenders Law Center v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ............................................................................... 15, 16

*Kingdom v. Trump*,
  No. 25-Cv-691, 2025 WL 1568238 (D.D.C. June 3, 2025) ....................................... 24

*Las Americas Immigrant Advocacy Center v. Wolf*,
  507 F. Supp. 3d 1 (D.D.C. 2020)................................................................................ 18

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)........................................................................... 19, 22, 23

*Lin v. U.S. Department of Justice*,
  459 F.3d 255 (2d Cir. 2006) ........................................................................................ 2

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................... 13

*Make the Road New York v. Mullin*,
  No. 25-5320, 2026 WL 1792978 (D.C. Cir. June 23, 2026) ...................................... 24

*Natural Resources Defense Council v Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020)...................................................................................... 17

*Neguse v. U.S. Immigration & Customs Enforcement*,
  No. 25-Cv-2463, 2026 WL 575509 (D.D.C. Mar. 2, 2026) ....................................... 12

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................. 12, 22

*Open Communities Alliance v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017)............................................................................ 20

*Pangea Legal Services v. DHS*,
  512 F. Supp. 3d 966 (N.D. Cal. 2021).......................................................................... 1

*Pursuing America's Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016).................................................................................... 22

*Shawnee Tribe v. Mnuchin*,
  984 F.3d 94 (D.C. Cir. 2021)...................................................................................... 23

*Vote Forward v. Dejoy*,
   490 F. Supp. 3d 110 (D.D.C. 2020) ................................................................. 20

*Whitman-Walker Clinic, Inc. v. HHS*,
   485 F. Supp. 3d 1 (D.D.C. 2020) ..................................................................... 21

## STATUTES

5 U.S.C. § 704 ...................................................................................................... 17

5 U.S.C. § 705 ............................................................................................ 1, 12, 19

5 U.S.C. § 706(2)(A) ...................................................................................... 17, 19

## RULES

Federal Rule of Civil Procedure 65(c) ................................................................ 24

## REGULATIONS

8 C.F.R. § 208.6 .................................................................................................... 2

8 C.F.R. § 208.6(a) ....................................................................................... 1, 18, 19

8 C.F.R. § 208.6(c) .............................................................................................. 18

8 C.F.R. § 236.1(e) ...................................................................................... 1, 18, 19

85 Fed. Reg. 80274 (Dec. 11, 2020) ................................................................. 1, 2

## OTHER AUTHORITIES

IALDF*, About*,
   https://www.ialdf.org/about .......................................................................... 11

IALDF, *Frequently Asked Questions*,
   https://www.ialdf.org/faqs ............................................................................ 12

**INTRODUCTION**

In March 2025, the federal government instituted a new policy of sharing confidential information about Iranian asylum seekers with the Iranian Government.  The new policy puts Iranian asylum seekers at heightened risk of detention, torture, and death upon their removal to Iran, and endangers their family members in Iran.  The policy is contrary to federal regulations and is causing ongoing irreparable injury to Plaintiff Iranian American Legal Defense Fund (IALDF).  Section 705 of the Administrative Procedure Act (APA) empowers this Court to prevent that harm by returning the parties to the status quo ante while the Court adjudicates the legality of the government's action.  The law and the equities here overwhelmingly favor such relief.  Thus, this Court should stay the policy and issue appropriate preliminary relief.

**BACKGROUND**

**A.      Information regarding asylum and similar applications is protected from disclosure.**

Individuals in the United States who fear persecution if returned to their country of origin may apply for several forms of relief, including asylum, withholding of removal, and protection under the Convention Against Torture (CAT).  The confidentiality of information contained in or pertaining to such applications is strictly protected.  Specifically, 8 C.F.R. § 208.6(a) provides:

> Information contained in or pertaining to any application for refugee admission, asylum, withholding of removal under section 241(b)(3) of the Act, or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Secretary.[1]

---

[1] The version of 8 C.F.R. § 208.6 quoted above was promulgated as part of a 2020 rulemaking, 85 Fed. Reg. 80274 (Dec. 11, 2020), that was preliminarily enjoined in *Pangea Legal Services v. DHS*, 512 F. Supp. 3d 966 (N.D. Cal. 2021).  The 2020 changes to § 208.6 were conforming edits for consistency, and to make clear that applications for refugee admission are subject to the same confidentiality provisions governing applications for asylum, withholding, and CAT protection.

1

Similarly, 8 C.F.R. § 236.1(e) prohibits the government from revealing "the fact that any detained alien has applied for asylum or withholding of removal" when coordinating notification, travel arrangements, and documents with consular officials of the receiving country. Indeed, the prohibition on disclosure is so complete that it encompasses information from which one could infer that an individual had applied for asylum or similar forms of protection. *See*, *e.g.*, *Anim v. Mukasey*, 535 F.3d 243, 254–55 (4th Cir. 2008) (holding that "explicit disclosure of the fact that the applicant has applied for asylum is not required for a violation of § 208.6," because confidentiality is breached by a disclosure from which one may infer that the individual had applied for asylum); *Lin v. U.S. Dep't of Just.*, 459 F.3d 255, 262–66 (2d Cir. 2006) (holding that the U.S. government violated the confidentiality guarantee of 8 C.F.R. § 208.6 by providing information to officials of the asylum seeker's country of origin from which one could infer that asylum seeker had applied for asylum in the United States). In short, protecting the confidentiality of asylum seekers' information is an unambiguous obligation of the U.S. government.

