**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IRANIAN AMERICAN LEGAL DEFENSE FUND, <br><br> *Plaintiff,* <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, et al., <br><br> *Defendants.* | Civil Action No. 26-2375-ACR |

**DECLARATION OF ALI RAHNAMA**

I, Ali Rahnama, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct. If called as a witness, I could and would testify as follows.

**Background**

1. I am an attorney, licensed to practice law in the District of Columbia since 2016. I earned my Juris Doctor from The George Washington University Law School in 2015 and a Master of Laws (LL.M.) from Columbia Law School in 2021.

2. I have devoted much of my legal career to immigration, refugee, civil-rights, and human-rights matters. From 2013 to 2017, I served as Director of Legal Services for the Iranian American Bar Association, where I established and ran a legal clinic providing support to underrepresented individuals; organized attorney teams at ports of entry to assist individuals affected by immigration policies; and helped lead the evidence-gathering effort for *Pars Equality Center v. Trump*, No. 17-CV-0255, 2017 WL 7201732 (D.D.C. July 19, 2017), challenging the constitutionality of Executive Order 13769, or the original travel ban.

3. Previously, as a law clerk at an immigration law firm, I assisted on asylum and other immigration matters and interacted directly with U.S. Citizenship and Immigration Services (USCIS) and the U.S. Department of Homeland Security (DHS). In private

practice in Washington, D.C., I worked on immigration matters and with the U.S. Department of State and DHS on the legal process for the protection of refugees. I have taught constitutional and public international law as a part-time professor and through the George Washington International Human Rights Clinic and the Robert F. Kennedy Center, contributed to international human-rights work, including drafting due-process and mutual-legal-assistance provisions of the proposed Convention on Crimes Against Humanity submitted to the United Nations International Law Commission. I am a native speaker of Persian (Farsi).

4.      I started serving at the Iranian American Legal Defense Fund ("IALDF") as Interim Executive Director in 2025, after years of foundational work as a co-founder of the organization. In this role, I oversee IALDF's legal-services programming to protect and empower the Iranian American community. As our community has been seriously suffering in the past year due to the restrictive and targeted recent immigration policies, we have also focused on providing services to asylum seekers and noncitizens in immigration detention and removal proceedings.

5.      As Interim Executive Director, I direct IALDF's case intake and analysis; prepare memoranda for the Board of Directors on potential immigration, civil-rights, and constitutional litigation; supported the Board in establishing the Case Review Committee that oversees IALDF's impact litigation and legal strategy; and lead our team in coordinating rapid-response protocols with volunteer attorneys and interpreters. I also manage IALDF's early-stage staffing, regulatory compliance, and development. Because I am fluent in Persian, I personally participate in intake conversations and in-person detention visits with many of the Iranian asylum seekers IALDF serves, and the facts set forth in this declaration are based on my personal knowledge, on information gathered through IALDF's legal-services work, and on my review of IALDF's records.

6.      I submit this declaration to describe the concrete, ongoing harm that IALDF is suffering as a direct result of the unlawful disclosure of confidential, asylum-related records and information — information protected from disclosure under the asylum-confidentiality regulation, 8 C.F.R. § 208.6, and related provisions — to representatives of the Islamic Republic of Iran by U.S. Immigration and Customs Enforcement ("ICE") and components

of the U.S. Department of State. As I explain below, this policy has directly impaired IALDF's preexisting ability to deliver the confidential legal counseling, asylum screening, detention representation, safety planning, public education campaign, and referral services that IALDF already provides to the people it serves.

**IALDF's Mission and Scope**

7.   IALDF is a national nonpartisan nonprofit organization dedicated to empowering, protecting, and defending the Iranian American community — working to safeguard civil and political rights, eliminate discrimination, and create pathways for education and economic success — through advocacy, legal support, and community engagement.

8.   IALDF is headquartered in Washington, D.C., and operates nationally. Among other activities, IALDF visits ICE detention centers in multiple states across the country and supports immigration detainees and asylum seekers with services directed at ensuring legal protection, including confidential intake and screening, connection to counsel, and related support.

