**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IRANIAN AMERICAN LEGAL DEFENSE FUND,<br><br>        *Plaintiff*,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, et al.,<br><br>        *Defendants*. | Civil Action No. 26-cv-02375-ACR |

**DECLARATION OF CYRUS MEHRI**

I, Cyrus Mehri, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct. If called as a witness, I could and would testify as follows.

**Background**

1.      I am an attorney and a member in good standing of the bars of Washington, D.C., and Connecticut. I graduated from Cornell Law School in 1988, clerked for U.S. District Court Judge John T. Nixon in the Middle District of Tennessee, then joined Cohen Milstein Hausfeld & Toll in 1989. In 1998, I left Cohen Milstein to start my own firm.

2.      My primary practice has been in the field of civil rights. I co-founded Mehri & Skalet, a firm of about ten attorneys, which is currently located at 2000 K Street NW, Washington, D.C. Our website is findjustice.com. I have been co-lead counsel in some of the largest race and gender discrimination cases in U.S. history. The hallmark of our settlements is programmatic relief that improves company policies and practices on a going forward basis.  By way of example, in federal court in the District of Columbia, I served as co-lead counsel and court appointed class counsel in three successful gender discrimination class actions: *Brown v. Medicis Pharm. Corp.*, No. 13-cv-01345 (D.D.C.) (Leon, J.); *Carter v. Wells Fargo Advisors, LLC*, No. 09-cv-01752 (D.D.C.) (Kollar-Kotelly, J.) and

*Augst-Johnson v. Morgan Stanley & Co., Inc.*, No. 06-cv-01142 (D.D.C.) (Kollar-Kotelly,J.). I have practiced in federal courts all over the country.

3.  I am well-known within the Iranian American community in part because my firm, Mehri & Skalet, helped lead the legal and community effort by Iranian American organizations challenging President Trump's first travel ban in litigation that became known as *Pars Equality Center v. Trump* (D.D.C.) (Chutkan, J.) The case sought to protect Iranian Americans and other affected communities from the discriminatory and harmful effects of Executive Order 13769, commonly known as the first travel ban. In the challenge to that Executive Order, *Trump v. Hawaii*, 585 U.S. 667 (2018), we filed an amicus brief in the Supreme Court on behalf of Iranian American organizations, presenting evidence about the ban's real-world impact, including family separation and the government's ineffective waiver process. Our brief was cited favorably by four Justices: Justice Breyer, joined by Justice Kagan, relied on the brief's evidence regarding waiver denials, and Justice Sotomayor, joined by Justice Ginsburg, cited the brief in concluding that the waiver process was, in practice, "vanishingly rare" and arbitrary.

4.  The U.S. State Department featured my profile in its publication *Faces of Successful Iranian Americans*, titled "Cyrus Mehri: A Lawyer with a Conscience."

5.  In 2025, I co-founded the Iranian American Legal Defense Fund (IALDF) to advocate for and protect the Iranian American diaspora, a community of more than one million people in the United States. Iranian Americans are a high-impact immigrant community that has contributed profoundly to every sector of American life, including business, medicine, law, technology, the arts, academia, public service, and civic life. Members of the community have been especially influential as entrepreneurs and leaders in Silicon Valley, founders of small businesses, job creators, public-sector professionals, educators, physicians, attorneys, engineers, artists, members of the military, and first responders who serve communities across the country. Iranian Americans are also among the most highly educated immigrant groups in the United States, with a significant share holding graduate and professional degrees. Notwithstanding these contributions, Iranian Americans have faced persistent discrimination and exclusion, including being disproportionately harmed by travel bans, subjected to discrimination in the marketplace and public life, and, at times, targeted by hate crimes and bias-motivated harassment.

6.   IALDF was launched on July 4, 2025, the 249th anniversary of the Declaration of Independence. We chose that date deliberately: the Declaration's promise of liberty, equality, and opportunity reflects the ideals that drew generations of Iranian Americans to this country, while the American Founders themselves looked across world history, including to ancient Iran, for examples of governance, tolerance, and human dignity. We understood at the time of IALDF's inception that our community faced serious and growing challenges, but we could not have imagined how quickly the need for this organization would become urgent.