**B.     Defendants have adopted a new policy of sharing information about Iranian asylum seekers with the Iranian Government.**

### 1.  *Mass Deportations of Iranian Asylum Seekers*

The United States and the Iranian Government have been adversaries since the 1979 hostage crisis and have had no formal diplomatic relations for nearly half a century. Clayton Thomas, Cong. Rsch. Serv., R47321, *Iran: Background and U.S. Policy* 8 (May 22, 2025) (Ex. 5); Bureau of Near E. Affs., U.S. Dep't of State, *U.S. Relations with Iran* (Apr. 1, 2022) (Ex. 6), https://2021-2025.state.gov/u-s-relations-with-iran/. Because the Iranian Government maintains

---

*See* 85 Fed. Reg. at 80275. Plaintiff's argument is the same regardless of which version of § 208.6 is currently operative.

no embassy or consulate in the United States, its consular functions are performed by the Iranian Interest Section, which is housed within the Embassy of Pakistan in Washington, D.C. *Pakistan to Handle Iranian Affairs in U.S.*, N.Y. Times (Mar. 17, 1992) (Ex. 7), https://www.nytimes.com/1992/03/17/world/pakistan-to-handle-iranian-affairs-in-us.html. The Iranian Interest Section is, for all practical purposes, the representative of the Iranian Government within the United States.

According to the State Department's own reporting, the Iranian Government engages in unlawful killings, enforced disappearances, torture, and arbitrary detention, and persecutes political dissidents and religious minorities. *See* U.S. Dep't of State, *2024 Country Reports on Human Rights Practices: Iran* 1–2 (Aug. 12, 2025) (Ex. 8), https://www.state.gov/reports/2024-country-reports-on-human-rights-practices/iran/. In 2024 alone, it executed hundreds of people, including detainees arrested in connection with the Woman, Life, Freedom movement. *Id.* In early 2026, the Iranian Government responded to nationwide pro-democracy protests with reported mass killings of tens of thousands of its own citizens, mass imprisonment, and maiming. Press Release, Off. of the U.N. High Comm'r for Hum. Rts., *Iran: UN Experts Demand Transparency and Accountability Following Nationwide Protests* (Feb. 20, 2026) (Ex. 9), https://www.ohchr.org/en/press-releases/2026/02/iran-un-experts-demand-transparency-and-accountability-following-nationwide. According to Iran Human Rights Monitor's June 2026 report, the Iranian Government has publicly executed more than 800 individuals this year alone. *Iran HRM Monthly Report – June 2026*, Iran Hum. Rts. Monitor (July 4, 2026) (Ex. 10), https://iran-hrm.com/2026/07/04/june-32313/.

Beginning in late September 2025, the United States and the Iranian Government have worked together to carry out mass deportation flights of asylum seekers who had fled Iran. At

3

least three such charter flights have occurred, and more than 100 Iranian nationals have been removed to Iran. *Third Batch of Iranians Deported by US to Return Home, Tasnim Reports*, Reuters (Jan. 26, 2026) (Ex. 11), https://www.reuters.com/world/middle-east/third-batch-iranians-deported-by-us-return-home-tasnim-reports-2026-01-26/; Farnaz Fassihi & Hamed Aleaziz, *U.S. Deports Planeload of Iranians After Deal With Tehran, Officials Say*, N.Y. Times (Sept. 30, 2025) (Ex. 12), https://www.nytimes.com/2025/09/30/world/middleeast/us-iran-deportation-flight.html. A fourth flight planned for the end of March 2026 did not occur because of the war between the United States and Iran that began on February 28, 2026. Mehri Decl. ¶ 55. In addition to the charter flights, the U.S. government has removed additional Iranian nationals on commercial flights. Mehri Decl. ¶ 56.

The United States did not ask the Iranian Government for any protections, protocol, or assurances of any kind concerning the deportees' safety upon their return. Mehri Decl. ¶ 59. Upon arrival in Tehran, some deportees were made to fill out forms explaining why they had left Iran and sought asylum in the United States, and some were called in for interrogation by the intelligence wing of the Islamic Revolutionary Guard Corps. Farnaz Fassihi, *U.S. Deports Second Planeload of Iranians, Officials Say*, N.Y. Times (Dec. 7, 2025) (Ex. 13), https://www.nytimes.com/2025/12/07/world/middleeast/us-deports-second-planeload-iranians.html.

Plaintiff IALDF has been working to secure the release of detained Iranian asylum seekers who are suffering prolonged detention, and to that end has visited Immigration and Customs Enforcement (ICE) detention facilities in Arizona, Georgia, Louisiana, Mississippi, and Texas. Rahnama Decl. A (Ex. 1) ¶¶ 14-15. That work proceeds against an unforgiving clock. Deportation flights, whether charter or commercial, typically come with only a couple of days' notice, and

4

access to ICE detention facilities is difficult and slow to obtain.  Rahnama Decl. A (Ex. 1) ¶ 15.

By the time IALDF learns that a client or prospective client is scheduled for removal to Iran, the

window in which to act is often measured in hours.

### 2.  *Policy Divulging Asylum-Related Information with Iranian Government*

In March 2025, a ranking official at the Embassy of Pakistan contacted the Iranian Interest

Section to convey that the U.S. government wanted to speak.  Mehri Decl. ¶ 37.  A meeting was

arranged and held at the State Department.  Mehri Decl. ¶ 37.  The State Department representative

at that meeting was described as a director of the Department's Middle East section.  Mehri Decl.

¶ 38.  The representative stated that the United States wished to deport Iranian nationals, including

those in ICE detention.  Mehri Decl. ¶ 39.  According to the Senior Official of the Iranian Interest

Section, the State Department representative said that the United States wanted to "get rid of all

Iranians" in detention, and asked for the Iranian Government's help in doing so.  Mehri Decl. ¶¶

21, 39.  During the meeting, the Iranian Interest Section asked for a list of the detained Iranian

nationals the U.S. government wished to deport.  Mehri Decl. ¶ 41.  A U.S. liaison complied with

this request by providing a list of approximately 150 names to the Iranian Interest Section official.