9.   IALDF is a leading civil-rights voice of the Iranian American community. Because most asylum seekers who have fled the Islamic Republic of Iran face grave persecution if returned — and because disclosure of their asylum claims poses an immense risk of harm to family members and associates still inside Iran — maintaining the confidentiality of clients' asylum status and asylum-related information is of the utmost importance to IALDF and to the people it serves. Confidentiality is not incidental to IALDF's legal services; it is a precondition to providing them.

10.  Since its incorporation, IALDF has provided pro bono immigration and asylum legal services on a growing basis, with plans under development to expand its direct-representation capacity. This direct work is in addition to IALDF's extensive work connecting asylum seekers with local pro bono counsel — both through IALDF's intake system and by visiting ICE detainees directly, in person.

11.  IALDF's legal-services team currently includes three attorneys and an outside team of four attorneys who serve on IALDF's Case Review Committee. IALDF also has a small staff of three seasonal interns and two other non-attorney full-time employees. IALDF works

closely with local pro bono counsels and local and national nonprofits to provide legal-services support on referred cases, along with interpretation and other support as necessary. IALDF provides all of its legal services pro bono. IALDF currently serves clients who reside or are detained in Arizona, Georgia, Louisiana, Mississippi, Colorado, New Jersey, Texas, and California.

12.    Providing representation and legal support — including through referrals to local counsel — to clients at risk of removal has become a core component of IALDF's work, particularly because the need for pro bono legal representation for Iranian asylum seekers has grown substantially since early 2025. Most IALDF clients have no or limited English comprehension, which makes navigating immigration detention and removal proceedings even more difficult. IALDF provides its services in languages clients understand, through staff with relevant language fluency or through interpreters.

13.    Since 2025, IALDF has served a substantial number of clients in connection with removal and detention matters, including clients whom IALDF did not formally represent before the immigration court — who either had other counsel or proceeded pro se — but who received IALDF's help and legal support. Given IALDF's rapid growth in the past year and current immigration-enforcement trends, I expect IALDF to continue expanding both its direct and referral legal services to a larger group of clients facing removal in the coming years.

**IALDF's Regular Legal-Services Model Before the Challenged Conduct**

14.    Before the challenged disclosure policy came to light, IALDF's regular legal-services model already centered on direct, client-facing work with detained Iranian asylum seekers. That model includes: (a) confidential intake and asylum screening, conducted in the client's language; (b) in-person visits to ICE detention facilities to meet detainees, assess their cases, and build the trust necessary to obtain the sensitive facts an asylum or Convention Against Torture claim requires; (c) confidentiality counseling and safety planning; (d) preparation of, or assistance with, declarations and supporting evidence; (e) connection and referral to local pro bono counsel, with continued legal-services support; and (f) coordination of interpretation and related support.

15.    In carrying out this model, IALDF has traveled to detention facilities in Arizona, Georgia, Louisiana, Mississippi, and Texas to meet detainees in person, and has spent hundreds of hours on the telephone with detainees and with their relatives and contacts in the United States. The ability to elicit complete and candid information from clients — including the details of the persecution they fled and the risks they face on return — is the foundation of every one of these services. One focus of our work has been to seek the release of Iranian asylum seekers detained by ICE and suffering from prolonged detention. This work is acutely time-sensitive. Gaining access to detained asylum seekers is itself difficult and slow, and arranging an in-person visit to an ICE detention facility can take days or longer to secure. At the same time, IALDF and the people it serves frequently receive only a few days' notice, if any, before a detainee is placed on a charter or commercial deportation flight to Iran, so that the window in which IALDF can identify an at-risk detainee, meet with the detainee, and take protective action is often measured in days or even hours. The conduct described below has created new obstacles and new barriers to our work and overall frustrated the mission of our organization.