**Mass Deportations of Iranians**

7.   The Islamic Republic of Iran and the United States have been adversaries since the 1979 hostage crisis and have had no formal diplomatic relations for nearly half a century. Yet, in late September 2025, we were stunned to learn that the U.S. government and the Islamic Regime had reached an agreement to work together to mass deport asylum seekers fleeing the Islamic Regime, including individuals who face risks of persecution, torture, and death if returned. This arrangement raises grave concerns under U.S. and international law prohibiting refoulement.

8.   The principle of non-refoulement is the cornerstone of international refugee protection. It prohibits returning a person to a country where the person's life or freedom would be threatened, or where there are substantial grounds to believe the person would face torture or other irreparable harm. This obligation is binding on the United States under both treaty and domestic law. Internationally, Article 33 of the 1951 Refugee Convention, as incorporated through the 1967 Protocol, prohibits returning individuals to territories where their life or freedom would be threatened. In addition, Article 3 of the Convention Against Torture independently bars removal where there are substantial grounds to believe an individual would face torture. Congress codified these protections into domestic law through the Immigration and Nationality Act (INA), including Section 208 of the INA, 8 U.S.C. § 1158, and Section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), as well as Section 2242 of the Foreign Affairs Reform and Restructuring Act (FARRA), and implementing regulations at 8 C.F.R. §§ 208.16–208.18 and 1208.16–1208.18. Together, these provisions require the United States to provide a meaningful opportunity to seek asylum, withholding

of removal, and CAT protection before removing individuals to countries where such risks exist.

9.     The mass deportation flights to Iran violate each of these protections. The asylum seekers placed on these flights are precisely the individuals to whom non-refoulement protections most clearly apply: participants in the 2022 Woman, Life, Freedom movement; converts to Christianity and members of other religious minorities; and members of the LGBTQ community—each of whom faces a well-documented risk of imprisonment, torture, or execution upon return to the Islamic Republic of Iran. Removing these individuals to Iran without meaningful and individualized determinations of their protection claims breaches the United States' binding obligations under Article 33 of the Refugee Convention, Article 3 of the Convention Against Torture, Sections 208 and 241(b)(3) of the INA, Section 2242 of FARRA, and their implementing regulations. Coordinating those removals with representatives of the very regime from which these asylum seekers fled compounds the violation.

10.    Religious minorities, and particularly Christian converts, face especially grave danger if returned to Iran. The Islamic Republic has long treated conversion from Islam, underground church activity, and religious expression outside state-approved channels as threats to the regime. IALDF's investigation has confirmed that Christian converts are among the Iranian asylum seekers who have been deported or remain at risk of deportation.

11.    I have worked closely with IALDF's Interim Executive Director, Ali Rahnama, to address this human rights crisis. IALDF has submitted Freedom of Information Act requests to U.S. Immigration and Customs Enforcement, U.S. Customs and Border Protection, and the U.S. Department of State seeking records concerning the diplomatic, legal, and operational coordination underlying the removal, expulsion, or transfer of Iranian nationals from the United States to the Islamic Republic of Iran.   In April 2026, IALDF filed a complaint in federal court in Washington, D.C., seeking declaratory and injunctive relief regarding these FOIA requests.  We filed this case on July 7, 2026.

12.    Led by Mr. Rahnama, IALDF representatives have visited ICE detention facilities and met with Iranian asylum seekers in several states including Arizona, Georgia, Louisiana, Mississippi and Texas.  I joined Mr. Rahnama on visits to ICE detention centers in

Folkston, Georgia to meet Iranian asylum seekers myself.  Through those visits and related investigation, IALDF learned that many of these asylum seekers face grave risks if returned to Iran because they participated in the 2022 Woman, Life, Freedom movement, belong to religious minorities, converted to or promoted Christianity, or are members of the LGBTQ community. IALDF has also educated members of Congress about the mass deportation flights. Those efforts contributed to a public letter from twelve U.S. Senators to Secretary of State Marco Rubio raising concerns that the administration was returning individuals to a country where they may face persecution or torture, in violation of U.S. and international law. IALDF has raised similar concerns with human rights organizations, including Freedom House; filed urgent communications with the United Nations Committee Against Torture in connection with threatened removals; and worked with pro bono counsel on habeas petitions and related emergency litigation.