Mehri Decl. ¶ 41.

The March 2025 meeting produced an agreement and the policy challenged here, under

which ICE shares detainees' immigration files with Iranian officials and provides the opportunity

for the Iranian Government to select the individuals who will be deported, including on the mass

deportation flights described above.  Mehri Decl. ¶¶ 23, 41-42.  Through monthly meetings or

monthly delivery of documents, the Iranian Government obtains the names and detailed case

information of Iranian asylum seekers in ICE custody.  Mehri Decl. ¶¶ 23, 42.

The information-sharing did not end when the United States and Iran engaged in military strikes in June 2025, or during the ongoing war that started on February 28, 2026.  Although the monthly in-person meetings stopped just before the current hostilities began, ICE continued to mail or hand-deliver packages of detainee documents to the Iranian Interest Section.  Mehri Decl. ¶¶ 45, 48.

### 3.   *Confirmation of Policy by Iranian Asylum Seekers in ICE Custody*

Detained Iranian asylum seekers have confirmed that confidential information from their asylum applications and immigration court proceedings has been shared with the Iranian Government.  The detainees report that they were summoned by ICE officers and brought face-to-face with a representative of the Iranian Government who possessed detailed information about their asylum cases and who pressured them to abandon their claims and accept deportation to Iran.  PM Decl. (Ex. 2.A); SO Decl. (Ex. 2.B); ER Decl. (Ex. 2.F); AM Decl. (Ex. 2.G); NY Decl. (Ex. 2.H); NA Decl. (Ex. 2.J).  None had consented to the disclosure of their asylum information to the Iranian Government.  Rahnama Decl. A (Ex. 1) ¶ 17.

Declarant PM is a Christian convert who was active in the protests against the Iranian Government; her husband is also in ICE detention.  PM Decl. (Ex. 2.A).  While she was detained, facility managers announced that the Iranian detainees, including PM, "had to report for a visit" from the Iranian "Consul."  PM Decl. (Ex. 2.A).  She had requested no such visit.  The man who arrived was a senior figure from the Iranian Interest Section in Washington, D.C.  PM Decl. (Ex. 2.A).  When the senior Iranian official entered the room where PM and the other Iranian detainees had been assembled, he had their names written down and possessed specific information about their detention status and court proceedings, including their status as asylum seekers.  PM Decl. (Ex. 2.A).  The senior official pressed them to return to Iran.  PM Decl. (Ex. 2.A).  Through the

senior official, PM learned that her own husband, also an asylum seeker, would be placed on a chartered mass deportation flight to Iran.  PM Decl. (Ex. 2.A).  PM feared that if her husband was deported, he would be interrogated, tortured, imprisoned, and possibly hanged for apostasy, due to his conversion to Christianity, inviting other Muslims to the faith, and having claimed asylum in the United States, information which the U.S. government had shared with the Iranian Government.  PM Decl. (Ex. 2.A).

Declarant SO is a Woman, Life, Freedom protester who was shot with rubber bullets during pro-democracy demonstrations.  SO Decl. (Ex. 2.B).  One day in ICE detention, without explanation, facility administrators "instructed several Iranian detainees, including [herself], to gather in the visitation area" for a visit from the "Iranian consul."  SO Decl. (Ex. 2.B).  The visitor was a representative of the Iranian Interest Section, and he "had [their] names written down and had specific, detailed knowledge about [their] immigration cases."  SO Decl. (Ex. 2.B).  He told the assembled asylum seekers that "the regime is different now" and encouraged them to return to Iran.  SO Decl. (Ex. 2.B).

Declarant AM is a Christian convert who worshipped in an underground house church in Iran until his apartment was raided and his Bibles and electronics were seized.  He was sentenced to eighty lashes, but the sentence was suspended.  AM Decl. (Ex. 2.G).  Now in detention in the United States, AM was called by ICE, along with other Iranian detainees, to meet with an official from the Iranian Interest Section.  AM Decl. (Ex. 2.G).  According to AM, the official "had a list of our names and knew where we were in our asylum process."  AM Decl. (Ex. 2.G).  The official encouraged the detainees to return to Iran, telling them they "should be OK to go back unless there were judicial proceedings" against them.  AM Decl. (Ex. 2.G).

Declarants NY and NA, both Christian converts, describe the same experience: being summoned by ICE, not at their own request, to meet the Director of the Iranian Interest Section inside the ICE facility. NY Decl. (Ex. 2.H); NA Decl. (Ex. 2.J). According to NA, an ICE officer shared confidential information with the Iranian Interest Section Director during the meeting, increasing the likelihood that NA will be "detained, interrogated, tortured, or killed" if returned to Iran. NA Decl. (Ex. 2.J).

Declarant ER, a Christian convert who was beaten by Iranian police when a search of his phone revealed church photographs, and whose home was raided and father was detained and threatened, was compelled on two occasions to communicate with Iranian Government officials. ER Decl. (Ex. 2.F). First, in October 2025, while detained at an ICE facility in the United States, he was required to speak by telephone with a representative of the Iranian Interest Section. ER Decl. (Ex. 2.F). The representative knew about his asylum claim and where he was in the asylum process. About three weeks later, he and other Iranian detainees were transported by bus to a different ICE detention facility, to meet in person with an official of the Iranian Government. ER Decl. (Ex. 2.F).

Declarant CY, who fled Iran after being detained during a political protest in 2018, was also compelled to speak with a representative of the Iranian Government while detained at an ICE facility. In or around December 2025, CY was told by a facility officer that CY could not leave the visitation area until a call from the Iranian Interest Section had been answered. During this call, the representative stated that she had CY's "whole case file in her hands," which included CY's name, A number, the basis of CY's asylum claim, where CY was in the asylum process, and even the entire transcript of CY's fear interview, which had been "all sent to them by ICE." CY Decl. (Ex. 2L).