**How IALDF Learned of the Challenged Disclosures**

16.    During one of IALDF's detention-facility visits with Iranian asylum-seeker detainees, I learned that an official of the Islamic Republic of Iran had personally visited those detainees inside the facility, with visits facilitated by ICE, in order to pressure asylum seekers to return to Iran, a regime they ran away from. Based on what the detainees reported, the Iranian official knew that the detainees were asylum seekers with pending immigration matters of various postures and was aware of details of their cases. The detainees reported that they had not requested, and did not consent to, any meeting with the Iranian official; to the contrary, ICE summoned, assembled, and in some instances required them to appear before a representative of the very government from which they had fled, and several detainees told IALDF that they objected to, and were frightened by, being made to face him.

17.    These facts indicated to IALDF that protected, asylum-related information about IALDF's clients and prospective clients, information shielded from disclosure to the very government from which they sought protection, was being, or had been, disclosed to

representatives of the Islamic Republic of Iran, and that ICE was facilitating direct access by an Iranian government official to detained asylum seekers. None of the detained asylum seekers with whom IALDF has met gave consent to the disclosure of their asylum applications or asylum-related information to the Islamic Republic of Iran or its representatives. Because the purpose and foreseeable effect of these disclosures and visits is to facilitate the return of asylum seekers to the country whose government they fled, the policy strikes at the core of the protection IALDF exists to provide.

**Impairment of IALDF's Legal-Services Activities**

18.     The challenged policy directly interferes with IALDF's core legal-services activities by undermining the confidentiality on which those activities depend and by chilling the candor IALDF needs from its clients. Since learning of the Interest Section director's visits, IALDF has found that clients and prospective clients are more reluctant to disclose asylum-related facts, fearing that information they share could reach the Islamic Republic of Iran and endanger them, their families, or their associates inside Iran.

19.     These fears directly impair IALDF's ability to deliver legal services. When clients withhold facts, IALDF's attorneys cannot obtain the complete information necessary to assess an asylum or Convention Against Torture claim, cannot prepare accurate declarations, cannot reliably evaluate the risk a client would face on return, and cannot give sound advice about the client's options. IALDF must then spend considerable additional time and effort attempting to repair client trust before it can do the substantive legal work at all.

20.     The policy also complicates IALDF's detention-related work. Because detained IALDF clients and prospective clients are subject to consular-notification and detention practices, see 8 C.F.R. § 236.1(e), and because the government has caused or threatens to cause the disclosure of protected asylum-related information to a foreign government, IALDF must now conduct additional individualized risk screening, advise clients about the risk that their information or their detention may be disclosed to the Islamic Republic of Iran, prepare or consider emergency and protective filings, and engage in safety planning for clients whose family members and acquaintances remain exposed to retaliation inside Iran.

**Operational Injury and Diversion of IALDF's Resources**

Declaration of Ali Rahnama — Page 6

21.    As a direct result of the challenged policy, IALDF has had to change how it operates. IALDF has revised and redesigned its intake system to add hours of conversation with each detainee in order to determine whether the detainee has had any encounter with officials of the Islamic Republic of Iran, and how any such encounter has affected the detainee and the detainee's family members or acquaintances — all in addition to IALDF's ordinary intake regarding the client's case and detention conditions. These longer intakes are now a standard part of IALDF's screening.

22.    IALDF has also been required to spend substantial staff and attorney time as a result of this unlawful disclosure policy that also facilitates forced deportations to the Islamic Regime in Iran, to deal with emergency (and unexpected) work in attempting to respond to and prevent those deportations, such as by drafting and filing UN complaints and TROs in federal court, as well as helping obtain expert declarations on country conditions to stop chain refoulement through third country removals.

23.    IALDF has also been required to spend substantial staff and attorney time on new tasks generated by the policy: researching the governing law and case authority in order to advise detainees who fear that their information may be shared with the regime; conducting disclosure-risk screening and safety planning; extra traveling time to detention facilities in Arizona, Georgia, Louisiana, Mississippi, and Texas; and spending hundreds of hours on the telephone with detainees and their relatives and contacts in the United States, to address the fallout from the policy. These have resulted in delayed intakes, lost client candor, additional visits, and matters IALDF could not accept.