13.  Tragically, the Islamic Republic of Iran remains one of the world's most repressive governments. Its record includes systematic persecution, arbitrary detention, torture, coerced confessions, denial of fair trials, executions, and brutal suppression of peaceful dissent. Recent nationwide protests in early 2026 were met with extraordinary violence, including reports of mass killings of tens of thousands, mass imprisonment, and the maiming or serious injury of countless protesters who sought basic dignity, freedom, and democratic change. The Islamic Regime publicly executed over 800 individuals this year alone, according to Iran Human Rights Monitor's June 2026 report. This repression is not only a human rights catastrophe; it is also the deliberate suppression of the extraordinary human capital of more than 90 million Iranians, whose talents and aspirations have been constrained by an authoritarian system that fears its own people.

14.  The U.S. Department of State's own 2024 Country Reports, published on August 12, 2025, confirm this well-documented pattern of repression. In its most recent Country Report on Human Rights Practices for Iran, the State Department identified that the Islamic Republic of Iran executed hundreds of prisoners in 2024 alone, including many who confessed under torture and faced unfair trials. Some of those included a number of prisoners detained in connection with protests related to the Woman, Life, Freedom movement who were arrested, sentenced to prison and death, subjected to torture, or executed during the year. The State Department further identified serious human rights abuses, including arbitrary or

unlawful killings, enforced disappearance, torture or cruel, inhuman, or degrading treatment or punishment, harsh and life-threatening prison conditions, arbitrary arrest and detention, serious restrictions on freedom of expression, assembly, association, and religion, and the denial of fair trial guarantees. These official findings confirm that individuals returned to Iran—particularly political dissidents, religious converts, women's rights advocates, protesters, and other perceived opponents of the regime—face a grave and foreseeable risk of persecution, imprisonment, torture, or worse.

15.     Notwithstanding this documented pattern of repression, the United States government is coordinating with the Islamic Regime to carry out mass deportation flights to Iran. According to public reporting, the first deportation flight arrived in Tehran via Qatar in late September or early October 2025, and additional flights followed in December 2025 and January 2026.  The January flight occurred just a couple of weeks after the Islamic Regime massacred tens of thousands of protesters.

**The U.S. Government Has Provided Confidential Information to The Iranian Regime**

16.     During IALDF's visits with Iranian asylum seekers detained by ICE, Mr. Rahnama met with individuals who reported that a senior official from the Islamic Republic of Iran's Interest Section in Washington, D.C., had been permitted direct access to Iranian detainees in ICE custody. According to these detainees, facility personnel instructed Iranian detainees to meet with the Iranian Regime official who knew their names and possessed specific information about their detention status, immigration proceedings, and court cases. Detainees understood him to be encouraging return to Iran while minimizing the risks they would face. These accounts are consistent with IALDF's broader concern that the U.S. government coordinated with representatives of the Islamic Republic of Iran in connection with mass deportation flights and shared information concerning Iranian nationals facing removal to Iran.

17.     On Tuesday, March 24, 2026, at approximately 12:30 p.m. Eastern Standard Time, I received an unsolicited and unexpected telephone call from the Senior Official of Iran's Interest Section in Washington, D.C.

18. I had previously met in person with this individual on at least two occasions and spoken with him by telephone on a few occasions. Those interactions were approximately fifteen years ago in connection with a trip my father made to Iran who was visiting Iran for the first time in approximately 40 years.  This Senior Official assisted my father to receive his Iranian Passport and with necessary paperwork and travel documentation.

19. During the telephone call on March 24, 2026, the Senior Official began by asking how my father was doing. I informed him that my father had passed away in 2022. He expressed condolences and then stated that he wanted to share with me his perspective regarding his visits to Iranian detainees held in ICE facilities and requested that we meet in person to discuss the matter further.

20. I made clear to the Senior Official that as a lawyer advocating on behalf of Iranian detainees seeking freedom from detention and asylum from the Iranian Regime, we were on opposite sides. I wanted him to understand that I was a lawyer investigating the very issue he wanted to talk about and that we were in adverse positions. I said words to the effect of: I am trying to help these asylum seekers obtain freedom from detention and protection in the United States; you are trying to take them back. He said "I understand" but that he wanted me to understand his perspective.

21. The Senior Official began by stating that he was visiting ICE detention centers in response to detainees asking for or needing help. The Senior Official disclosed that, approximately one year earlier, the U.S. State Department had instituted a new system and new policy concerning Iranian detainees. He stated that this change in policy was initiated by the U.S. Department of State reaching out to him, and that a meeting took place in Washington, D.C., under the auspices of the Embassy of Pakistan. At this meeting, according to the Senior Official, the State Department stated, in substance and effect, that the State Department wanted to "get rid of Iranian detainees" and asked the Islamic Regime for help.