8

### 4. *Confirmation of Policy by Senior Official of Iranian Interest Section*

On March 24, 2026, the Senior Official of the Iranian Interest Section spoke by telephone with IALDF board member and civil rights attorney Cyrus Mehri, and on March 26, 2026, he met with Mr. Mehri in person. During those conversations, the Senior Official described the U.S. government's information-sharing policy in detail. Mehri Decl. ¶¶ 16-17, 21-48. According to the Senior Official, ICE has provided the Iranian Government with immigration documents related to each detainee, including asylum applications and related case files. Mehri Decl. ¶¶ 25, 42. ICE has provided the files at monthly in-person meetings, by mail, and by ICE liaison officers handing the documents directly to the Iranian Government's representatives. Mehri Decl. ¶ 43. The Senior Official also confirmed that ICE arranged for his meetings with Iranian detainees inside ICE facilities. Mehri Decl. ¶¶ 32, 44.

### 5. *Policy's Increase of Risk of Harm to Iranian Asylum Seekers*

Asylum applications typically contain the applicant's identity, religion, political activity, associates, and precise reasons the applicant believes the Iranian Government will harm them. Rahnama Decl. B (Ex. 2) ¶ 11. For example, some detainees, such as Declarant IT, were participants in the 2022 Woman, Life, Freedom movement, and therefore face a well-documented risk of imprisonment, torture, and execution upon return to Iran. U.S. Dep't of State, *2024 Country Reports on Human Rights Practices: Iran* 5–6 (Ex. 8); Mehri Decl. ¶¶ 9, 14, 62. Declarant SO, a protestor since the age of eighteen, likewise faces such risks: SO was shot with rubber bullets during the Mahsa Amini protests and held for three days in solitary confinement. SO Decl. (Ex. 2.B). And OP is a women's rights activist and playwright. OP Decl. (Ex. 2.D). These details of their asylum applications are now in the hands of the Iranian Government.

9

Similarly, the Iranian Government treats conversion from Islam, underground house-church activity, and inviting others to the Christian faith as threats to the state. Pastor Robak Hoospianmer Decl. (Ex. 4) ¶¶ 30-32. Converts are labeled "infidels," and face especially grave danger upon return: imprisonment, torture, and charges of apostasy—potentially punishable by death. Mehri Decl. ¶¶ 10, 60-61; Hoospianmer Decl. (Ex. 4) ¶ 29. Christian converts are routinely accused by Iranian authorities of being agents of Western governments or Israel, or of posing national security threats, regardless of any actual conduct. Hoospianmer Decl. (Ex. 4) ¶¶ 30-32. Christian converts are among those whose asylum application information has been shared with the Iranian Government. Mehri Decl. ¶¶ 60-61. At least seven of the declarants here are Christian converts. PM Decl. (Ex. 2.A); LV Decl. (Ex. 2.C); ER Decl. (Ex. 2.F); AM Decl. (Ex. 2.G); NY Decl. (Ex. 2.H); NA Decl. (Ex. 2.J); RT Decl. (Ex. 2.K).

LGBTQ individuals face some of the gravest dangers of any group returned to Iran, because the Iranian Government does not merely tolerate their persecution, it mandates it by law. *See* U.S. Dep't of State, *2024 Country Reports on Human Rights Practices: Iran* 2–6 (Ex. 8) (documenting criminalization of consensual same-sex conduct, violence, arbitrary arrest, and other abuses directed at LGBTQ persons). Under Iran's Penal Code, same-sex sexual acts are criminal offenses punishable by flogging and, for certain acts, by execution. *See id*. Indeed, when asked directly whether LGBTQ asylum seekers would be safe if returned, the Senior Official of the Iranian Interest Section declined to say whether returnees would face prosecution or imprisonment. Mehri Decl. ¶ 63.

Moreover, disclosure of information from asylum applications endangers not only the asylum seekers themselves but their family members, associates, acquaintances, and fellow congregants still inside Iran, who face arrest, interrogation, torture, and death by association or in

10

retaliation. Mehri Decl. ¶ 42. Homes have been raided and phones seized that contain the images and identities of other believers and other protesters, ER Decl. (Ex. 2.F); AM Decl. (Ex. 2.G); RT Decl. (Ex. 2.K); and the safety of the members of underground house churches in which several declarants worshipped depends upon secrecy, which the challenged policy has now breached. AM Decl. (Ex. 2.G); PM Decl. (Ex. 2.A). PM and her detained husband illustrate how the harm compounds within a single family: the disclosure of one spouse's file endangers both, as demonstrated by the Iranian Government's agent who told PM that her husband would be returned to Tehran. PM Decl. (Ex. 2.A).

### C. Plaintiff IALDF challenges this new information-sharing policy.

Plaintiff IALDF is a national, nonpartisan nonprofit organization dedicated to empowering, protecting, and defending the Iranian American community. Its mission is to safeguard civil and political rights, eliminate discrimination, expand opportunity, and foster inclusion through advocacy, legal support, and community engagement. IALDF describes itself as "the leading civil rights voice of the Iranian American community," with a mission of providing "legal protection and empowerment for all Iranians in America." *About*, IALDF, https://www.ialdf.org/about. Consistent with that mission, IALDF focuses on the legal and institutional challenges facing Iranian Americans and Iranian nationals in the United States, including immigration and visa issues, civil-rights violations, profiling and surveillance, hate crimes, discrimination, and economic exclusion.