24.    These operational changes have measurable costs to IALDF, which I can quantify as follows. As a result of the additional disclosure-risk screening the challenged policy requires, each client intake and detention interview now takes approximately 20% longer than it did before. Also, in many cases, this issue adds additional days of visiting detainees as establishing the necessary trust has become a serious hurdle. Across IALDF's small legal-services team, I estimate that disclosure-risk screening, safety planning, legal research about the information-sharing policy, and related emergency communications now consume on the order of 5 to 10 additional attorney and staff hours per week — time

that was previously spent on substantive case work, educational campaigns, and connecting clients to pro bono counsel.

25. Because IALDF's capacity is fixed and its services are provided pro bono, this added work directly reduces the number of people IALDF can serve. The longer intakes and added screening mean that IALDF can take on meaningfully fewer new clients and conduct fewer detention visits than it otherwise could — I estimate a reduction of roughly 20% to 25% in new matters our team can absorb — and a growing share of our existing matters now require more intensive, time-consuming attention because of the disclosure risk. To absorb this work, IALDF has had to reassign attorney and staff time away from other parts of its program and the development of its community legal-resource materials. In addition, this work strains IALDF's ability to meet deliverables and requirements tied to its funding, emergency work the policy has generated, and the diversion of capacity puts at risk IALDF's ability to satisfy existing funder commitments and to secure future funding.

26. The challenged policy has also forced IALDF to change how it operates at a structural level. IALDF has revised its intake scripts and questions to add a dedicated module screening for any contact with Iranian government officials; expanded its staff and volunteer training and supervision to cover disclosure-risk counseling and safety planning; and modified its referral protocols so that local pro bono counsel are alerted to the disclosure risk when a matter is referred.

27. This is not generalized advocacy or mission-related spending. It is a concrete impairment of, and diversion of resources away from, the specific legal services — confidential intake, asylum screening, detention visits, and referral — that IALDF already provided to the people it serves before the challenged policy. The policy has made it harder, and in some instances impossible, for IALDF to deliver those preexisting services.

**The Injury Is Ongoing and Imminent**

28. The harm to IALDF is ongoing and imminent. IALDF continues to conduct intake and detention visits with Iranian asylum seekers on a regular basis, and it continues to encounter clients who fear that their information has been or will be disclosed to the Islamic Republic of Iran. So long as ICE and the Department of State continue the challenged disclosure and

access practices, IALDF will continue to incur the added intake time, screening, research, safety planning, and trust-repair burdens described above, and will continue to be impaired in delivering its legal services to the detained asylum seekers it serves and is imminently likely to serve.

**Causation and Redressability**

29. IALDF's operational injuries are directly caused by the challenged policy itself — the disclosure of protected, asylum-related information to representatives of the Islamic Republic of Iran and ICE's facilitation of an Iranian government official's access to detained asylum seekers — and not by independent third-party decisions or general immigration conditions. It is the disclosure and the facilitated access, and the well-founded fear they create among IALDF's clients, that have forced IALDF to lengthen its intakes, add disclosure-risk screening and safety planning, divert attorney time to legal research and emergency work, and alter its intake forms, scripts, training, and referral protocols.

30. These injuries would be redressed by the relief sought in this action. An order barring the challenged policy would directly reduce or eliminate IALDF's operational impairment: clients would have less reason to withhold asylum-related information, IALDF could return its intake, screening, and detention-visit processes to their prior form, and IALDF could redirect the staff and attorney time now consumed by disclosure-risk work back to the legal services it provides. Unlike a case in which the requested remedy would not reach the conduct causing the injury, the relief sought here is directed at the very disclosure and access practices that are impairing IALDF's services.

31. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on **July 14, 2026**, in Washington, D.C.                    .

**Ali Rahnama**
Interim Executive Director
Iranian American Legal Defense Fund