22. The Senior Official stated that, pursuant to coordination between the Islamic Regime and the U.S. government, 150-160 Iranians were sent back to Iran and that many were asylum seekers.

23. The Senior Official stated that, pursuant to this new U.S. State Department-Islamic Regime policy, the Islamic Republic of Iran's Interest Section and ICE liaison officials met monthly

to review files of detainees and to select individuals for deportation including mass deportation flights. He indicated that this arrangement meant that the Islamic Republic of Iran had obtained the names and detailed information of Iranian asylum seekers— individuals who had sought protection from the very government now receiving their confidential case information.

24. The Senior Official stated that the last monthly in person meeting between the Interest Section and ICE occurred just before the war started on February 28, 2026.

25. The Senior Official stated that he maintained individual files on each detainee, including information about what was happening with their court hearings and legal processes. He also received copies of their final removal orders. Final removal orders often contain sensitive confidential information about asylum claims. He mentioned that he also helped detainees with their documents.

26. The Senior Official was trying to make the case that it was the asylum seekers themselves who were pushing him to help them return to Iran and that he was helping them either to self-deport or to go to a third country because their situation in U.S. detention was not tenable when ICE is keeping them in detention for a year or more. Contrary to his claims, IALDF's investigation reveals that many asylum seekers were coerced to meet with him while in ICE detention.

27. The Senior Official stated that he had visited ICE detention facilities in Florence, Arizona and in the San Diego, California area. He stated that he had plans to visit facilities in Louisiana, Chicago, and Texas, before the war started on February 28, 2026, which stopped those visits. He stated that he wanted to go to the bigger facilities that held more Iranian nationals.

28. As I pressed for more information during the call, the Senior Official became more cautious and began providing less information. Also at times he said, "I need to check my notes."

29. During the call, we discussed the number of detainees. The Senior Official stated that there were approximately 400 to 500 Iranian asylum seekers that ICE was detaining but approximately up to 4,000 Iranian nationals in total within the ICE system.

30. The Senior Official stated that he had helped ICE and the State Department to distinguish Iranian national detainees from other detainees. He made clear he was working in close coordination with ICE and the State Department.

31. The Senior Official disclosed that he had helped facilitate the deportation of approximately 150 to 160 Iranian nationals to Iran. He stated that these individuals were mostly between 30 and 40 years of age. He stated that he knew where each of these individuals was in the legal process.

32. The Senior Official stated that ICE was providing introductions for him to meet with these detained individuals at the facilities.

33. Our call lasted about twenty minutes, at the end of which the Senior Official insisted on meeting in person. I made no commitment at the time.

34. He confirmed my worst fears—that the U.S. government was working closely with the Islamic Regime, sharing confidential information, and deporting asylum seekers in coordination with the Islamic Regime. After the call, upon reflection, I concluded that I had a duty to gather more facts. So, the next day, I called the Senior Official and asked him to come to my office the following day, March 26, 2026.

35. On Thursday, March 26, 2026, the Senior Official came to my office at 2000 K Street, NW, Washington, D.C. for an in-person meeting. Also present in the conference room were Ali Rahnama, a fellow board member and Interim Executive Director of the IALDF, and Richard Condit, a partner at my firm who specializes in whistleblower law.

36. The meeting with the Senior Official started at 3:00 p.m. and lasted about 75 minutes. He indicated that he was speaking with us frankly but "confidentially." I informed him that what he told us could not be treated as confidential because Mr. Rahnama and I have key roles with the IALDF and that the IALDF has an ongoing investigation on behalf of asylum seekers fleeing the Islamic Regime. Nevertheless, during this meeting, the Senior Official provided detailed information about the following matters.

37. Expanding on what he had told me during our telephone call, the Senior Official provided additional details about the State Department's outreach. He stated that approximately five days before the Iranian New Year (Norooz) in 2025, the second-ranking official at the

Embassy of Pakistan contacted the Iranian Interest Section to convey that the United States government wanted to speak with them. A meeting was subsequently arranged and held at the U.S. Department of State.

38. The Senior Official stated that the U.S. State Department representative at this meeting was described as the general director of the Middle East section. The Senior Official described this individual as being of Indian descent and a Georgetown University graduate.