IALDF was created to provide dedicated legal infrastructure for a community facing immigration delays and detentions, business and employment discrimination, banking discrimination, and other civil rights harms. As explained in its public materials, IALDF focuses on legal defense, impact litigation, rapid response, direct legal intervention, and community

11

education to address legal threats affecting the Iranian American community. *Frequently Asked Questions*, IALDF, https://www.ialdf.org/faqs.    IALDF also prioritizes cases with broad community impact, including immigration matters involving delays, detention, and deportation; civil rights violations such as hate crimes, racial profiling, and First Amendment issues; economic discrimination; and policy-based litigation involving national-origin discrimination.

## LEGAL STANDARDS

Section 705 of the APA authorizes a court to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  The court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.*  The factors governing issuance of a Section 705 stay and those that govern the grant of a preliminary injunction are the same. *See District of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020); *Neguse v. U.S. Immigr. & Customs Enf't*, No. 25-cv-2463, 2026 WL 575509, at \*6 (D.D.C. Mar. 2, 2026).  Under those standards, the moving party must show that (1) it has substantial likelihood of success on the merits, (2) it would suffer irreparable injury if the relief were denied, (3) other interested parties would not be substantially harmed if the relief were granted, and (4) the public interest would be furthered by the relief. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The third and fourth factors—harm to other parties and the public interest—merge when the federal government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

**I.      IALDF is likely to succeed on the merits.**

**A.      IALDF has shown a substantial likelihood of standing.**

To secure a stay under 5 U.S.C. § 705 or other preliminary relief, a plaintiff must show a "substantial likelihood of standing." *Cabrera v. DOL*, 792 F. Supp. 3d 91, 101 (D.D.C. 2025)

(quoting *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017)).  To establish standing, the plaintiff must demonstrate a concrete and particularized injury that is fairly traceable to the defendant's conduct and likely to be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  Redressability is satisfied where it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision," *id.* at 561; the plaintiff need not show that relief is certain, only that the requested relief would remedy its injury.  *See Dep't of Com. v. New York*, 588 U.S. 752 (2019); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017).

Here, Defendants' policy "affect[s] and interfere[s] with" IALDF's own "core business activities," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024), and that injury is both traceable to the policy and redressable by an order staying and vacating it.  Legal-services work is core to IALDF's mission, structure, and operations.  As a nonprofit organization dedicated to empowering, protecting, and defending the Iranian American community, IALDF spends significant time and resources on direct, client-facing work with detained Iranian asylum seekers.  Specifically, IALDF has been seeking the release of asylum seekers of Iranian descent who have been detained by ICE and are suffering from prolonged detention.  Rahnama Decl. A (Ex. 1) ¶¶ 14–15.  IALDF staff visit ICE detention centers in multiple states, and support immigration detainees and asylum seekers through confidential intake, referrals, and related support.  IALDF provides these services pro bono through a small legal-services team of three attorneys, four outside attorneys on its Case Review Committee, three seasonal interns, local pro bono counsel, and interpreters.  *Id.* ¶¶ 6, 8–11.  Its clients are detained or reside in Arizona, Georgia, Louisiana, Mississippi, Colorado, New Jersey, Texas, and California, and many have limited English

comprehension, requiring IALDF to provide legal services in languages clients understand. *Id.* ¶¶ 11–12.

Defendants' policy of sharing the confidential information of Iranian asylum seekers with the Iranian Government has impaired IALDF's direct services work by undermining the trust that makes IALDF's legal services possible. IALDF's legal-services model is predicated on confidential intake and asylum screening in the client's language; in-person detention visits to assess claims and build trust; counseling and safety planning; preparation of declarations and supporting evidence; referrals to local counsel with continuing legal support; and interpretation coordination. *Id.* ¶¶ 12, 14–15. During a detention-facility visit, IALDF learned that an official of the Iranian Government had personally visited detained Iranian asylum seekers against their will inside an ICE facility, with ICE facilitation, to pressure them to return to Iran. *Id.* ¶ 16. According to the detainees, the Iranian official knew they were asylum seekers with pending immigration matters and knew details of their cases. Rahnama Decl. A (Ex. 1) ¶¶ 16–17. As a result, many clients and prospective clients have become more reluctant to disclose asylum-related facts, because they fear that information provided during legal counseling could reach the Iranian Government and endanger themselves, their families, or their associates inside Iran. *Id.* ¶ 18. When clients withhold those facts, IALDF attorneys' ability to offer counsel—to assess asylum or CAT claims, prepare accurate declarations, evaluate risk on return, and provide sound legal advice—is impaired. *Id.* ¶ 19.

For these reasons, courts in this District and elsewhere have recognized the standing of legal-services organizations whose client-facing work is obstructed by government action. For instance, a legal nonprofit successfully asserted standing where ICE practices prevented its attorneys from visiting or speaking confidentially with clients, forced the organization to devote

14

resources to locating clients and establishing basic communication, and left less time for substantive legal work. *Advocs. for Hum. Rts. v. DHS*, 825 F. Supp. 3d 858, 880 (D. Minn. 2026). And in *Immigrant Defenders Law Center v. Noem*, 145 F.4th 972, 984–87 (9th Cir. 2025), a legal services organization had standing to challenge the "Remain in Mexico" policy, which impeded the organization's ability to provide counseling and legal assistance to asylum seekers.

The same principles apply here. IALDF's injury is not that the challenged policy makes its clients afraid, although it does; the injury is that the policy destroys the conditions necessary for IALDF to perform its legal work. By impairing client candor, the policy lengthens intake, complicates detention representation, and requires IALDF to spend extra time rebuilding trust before it can obtain the facts necessary to prepare or support claims for relief. Rahnama Decl. A (Ex. 1) ¶¶ 18–20.