39. According to the Senior Official, the State Department representative stated, in substance, that the U.S. government wanted to "get rid of all Iranians, illegals." The Senior Official told me he became upset at this characterization and responded to the State Department representative by noting that Iranians came to the United States with money and innovation, that the number of undocumented Iranians should not exceed 4,000 to 5,000 out of a community of at least 1.6 million, and that the number of Iranian detainees was small relative to the number of ICE detainees from other nationalities.

40. The Senior Official stated that the State Department had conducted similar outreach meetings with other embassies as part of a broader effort to deport people.

41. The Senior Official stated that during the meeting he asked the State Department to provide a list of the detained Iranian nationals they wished to deport for the Interest Section to consider. He stated that the U.S. government representatives did not have a complete list but that, at the end of the meeting, a liaison provided approximately 150 names for his consideration.

42. The Senior Official elaborated on the monthly meetings he had described during our telephone call. He stated that at these monthly meetings, ICE brought documents pertaining to individual detainees and asked the Interest Section to consider those cases. He stated that, for each detainee, ICE provided their legal and immigration documents, including judge's orders, applications, and—critically—asylum applications and related information. In other words, the U.S. government provided the Islamic Republic of Iran with the names, legal case details, and asylum information of Iranian nationals who had sought protection from the Iranian government.

43.   The Senior Official further stated that ICE initially mailed these document packages to the Interest Section but also had more recently begun delivering them in person. ICE officers, described as liaisons, would come to the Interest Section's office and hand the documents directly to the Islamic Regime's representatives. He stated that even as of the date of our meeting, the Interest Section received new cases by hand delivery.

44.   The Senior Official stated that the Interest Section would then contact the individual detainees and ask them what they wanted to do. He stated that ICE provided introductions for him to meet with these detainees in person at the facilities.

45.   The last in-person meeting with ICE, according to the Senior Official, took place in the month before the U.S.–Iran war began on February 28, 2026. He stated that although the monthly in-person meetings had stopped just before the war started, ICE continued to deliver document packages to the Interest Section. He stated that on the date of our meeting, March 26, 2026, he had received files on five detainees.

46.   The Senior Official also stated that the current administration's detention policy represents a sharp departure from prior practice — including that of the first Trump Administration — under which Iranian detainees were typically released after approximately 90 days and then required to report for periodic check-ins. He explained that the current practice is designed to demoralize detainees to the point that they lose hope and agree to self-deport.

47.   The Senior Official stated that detainees were approximately 80 to 90 percent newcomers to the United States who had been detained by ICE, with most having entered the United States in San Diego. Some had entered at Port Isabel, El Paso, or other entry points.

48.   The Senior Official stated that the U.S. government had provided him with detailed information on approximately 300 to 400 Iranian detainees. The Senior Official further indicated that this information-sharing process remained ongoing notwithstanding the armed conflict that commenced on February 28, 2026, between the United States and Iran.

49.   The Senior Official provided additional details about his visits to detention facilities. He stated that he traveled alone to these facilities, but that if he knew attorneys in those cities, he would sometimes go with them.

50.    He stated that in Arizona, most of the Iranian detainees were newcomers, while at the facility near Palm Springs, California, the detainees had been in the United States for years and were generally more affluent.

51.    The Senior Official stated that he had personally spoken to over 200 detainees.

52.    The Senior Official stated that the first mass deportation flight departed from Alexandria, Louisiana, on approximately September 30, 2025, traveling through Qatar to Iran. It was originally supposed to carry approximately 120 deportees, but the Qatari government did not accept that number, and ICE had failed to provide passports or other travel documents for some detainees. Ultimately, approximately 50 to 60 individuals were deported on this flight. He stated that among the 50 to 60 deportees, two individuals visibly resisted leaving. He stated those two deportees cut their wrists with razors in protest and were taken to the hospital. He indicated that he met with the detainees prior to the mass deportation flights.

53.    The Senior Official stated that the second mass deportation flight departed on approximately December 7, 2025. The flight was supposed to carry approximately 55 individuals but left with approximately 35 on board because ICE had misplaced detainee documents.

54.    The Senior Official stated that the third flight, on approximately January 25, 2026, was supposed to carry approximately 51 to 52 individuals but because of a measles outbreak among the detained, ultimately 14 to 15 individuals departed.