In addition, as a result of Defendants' policy, IALDF has been forced to make substantial operational changes: IALDF must now conduct individualized disclosure-risk screening, advise detained clients about the risk that their information or detention may be disclosed to Iran, prepare or consider emergency and protective filings, and engage in safety planning for clients whose family members and acquaintances remain vulnerable to retaliation inside Iran. *Id.* ¶ 20. IALDF has revised its intake system to add hours of conversation with each detainee about whether the detainee has had contact with Iranian officials and how any such contact affected the detainee and the detainee's family members or acquaintances. *Id.* ¶ 21. It must continue to revise intake scripts, develop a dedicated module screening for contact with Iranian government officials, expand staff and volunteer training and supervision to cover disclosure-risk counseling and safety planning, and modify referral protocols to alert counsel to the disclosure risk. *Id.* ¶ 26.

15

Now, as a result of Defendants' policy, each client intake and detention interview takes approximately 20 percent longer. Rahnama Decl. A (Ex. 1) ¶ 24. In many cases, establishing the trust needed to discuss asylum-related facts adds additional days of detainee visits. *See id.* Disclosure-risk screening, safety planning, legal research, and related emergency communications consume approximately five to ten additional attorney and staff hours per week. *See id.* These tasks have reduced the number of new matters IALDF's team can absorb by roughly 20% to 25%. Rahnama Decl. A (Ex. 1) ¶¶ 24–25. Because IALDF's capacity is fixed and its services are provided pro bono, these added burdens necessarily displace ordinary substantive case work, detention visits, referrals, and development of community legal-resource materials. *Id.*; *see Amica Ctr. for Immigrant Rts. v. EOIR*, 822 F. Supp. 3d 119, 141–46, 148–49 (D.D.C. 2026) (holding that legal-services organizations had standing to challenge a rule that required them to reorganize operations, train staff, expend resources, face tighter deadlines, and serve fewer clients with less care); *Immigrant Defs.*, 145 F.4th at 984–87 (finding that a legal-services organization had standing where the challenged policy forced it to expend additional resources, alter its representation model, increase travel, and divert staff resources to continue serving its core constituency). So long as the challenged disclosure and access policy is in place, IALDF will continue to incur additional intake time, screening, legal research, safety planning, emergency communications, and trust-repair burdens, and it will continue to be impaired in providing legal services to the detained asylum seekers it currently serves and is imminently likely to serve.

These injuries are caused by the challenged policy and redressable by this Court. The injuries arise from the challenged disclosure of protected asylum-related information to representatives of the Iranian Government and ICE's facilitation of Iranian officials' access to detained asylum seekers—not from generalized immigration conditions or independent third-party

16

choices.  Rahnama Decl. A (Ex. 1) ¶ 29.  The requested preliminary relief would redress those injuries by suspending the policy that impairs IALDF's work, thereby eliminating the reason for IALDF's clients' fear of speaking to IALDF.  IALDF can restore its intake, screening, and detention-visit processes to their prior form, and attorney and staff time now consumed by disclosure-risk work can return to ordinary legal services.  *Id.* ¶¶ 29–30.

IALDF has shown injury to its own legal services and operations that is concrete and particularized, traceable to the challenged policy, and redressable by the requested preliminary relief.  It is likely to establish Article III standing.

### B.    IALDF is likely to succeed on the merits of its claim.

The APA directs a reviewing court to set aside final agency action that is not in accordance with law.  5 U.S.C. § 706(2)(A).  Here, IALDF is likely to succeed on its claim that Defendants' policy violates federal regulations and unequivocal legal obligations.

### 1.    The new policy is final agency action.

The APA provides for review of "final agency action."  5 U.S.C. § 704.  Agency action is final where it (1) marks the consummation of the agency's decisionmaking process and (2) is an action by which rights or obligations have been determined or from which legal consequences flow.  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).  The new policy satisfies both requirements.  First, the new policy of providing confidential information about asylum seekers to the Iranian Government "marks the consummation of the agency's decisionmaking ... unless and until it is superseded."  *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020).  The new policy is thus "the final word from the agency on what will happen up to the time of any different permanent decision."  *Id.* at 78.  Second, the new policy "alter[s] the legal regime to which the agency action is subject."  *Bennett*, 520 U.S. at 178.  Before the change in policy, Defendants kept confidential the information in the immigration files of Iranian asylum seekers, in accordance with

8 C.F.R. §§ 208.6(a) and 236.1(e). Now, they do not. This change in policy has "direct and appreciable legal consequences," *id.*, because Iranian asylum seekers no longer enjoy the protection previously afforded to the details of their asylum applications, and IALDF must address the impact of the policy change in counseling its clients. *See Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 35 (D.D.C. 2020) (holding that policies that directly and immediately affect plaintiffs "unquestionably qualify as 'final agency action' for the purpose of section 704 of the APA").

### 2.    The new policy is contrary to law.

By providing the Iranian Government with documents and information showing that an individual has sought asylum, withholding of removal, or CAT protection, Defendants have acted contrary to the plain language of two federal regulations.

First, 8 C.F.R. § 208.6(a) provides:

> Information contained in or pertaining to any application for refugee admission, asylum, withholding of removal under section 241(b)(3) of the Act, or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Secretary.

While § 208.6(c) lists exceptions, none of the exceptions allow disclosure to anyone other than U.S. government officials and contractors, or to courts in the United States.

Second, to the extent that the U.S. government must notify consular or diplomatic officials of the receiving country about a removal to coordinate travel documents and other logistics, 8 C.F.R. § 236.1(e) prohibits agency officials from revealing "that any detained alien has applied for asylum or withholding of removal."

18

Because the information-sharing policy violates 8 C.F.R. §§ 208.6(a) and 236.1(e), IALDF is likely to succeed on its claim under 5 U.S.C. § 706(2)(A).