55.    The Senior Official stated that a fourth flight had been planned for the end of March but had not occurred due to the war.

56.    The Senior Official stated that additional deportees were sent back on commercial flights.

57.    The Senior Official stated that the U.S. government did not inform the Interest Section of the exact departure or arrival times for flights transiting through Qatar or Kuwait. He stated that on the first flight, ICE sent the detainees in "bad and nasty jail clothing." For the second and third flights, the Senior Official stated that he personally purchased clothing from Costco for the detainees and gave them money to have upon arrival in Iran as some had no money or were from towns far from the capital Tehran. He stated that the detainees were handcuffed and shackled throughout the plane rides.

58.     The flight routes, according to the Senior Official, were organized by ICE through Omni Corporation from the United States to the Middle East and then from there via Qatar and Kuwait airways to Iran. He indicated that Qatar will no longer be the intermediary country.

59.     I specifically asked the Senior Official whether the U.S. government had asked Iran or its Interest Section to guarantee the safety or well-being of the returned asylum seekers upon their arrival in Iran. The Senior Official stated unequivocally that the United States did not ask for any protections for the deportees, did not provide any protocol regarding their treatment, and did not request any assurances whatsoever.

60.     When I asked about the safety of individuals who had applied for asylum based on political persecution —such as Woman, Life, Freedom protesters— the Senior Official stated that "according to Iranian law, applying for asylum is not a crime." However, he acknowledged that individuals who had "actually tried to convert people to Christianity" might face problems upon return, which, he acknowledged, could include imprisonment.

61.     The Senior Official noted that many of the deportees on the flights had applied for asylum and that Christian asylum seekers in particular often crossed the U.S. border "holding a bible or something to show they are asylum seekers."

62.     When I asked specifically about participants in the "Woman, Life, Freedom" protests, the Senior Official stated that if a protester had "hurt a police officer or something," they could face consequences, indicating again that this could include imprisonment.

63.     When I asked about the safety of LGBTQ individuals upon return to Iran, the Senior Official stated that during a trip to Iran, he had asked Iranian officials at the foreign ministry about this issue. He stated that the officials told him such individuals were "fine" and referenced a park next to their building—Park Shahr—where he said police "protected them" under what he described as a "no ask, no tell" policy. He did not directly answer whether LGBTQ asylum seekers could face prosecution, imprisonment, or other harm under Iranian law if returned.

64.     I asked the Senior Official on two separate occasions during the meeting whether there was any written agreement between the Iranian government and the U.S. government that prompted or governed this deportation process.

65. The Senior Official stated that there was no written agreement—"just a pressure by U.S. government  that we have to accept these people." He stated that the U.S. government told them they had two choices: either Iran takes the deportees including asylum seekers back or the U.S. government sends them to a third country. He noted that the U.S. government had in fact sent some Iranians to Panama.

66. He stated that under the Administration's new policy, detainees are typically held well over a year, with many facing no apparent end to their detention. He stated that the current administration's policy represented a fundamental departure from practice of all prior administrations including the first Trump Administration.

67. Based on the facts described above, the U.S. government's conduct raises grave legal concerns in at least three fundamental ways. First, the U.S. government has permitted representatives of the Islamic Republic of Iran—the very regime from which these asylum seekers fled—to gain direct access to Iranian asylum seekers held in U.S. immigration detention. Second, the U.S. government has shared confidential and highly sensitive information concerning those asylum seekers' immigration proceedings and protection claims with representatives of that regime, raising serious concerns under U.S. asylum-confidentiality protections. Third, the U.S. government has coordinated mass deportation flights and other removals of Iranian asylum seekers to Iran without adequate safeguards against refoulement—the return of individuals to a country where their life or freedom may be threatened, or where they face a substantial risk of torture, persecution, imprisonment, or death. These actions are inconsistent with the protective purposes of U.S. asylum, withholding-of-removal, and Convention Against Torture laws. It also runs counter to America's longstanding tradition dating back to founders such as George Washington and James Madison of upholding America as a home for those fleeing tyranny. Instead of America being a beacon of hope, the new policy, adopted in March of 2025 and implemented through periods of war and tenuous peace, betrays American values on its 250th Anniversary.

Executed on July 9, 2026.

_____
Cyrus Mehri
2000 K Street, NW
Washington, D.C. 20006