## II.     IALDF will suffer irreparable injury unless this Court stays the new policy.

IALDF will suffer irreparable harm absent a stay under 5 U.S.C. § 705 and preliminary injunctive relief. *See League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (stating that irreparable harm exists where the injury is "certain and great," "actual and not theoretical," sufficiently imminent to create a "clear and present need" for equitable relief, and "beyond remediation"). Here, the challenged disclosure and access practices are already compromising the legal-services infrastructure through which IALDF serves Iranian asylum seekers in detention and removal proceedings.

IALDF's work depends on candid, confidential intake with asylum seekers who must disclose facts about persecution, political opinion, family ties, and possible retaliation by the Iranian Government. Rahnama Decl. A (Ex. 1) ¶¶ 9, 14–15. Defendants' policy has altered the conditions under which that work can occur: clients and prospective clients now fear that information shared in legal counseling may reach the very government from which they seek protection. *Id.* ¶¶ 16–18. As in *Newby*, the resulting impairment is time-sensitive and not remediable after the fact. Once a detained asylum seeker withholds facts during intake, loses trust in counsel, misses the opportunity to develop evidence, or proceeds through detention or removal proceedings without full disclosure of persecution-related facts, the harm cannot be undone.

It is difficult to overstate how time-sensitive IALDF's legal services are. Access to the affected individuals inside ICE facilities is limited and challenging to obtain, and IALDF ordinarily receives only a few days' notice, if any, before an Iranian asylum seeker is placed on a mass deportation or commercial flight to Iran. Rahnama Decl. A (Ex. 1) ¶ 15. Every hour IALDF must divert to address the harm of the federal government's disclosure of protected asylum

19

information to the Iranian Government is an hour taken from the narrow window in which IALDF can still act to protect a detainee from removal. *Id.* The conditions of confinement and the psychological pressure ICE places on Iranian detainees make it still harder to communicate effectively and to build the trust that candid intake requires. *Id.*; OP Decl. (Ex. 2.D); AM Decl. (Ex. 2.G); RT Decl. (Ex. 2.K). Selection for a deportation flight to Iran creates a grave risk of torture and imprisonment for Woman, Life, Freedom protesters, Christian converts, and members of the LGBTQ community, so that each meeting with an at-risk asylum seeker is high-stakes — often, quite literally, a matter of life and death.

Case law in this District confirms that this type of operational impairment is irreparable when government action forces an organization to redesign its services, divert scarce resources, and serve fewer people. *See Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 130–31 (D.D.C. 2020) (finding irreparable harm where the challenged policy forced civic organizations to change the timing and design of their get-out-the-vote work, respond to unanticipated inquiries, expend additional funds, and redirect resources); *District of Columbia*, 444 F. Supp. at 41–42 (finding irreparable harm when the challenged rule directly conflicted with organization's mission, increased demand, required staff to help affected clients navigate new requirements, and diverted limited resources away from other social-service, advocacy, and organizing work); *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 177–78 (D.D.C. 2017) (holding that HUD's delay of a housing rule irreparably harmed nonprofit whose mission was to help low-income families access higher-opportunity neighborhoods since delay impaired mission-centered programming and diverted scarce resources).

IALDF's harm is analogous but more acute. Defendants' practices have not merely required IALDF to send more information to clients or adjust a campaign calendar. They have

20

forced IALDF to restructure its legal-services model altogether, adding disclosure-risk screening, safety planning, legal research, emergency communications, additional detention visits, revised intake scripts, expanded staff and volunteer training, and modified referral protocols.  Rahnama Decl. A (Ex. 1) ¶¶ 20–26.  Furthermore, IALDF has had to divert attorney and staff time away from substantive case preparation, detention visits, referrals, and community legal-resource materials to address a disclosure risk created by Defendants.  *Id.* ¶¶ 24–27.  And unlike a generalized delay in regulatory implementation, Defendants' conduct directly interferes with confidential client communication, which is the very mechanism through which IALDF's legal services operate.  IALDF's clients are not merely reluctant to share personal information; they fear that asylum-related facts could be transmitted to the Iranian Government, exposing themselves, family members, or associates to retaliation.  *Id.* ¶¶ 16–19.  That fear impairs IALDF's ability to assess asylum and CAT claims, prepare accurate declarations, evaluate risk on return, and provide sound legal advice.  *Id.* ¶ 19; *see Cath. Legal Immigr. Network, Inc. v. EOIR*, No. 21-00094, 2021 WL 3609986, at *2–3 (D.D.C. Apr. 4, 2021) (staying immigration rule because rule's changes to immigration-court procedures impaired legal-services organizations' ability to provide representation, assist pro se respondents, and coordinate pro bono attorneys); *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 57–58 (D.D.C. 2020) (finding that organization established likelihood of experiencing irreparable harm where a new agency rule caused patients to withhold information from providers, making care more costly, more involved, and less effective).

The deterioration of attorney-client trust, the loss of candid asylum-related disclosures, the inability to develop claims fully while clients are detained, and the reduction in IALDF's capacity to accept urgent matters, Rahnama Decl. A (Ex. 1) ¶¶ 18–28, cannot be reconstructed after final judgment.  A later ruling cannot recreate an intake interview in which the client was too afraid to

disclose persecution facts, restore legal opportunities lost during detention or removal proceedings, or give IALDF back the matters it could not accept because attorney time was diverted to address Defendants' unlawful policy.

Moreover, the harm is ongoing. IALDF continues to conduct intake and detention visits with Iranian asylum seekers and continues to encounter clients who fear that their information has been or will be disclosed to the Iranian Government. Rahnama Decl. A (Ex. 1) ¶ 28. So long as Defendants continue the challenged practices, IALDF will continue to be impaired in a manner that satisfies the "clear and present need" requirement for preliminary relief. *See Newby*, 838 F.3d at 7–8.

Finally, the requested relief is tailored to the source of the harm. IALDF's injury flows from Defendants' disclosure of protected asylum-related information to representatives of the Iranian Government and ICE's facilitation of Iranian government access to detained asylum seekers. Rahnama Decl. A (Ex. 1) ¶ 29. An order barring those practices would directly reduce or eliminate the operational impairment. *Id.* ¶ 30. Because Defendants' policy is presently impairing IALDF's legal-services work in ways that cannot be repaired later, IALDF has shown irreparable harm sufficient to support a Section 705 stay and preliminary injunctive relief.

## III.    The balance of equities and the public interest favor IALDF.

The final two factors—balancing the equities and weighing the public interest—"merge when the Government is the opposing party," *Nken*, 556 U.S. at 435, because "the government's interest *is* the public interest," *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original). Both the equities and public interest weigh decisively in favor of preserving the status quo ante while the Court adjudicates the legality of the government's action.

A plaintiff's likelihood of success is "a strong indicator that a preliminary injunction would serve the public interest" because "[t]here is generally no public interest in the perpetuation of

22

unlawful agency action." *Newby*, 838 F.3d at 12.  In addition, there is "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (cleaned up); *see Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (affirming that likely unlawfulness of agency action weighs against the government on the merged equities-and-public-interest factors).  Those principles apply with particular force here, where the requested relief would not confer affirmative benefits or reorder the immigration system, but would simply require Defendants to comply with the law pending further judicial review.

The equities also favor relief because the burdens on the parties are sharply asymmetrical. Absent preliminary relief, IALDF will continue to face immediate, concrete, and severe harm.  By contrast, preliminary relief would impose no comparable burden on Defendants.  It would not prevent Defendants from carrying out their operations consistent with governing statutes and regulations, or from communicating with foreign governments through lawful channels.  It would require only that Defendants refrain from the challenged policy of disclosing protected asylum-related information to officials of the Iranian Government and facilitating access by those officials to detained asylum seekers.  The government has no legitimate interest in continuing a policy that is likely contrary to law, and any administrative inconvenience associated with pausing that policy cannot outweigh IALDF's ongoing injury or the public's interest in lawful agency action.  *See Newby*, 838 F.3d at 12; *Shawnee Tribe*, 984 F.3d at 102.

The public interest is particularly strong where, as here, the consequences of Defendants' actions are severe.  Defendants' policy concerns not only IALDF's services, but also the integrity and orderly functioning of the entire asylum system.  The public has a strong interest in ensuring that asylum claims are developed and adjudicated on the basis of full and candid information, not distorted by fear that protected information will be transmitted to the very government from which

23

protection is sought. Furthermore, the vulnerability of the affected population reinforces the public interest in relief. *See Altschuld v. Raimondo*, No. 21-cv-02779, 2021 WL 6113563, at *5 (D.D.C. Nov. 8, 2021) (recognizing that the public interest analysis may account for effects on "the most vulnerable in our society"). Detained asylum seekers, who are seeking protection from persecution, often have limited access to counsel and ability to gather evidence, on top of facing language barriers and urgent legal deadlines. Rahnama Decl. A (Ex. 1) ¶¶ 11–15. IALDF's work helps ensure that those individuals can understand their rights, communicate their claims, and obtain or connect with counsel. Preserving that legal-services infrastructure serves the public interest; allowing Defendants' unlawful policy to erode it does not. There are no meaningful equities on the side of Defendants.

**IV.     The Court should stay Defendants' policy under Section 705 and issue appropriate injunctive relief.**

A stay of Defendants' policy is the appropriate preliminary relief to preserve the status quo ante while this case proceeds. Section 705 of the APA allows a court to "preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. In effect, a stay under Section 705 "is just the preliminary form of vacatur"—which is the ultimate relief IALDF seeks here. *Make the Rd. N.Y. v. Mullin*, No. 25-5320, 2026 WL 1792978, at *12 (D.C. Cir. June 23, 2026); *see Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (observing that "various courts have interpreted § 705 to permit a 'stay'—which may be more aptly described as a temporary rollback—even of already-consummated agency action"). Accordingly, the fact that the new policy is "already in effect does not bar this Court from staying [it]—and returning things to the *status quo ante* while this case proceeds—under section 705." *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 74 (D.D.C. 2025).

24

The Court should also grant the requested injunctive relief to ensure the efficacy of the stay for IALDF and for those Iranian asylum seekers whose confidential information has already been revealed to the Iranian Government.  IALDF respectfully requests that the Court order ICE to take necessary steps to prevent the removal of those detained individuals—who are now at heightened risk of detention, torture, and death if returned to Iran—until they can be identified, provided with notice that their information was shared, and given the opportunity to reopen their cases and assert a new independent basis for a grant of relief from removal.  Doing so will facilitate the restoration of IALDF's ability to assess asylum, withholding, and CAT claims, evaluate risks, and provide sound legal advice to its clients.  Finally, IALDF requests that, with respect to any injunctive relief, the Court waive the bond requirement under Federal Rule of Civil Procedure 65(c).

## CONCLUSION

For the foregoing reasons, the Court should grant IALDF's motion and enter a stay under section 705 of the APA, as well as appropriate injunctive relief.

Dated: July 15, 2026

Ali Rahnama (DC Bar No. 1032695)
Bardia Arasteh (pro hac vice forthcoming)
Iranian American Legal Defense Fund
1901 Pennsylvania Ave NW, STE 900
Washington, DC 20006
(202) 339-1255
ali.rahnama@ialdf.org
barasteh@ialdf.org

Respectfully submitted,

/s/ Michael T. Kirkpatrick
Michael T. Kirkpatrick
    (DC Bar No. 486293)
Hoyeon Kelly Lew
    (DC Bar No. 90028415)
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
(202) 588-7728
mkirkpatrick@citizen.org
klew@citizen.org

25