UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IRANIAN AMERICAN LEGAL DEFENSE FUND, <br><br> Plaintiff, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, et al., <br><br> Defendants. | Civil Action No. 26-2375 (ACR) |

**OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Table of Contents.................................................................................................................... i

Table of Authorities ............................................................................................................... ii

Introduction ...........................................................................................................................1

Background.............................................................................................................................2

      I.       Removal Processes...................................................................................................2

      II.     Plaintiff's Complaint and Motion for Preliminary Injunction...............................3

Legal Standards......................................................................................................................4

Argument................................................................................................................................5

      I.       Plaintiff is Unlikely to Succeed on the Merits........................................................5

            A.     The Court Lacks Jurisdiction. ..................................................................5

            B.     Plaintiff Cannot Seek Ultimate Relief in a Preliminary Posture..............27

            C.     Plaintiff's APA Claim Fails on the Merits...............................................28

      II.     Plaintiff Has Failed to Establish it Suffers Irreparable Harm..............................34

      III.    The Balance of the Equities and Public Interest Favor Denying Injunctive Relief. ..............................................................................................................................38

      IV.    The Court Should Require Plaintiff to Post Security. ..........................................40

      V.     The Court Should Stay Any Injunctive Relief.....................................................41

Conclusion ............................................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocates for Human Rights v. DHS*,
  825 F. Supp. 3d 858 (D. Minn. 2026) ................................................................7, 12

*All. for Retired Americans v. Bessent*,
  770 F. Supp. 3d 79 (D.D.C. 2025) ...........................................................................35

*Alvarez v. ICE*,
  818 F.3d 1194 (11th Cir. 2016) ................................................................................15

*Am. Foreign Serv. Ass'n v. Trump*,
  No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ....................................39

*Anim v. Mukasey*,
  535 F.3d 243 (4th Cir. 2008) ...................................................................................20

*Appalachian Voices v. FERC*,
  139 F.4th 903 (D.C. Cir. 2025)................................................................................27

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006).....................................................................................................5

*Arce v. United States*,
  899 F.3d 796 (9th Cir. 2018) ...................................................................................15

*Assoc. for Ed. Finance & Policy, Inc. v. McMahon*,
  786 F. Supp. 3d 13 (D.D.C. 2025) ...........................................................................33

*Babakhani v. Gantt*,
  2026 WL 1822995 (W.D. Okla. Jun. 24, 2026).......................................................36

*Ban v Marin*,
  2026 WL 562140 (C.D. Cal. Feb. 24, 2026) ..........................................................30

*Barnes v. E-Sys., Inc. Grp. Hosp Med. & Surgical Ins. Plan*,
  501 U.S. 1301 (1991) ...............................................................................................38

*Benisek v. Lamone*,
  585 U.S. 155 (2018) ....................................................................................................5

*Biden v. Texas*,
  597 U.S. 785 (2022)..................................................................................................24

*Biovail Corp. v. FDA*,
448 F. Supp. 2d 154 (D.D.C. 2006) ................................................................................37

*Monsalvo v. Bondi*,
604 U.S. 712 (2025) ........................................................................................................19

*Bonhometre v. Gonzales*,
414 F.3d 442 (3d Cir. 2005) ...........................................................................................18

*California Valley Miwok Tribe v. Haaland*,
Civ. A. No. 24-0947 (TSC), 2024 WL 4345787 (D.D.C. Sept. 30, 2024)......................34

*Camarena v. Director, Immigr. and Customs Enf.*,
988 F.3d 1268 (11th Cir. 2021) ................................................................................16, 17

*Canal A Media Holding, LLC v. USCIS*,
964 F.3d 1250 (11th Cir. 2020) ......................................................................................19

*Chaplaincy of Full Gospel Churches*,
454 F.3d (D.C. Cir. 2006).....................................................................................35, 36, 37

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995)............................................................................................5

*Coalition for Humane Immigrant Rights v. Dep't of Homeland Sec.*,
780 F. Supp. 3d 79 (D.D.C. 2025) .............................................................................10, 31

*Cobell v. Kempthorne*,
455 F.3d 301 (2006) .................................................................................................32, 34

*Colindres v. Dep't of State*,
71 F.4th 1018 (D.C. Cir. 2023)...........................................................................28, 29, 32

*Cruz v. DHS*,
2019 WL 8139805 (D.D.C. Nov. 21, 2019) ....................................................................37

*United States v. Curtiss-Wright Export Corp.*,
299 U.S. 304 (1936) ........................................................................................................15

*Dallas Safari Club v. Bernhardt*,
453 F. Supp. 3d 391 (D.D.C. 2020) ................................................................................27

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018) ..................................................................................4

*Davis v. Pension Ben. Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) .................................................................................4

*Dayo v. Holder*,
    687 F.3d 653 (5th Cir. 2012) ...................................................................................20

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety and Homeland Sec.*,
    108 F.4th 194 (3d Cir. 2024) ...................................................................................27

*Disability Rts. Council of Greater Wash. v. WMATA*,
    234 F.R.D. 4 (D.D.C. 2006) .....................................................................................27

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999)....................................................................................40

*E.F.L. v. Prim*,
    986 F.3d 959 (7th Cir. 2021) ....................................................................... 14, 16, 17

*Elgharib v. Napolitano,*
    600 F.3d 597 (6th Cir. 2010) ...................................................................................14

*Eshaghian v. Howard*,
    2026 WL 63451 (D. Ariz. Jan. 8, 2026).....................................................................2

*Eshaghpour v. Bondi*,
    2026 WL 100603 (W.D. Wash. Jan. 14, 2026) ..........................................................2

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) .......................................................................................... 6, 7, 9

*Fedorca v. Perryman*,
    197 F.3d 234 (7th Cir. 1999) ...................................................................................17

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015)....................................................................................7

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975)..................................................................................37

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) .................................................................................................24

*Wisc. Gas Co. v. F.E.R.C.*,
    758 F.2d 669 (D.C. Cir. 1985)..................................................................................35

*Ghafouri v. Noem*,
  2025 WL 3085726 (S.D. Cal. Nov. 4, 2025) ........................................................................30

*Gomez-Chavez v. Perryman*,
  308 F.3d 796 (7th Cir. 2002) ...............................................................................................17

*Growth Energy v. EPA*,
  5 F.4th 1 (D.C. Cir. 2021)......................................................................................................8

*Gulf Coast Mar. Supply, Inc. v. United States*,
  867 F.3d 123 (D.C. Cir. 2017)..............................................................................................29

*Haig v. Agee*,
  453 U.S. 280 (1981) ..............................................................................................................40

*Hamama v. Homan*,
  912 F.3d 869 (6th Cir. 2018) .........................................................................................14, 16

*Hawkins v. Haaland*,
  991 F.3d 216 (D.C. Cir. 2021)................................................................................................8

*Hilton v. Braunskill*,
  481 U.S. 770 (1987) ..............................................................................................................41

*Holder v. Humanitarian L. Proj.*,
  561 U.S. 1 (2010)...................................................................................................................39

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002) .......................................................................................39

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022).................................................................................................5

*Ibarra-Perez v. United States*,
  179 F.4th 743 (9th Cir. 2026) ...............................................................................................26

*Immigrant Defs. L. Cntr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ....................................................................................8, 12, 13

*J.E.F.M. v. Lynch*,
  837 F.3d 1026 (9th Cir. 2016) ........................................................................................18, 19

*Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*,
  101 F.3d 145 (D.C. Cir. 1996)................................................................................................9

*Jobbers Ass'n v. FPC*,
 259 F.2d 921 (D.C. Cir. 1958)........................................................................36

*Kamyab v. Bondi*,
 2025 WL 2917522 (W.D. Wash. Oct. 14, 2025) ...................................................2

*Khalil v. President, United States*,
 164 F.4th 259 (3d Cir. 2026) ....................................................................22, 23

*Kowalski v. Tesmer*,
 543 U.S. 125 (2004) ...........................................................................11, 12, 21

*La v. Holder*,
 701 F.3d 566 (8th Cir. 2012) .......................................................................29

*Lahooti v. Noem*,
 2026 WL 700538 (C.D. Cal. Mar. 5, 2026)..........................................................2

*Laughlin v. Cummings*,
 105 F.2d 71 (D.C. Cir. 1939)........................................................................28

*Lepelletier v. FDIC*,
 164 F.3d 37 (D.C. Cir. 1999).................................................................5, 12, 13

*Lin v. Dep't of Just.*,
 459 F.3d 255 (2d Cir. 2007) ........................................................................20

*Linares v. Dep't of Homeland Sec.*,
 529 F. App'x 983 (11th Cir. 2013) ................................................................19

*Lujan v. Nat'l Wildlife Fed.*,
 497 U.S. 871 (1990)..............................................................................33, 34

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ...............................................................................6, 9

*McNary v. Haitian Refugee Ctr., Inc.*,
 498 U.S. 479 (1991)..............................................................................21, 22

*Mahdawi v. Trump*,
 --- F.4th ---, 2026 WL 2090981 (2d Cir. July 21, 2026).......................................22

*Make the Road N.Y. v. Mullin*,
 179 F.4th 16 (D.C. Cir. 2026)..................................................................4, 25, 26

*Mata v. Dep't of Homeland Sec.*,
 426 F. App'x 698 (11th Cir. 2011) ..............................................................19

*Matter of A-S-M*,
 28 I&N Dec. 282 (BIA 2021) ......................................................................20

*Momennia v. Bondi*,
 2025 WL 3006045 (W.D. Okla. Oct. 27, 2025) ...................................................30

*Mullin v. Doe*,
 609 U.S. ___, 2026 WL 1825840 (Jun. 26, 2026) ...........................................4, 26

*Mylan Pharms., Inc. v. Shalala*,
 81 F. Supp. 2d 30 (D.D.C. 2000) ................................................................37

*N.S. v. Dixon*,
 141 F.4th 279 (D.C. Cir. 2025) ..............................................................24, 25

*Nat'l Taxpayers Union, Inc. v. United States*,
 68 F.3d 1428 (D.C. Cir. 1995) ....................................................................7

*Nken v. Holder*,
 556 U.S. 418 (2009) ..........................................................................passim

*Norton v. S. Utah Wilderness All.*,
 542 U.S. 55 (2004) ..............................................................................33

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
 930 F.3d 519 (D.C. Cir. 2019) ..................................................................34

*Ozturk v. Hyde*,
 155 F.4th 187 (2d Cir. 2025) ....................................................................22

*Rauda v. Jennings*,
 55 F.4th 773 (9th Cir. 2022) ..........................................................16, 17, 18

*Rauda v. Jennings*,
 8 F.4th 1050 (9th Cir. 2021) ....................................................................17

*Reno v. American-Arab Anti-Discrimination Committee*,
 525 U.S. 471 (1999) ..........................................................................passim

*Riley v. Blanche*,
 --- F.4th ---, 2026 WL 1902557 (4th Cir. Jul. 2, 2026) ........................................19

*Ruhrgas AG v. Marathon Oil Co.*,
   526 U.S. 574 (1999) ...................................................................................................5

*Sadeghe Menar v. English*,
   2026 WL 2066139 (N.D. Ind. Jul. 17, 2026)..........................................................30

*Sadhvani v. Chertoff,*
   460 F.Supp.2d 114 (D.D.C. 2006) ...........................................................................14

*SafeCard Srvs, Inc. v. SEC*,
   926 F.2d  (D.C. Cir. 1991)........................................................................................29

*Samiei v. Blanche*,
   2026 WL 1971266 (E.D. Va. Jul. 8, 2026)..............................................................30

*Santos v. Collins*,
   Civ. A. No. 24-1759 (JDB), 2025 WL 1823471 (D.D.C. Feb. 26, 2025)................34

*Scenic Am., Inc. v. Dep't of Transp.*,
   836 F.3d 42 (D.C. Cir. 2016)..................................................................................8, 9

*Sharif ex. rel. Sharif v. Ashcroft*,
   280 F.3d 786 (7th Cir. 2002) ...................................................................................17

*Sharifi v. Raycraft*,
   2026 WL 1970782 (E.D. Mich. Jul. 8, 2026) ..........................................................36

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011)...................................................................................4

*Sherley v. Sebelius*,
   689 F.3d 776 (D.C. Cir. 2012)..................................................................................26

*Silva v. United States*,
   866 F.3d 938 (8th Cir. 2017) ...................................................................................15

*Singh v. Carter*,
   185 F. Supp. 3d 11 (D.D.C. 2016) ........................................................................4, 27

*Singh v. Napolitano*,
   500 F. App'x 50 (2d Cir. 2012) ................................................................................14

*Standing Rock Sioux Tribe v. Army Corps of Eng'rs*,
   205 F. Supp. 3d 4 (D.D.C. 2016) .......................................................................35, 38

*Starbucks Corp. v. McKinney,*
   602 U.S. 339 (2024) ................................................................................4

*Tazu v. Att'y Gen.,*
   975 F.3d 292 (3d Cir. 2020) ...........................................................passim

*Themeus v. Dep't of Just.,*
   643 F. App'x 830 (11th Cir. 2016) ..........................................................19

*Tiktok Inc. v. Trump,*
   490 F. Supp. 3d 73 (D.D.C. 2020) ..........................................................39

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ................................................................................24

*Trump v. Int'l Refugee Assistance,*
   *Proj.*, 582 U.S. 571 (2017) ..............................................................27, 38

*United States Ass'n of Reptile Keepers, Inc. v. Zinke,*
   852 F.3d 1131 (D.C. Cir. 2017) ................................................................4

*United States v. Chemical Found.,*
   272 U.S. 1 (1926) ....................................................................................28

*United States v. FCC,*
   652 F.2d 72 (D.C. Cir. 1980) ...................................................................40

*United States v. Martinez-Fuerte,*
   428 U.S. 543 (1976) ................................................................................39

*Univ. of Texas v. Camenisch,*
   451 U.S. 390 (1981) .........................................................................10, 26

*Vijdani v. Mattos,*
   2026 WL 560209 (D. Nev. Feb. 27, 2026)...............................................30

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs,*
   714 F.3d 186 (4th Cir. 2013) ..................................................................34

*Warth v. Seldin,*
   422 U.S. 490 (1975) .........................................................................10, 11

*Waterkeeper All. v. Regan,*
   41 F.4th 654 (D.C. Cir. 2022)....................................................................8

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................................................3, 4, 27

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ....................................................................................................39

**Statutes**

5 U.S.C. § 705 ..................................................................................................................3, 25

8 U.S.C. § 1229a(c)(7) ...........................................................................................................20

8 U.S.C. § 1231 .....................................................................................................................24

8 U.S.C. § 1252(b)(9) ............................................................................................................21

8 U.S.C. § 1252(f)(1) .............................................................................................................24

8 U.S.C. § 1252(f)(2) .............................................................................................................25

8 U.S.C. § 1252(g) ............................................................................................. 13, 16, 17, 18

8 U.S.C. §§ 1252(a)(5) .....................................................................................................13, 18

**Rules**

Fed. R. App. 8 ........................................................................................................................25

Fed. R. Civ. P. 65 ....................................................................................................................3

Fed. R. Civ. P. 65(c) ..............................................................................................................40

**Regulations**

8 C.F.R. § 208.6 .............................................................................................. 3, 20, 29, 32

8 C.F.R. § 236.1(e) .......................................................................................... 2, 3, 29, 32

8 C.F.R. § 1003.2 ...................................................................................................................12

8 C.F.R. § 1003.2(c) ...............................................................................................................20

**INTRODUCTION**

Defendants respectfully submit this opposition to Plaintiff Iranian American Legal Defense Fund's (the "Fund") motion for emergency relief ("PI Mot.," Dkt. 9).[1]  The Fund goes to great lengths to string together a series of legitimate, government-to-government contacts and to allege that beginning in March 2025, the United States Government has conspired with the Government of the Islamic Republic of Iran to provide Iran with confidential information about alleged Iranian asylum seekers as part of removal procedures.  That allegation is false: The United States Government has not adopted a policy of providing confidential information about Iranian asylum seekers to the Islamic Republic of Iran.  Nor does the United States Government provide the Islamic Republic of Iran such information.  Even assuming the Fund is able to clear the numerous jurisdictional bars to this lawsuit, the Fund's claims squarely fail on the merits.

The Fund is also not entitled to preliminary relief because the Fund has not established irreparable harm.  The Fund primarily argues that it must provide legal services in a timely manner but it only receives a few days' notice before a removal to Iran is effectuated.  However, no removals have occurred since March 2026, and no removals to Iran are planned for the foreseeable future.  The balance of the equities also weighs decisively against granting the Fund's requested relief.

For these reasons, Defendants respectfully request that the Court deny the Fund's motion for preliminary relief.

---

[1]    All pin cites are to the ECF-generated page numbers appearing in blue color in the top, right corer of each page.

**BACKGROUND**

**I.    Removal Processes**

Before a removal order can be executed, the government must obtain travel documents from the country to which an alien is ordered removed. Ex. 1., Detention and Deportation Officer's Field Manual Chapter 16 (attached hereto) at 9 ("With certain exceptions, you must secure travel documents before removing an alien from the United States."). To do so, ICE usually submits a travel document packet to the relevant diplomatic mission. *See, e.g.*, *Kamyab v. Bondi*, 2025 WL 2917522, at *3 (W.D. Wash. Oct. 14, 2025). That is because ICE "must rely on foreign consular officials when a deportable alien lacks the necessary travel document to enter a foreign country." Ex. 1., Detention and Deportation Officer's Field Manual Chapter 16 (attached hereto) at 16. "Many foreign consulates have their own forms, which must be completed before a travel document will be issued." *Id*. Regardless, ICE includes as part of the packet "the charging document, final order, I-205, I-294 or I-296." *Id*. at 10. ICE "[r]edact[s] any reference to asylum and withholding of removal." *Id*.; *see also* 8 C.F.R. § 236.1(e).

A removal to the Islamic Republic of Iran cannot be effectuated "unless Iran issues a travel document." *Eshaghian v. Howard*, 2026 WL 63451, at *3 (D. Ariz. Jan. 8, 2026). Obtaining travel documents for removal to Iran has been difficult. *See, e.g.*, *Lahooti v. Noem*, 2026 WL 700538, at *3 (C.D. Cal. Mar. 5, 2026) ("Petitioner has shown that removal is unlikely because Iran will not issue travel documents to him as he cannot provide both an original passport and original birth certificate."). Indeed, "Iran usually does not issue travel documents or comply with other requests of DHS." *Id*. (citation modified and collecting cases). As a result, "ICE considers Iran an 'uncooperative' country which does not facilitate the return of its citizens." *Eshaghpour v. Bondi*, 2026 WL 100603, at *3 (W.D. Wash. Jan. 14, 2026).

## II.    Plaintiff's Complaint and Motion for Preliminary Injunction

Plaintiff Iranian American Legal Defense Fund is "a non-partisan, nonprofit organization" which "provides pro bono immigration and asylum legal services through its legal-services team"; "[s]eeking release and protection for people of Iranian descent escaping from the country has been a priority of the IALDF, especially after the United States started mass deportation flights to Iran in late September 2025." Compl. (Dkt. 1) ¶ 6. Relying exclusively on multiple levels of hearsay, the Fund broadly alleges that beginning in or around March 2025, the United States Government and the Government of Iran entered into an agreement to facilitate the removal of Iranian nationals from the United States to Iran. *Id*. ¶¶ 22-25. To facilitate those removals, the Fund alleges, ICE officials engaged in regular monthly meetings with the Iranian Interests Section and have delivered immigration records of Iranians ordered removed. *Id*. ¶¶ 26-29. The Fund alleges that ICE has disclosed protected information. *Id*. ¶ 30. The Fund also alleges that ICE has been facilitating communications between Iranian Interests Section officials and Iranian detainees, *id*. ¶¶ 31-32, and that the Iranian officials were provided with information about "their immigration cases, including the details of their asylum applications," *id*. ¶ 35.

The Fund brings a single APA claim, alleging that "providing to the Iranian Government confidential information protected by 8 C.F.R. § 208.6 and 8 C.F.R. § 236.1(e)" is "contrary to law," "arbitrary and capricious," and "an abuse of discretion" in violation of the Administrative Procedure Act. *Id*. ¶¶ 61-63. As a remedy, the Fund asks this Court to enjoin the government from providing such confidential information, vacate the policy, appoint a special master to review ICE's files, provide notice to asylum seekers whose confidential information may have been released, enjoin the United States government from "deporting any Iranian ICE detainee," and other relief. Approximately one week after filing its Complaint, the Fund also moved for

preliminary relief under 5 U.S.C. § 705 and Federal Rule of Civil Procedure 65, asking for substantially the same relief.  *See* PI Mot. (Dkt. 9); *see also* Proposed Order (Dkt 9-17).

## LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  To obtain such emergency relief, the movant must show that (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest."  *Id*.  The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The Supreme Court has held that at least the second factor—irreparable harm—must be likely and "not just a possibility."  *Winter*, 555 U.S. at 20.

Before *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another.  *Damus v. Nielsen*, 313 F. Supp. 3d 317, 326 (D.D.C. 2018) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)).  The D.C. Circuit has not had occasion to conclusively decide whether that sliding scale survives *Winter* and *Nken*.  *See Make the Road N.Y. v. Mullin*, 179 F.4th 16, 24-25 (D.C. Cir. 2026).  The Supreme Court has made clear, however, that "[t]he default rule is that a plaintiff seeking a preliminary injunction must make a clear showing" as to each *Winter* element.  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024).  Following *Winter*, courts have recognized that the sliding scale approach is no longer viable and that each of the factors is now an "independent, free-standing requirement."  *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (Kavanaugh, J., concurring); *see also Singh v. Carter*, 185 F. Supp. 3d 11, 16-17 (D.D.C. 2016) (sliding scale approach is "highly questionable," and a plaintiff "bears the burden of persuasion on all four preliminary injunction factors").

- 4 -

If the Court concludes that a claim fails as a matter of law, on a point of jurisdiction or merits, then a preliminary injunction is inappropriate. *See United States Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017). "So in evaluating the likelihood-of-success question for the purpose of ruling on a request for interim relief, courts may consider both the likelihood that they have jurisdiction and the likelihood that the claim will succeed on the merits," and, "[i]f they conclude that a claim fails on either ground, they must deny interim relief." *Mullin v. Doe*, 609 U.S. ___, 2026 WL 1825840, at *11 (Jun. 26, 2026) (plurality decision). Indeed, if the Court "concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Because preliminary injunctions are not "awarded as of right," but "[a]s a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018). A showing of a strong likelihood of success on the merits can still lead to the denial of preliminary injunctive relief if the party fails to make a sufficient showing of irreparable injury. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) ("Because the Plaintiffs are likely to succeed on the merits of their § 1231 claims, we apply the other preliminary injunction factors to decide whether the Plaintiffs are entitled to relief on those claims").

## ARGUMENT

### I. Plaintiff is Unlikely to Succeed on the Merits.

#### A. The Court Lacks Jurisdiction.

This Court lacks jurisdiction on multiple grounds, any one of which is sufficient to deny the motion for preliminary relief. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("While *Steel Co.* reasoned that subject-matter jurisdiction necessarily precedes a ruling on the

- 5 -

merits, the same principle does not dictate a sequencing of jurisdictional issues."). Indeed, if the Court "concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh*, 546 U.S. at 514.

          1.      <u>Plaintiff Lacks Standing to Raise the Rights of Others.</u>

"Because [the Fund] seeks to raise the rights of third parties—the [Iranian detainees]—[it] must show that [it] has standing under Article III, *and* that [it] satisfies third party, or *jus tertii*, standing requirements." *Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C. Cir. 1999).

          a.   The Fund cannot establish Article III standing.

A federal court's jurisdiction is limited only to "Cases" and "Controversies." U.S. Const. art. III, § 2. A case or controversy exists only if a plaintiff meets the "three elements" of "the irreducible constitutional minimum of standing": (1) "the plaintiff must have suffered an injury in fact"; (2) "there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation modified).

First, the Fund has failed to establish a legally cognizable injury to itself. Its asserted injury is to its core activities – that the alleged policy has affected how the Fund delivers legal services. PI Mem. (Dkt. 9-1) at 18-19. The Supreme Court has rejected such an attenuated theory of standing. In *FDA v. Alliance for Hippocratic Medicine*, the Supreme Court held that a group of doctors could not assert standing to challenge agency actions affecting third parties—and in their view, removing protections and "public safety requirements" that might otherwise apply to those third parties—"simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries." 602 U.S. 367, 391-22 (2024). Such an "attenuated"

theory of standing, the Court reasoned, would improperly allow doctors to challenge virtually any change in policy that might indirectly affect the health or safety of potential patients because it might affect the number of patients they serve, or the time involved in helping those patients. *Id.* There "would be no principled way to cabin such a sweeping doctrinal change" that would allow various groups to challenge policies affecting their potential clients, such as "[t]eachers in border states" "su[ing] to challenge" changes to "immigration policies" that would affect the number of students in their classrooms. *Id.* at 392.

The Fund asserts that it "has been forced to make substantial operational changes." PI Mem. (Dkt. 9-1) at 20. But *Food & Water Watch, Inc. v. Vilsack*, forecloses that argument. 808 F.3d 905, 920-21 (D.C. Cir. 2015). There, a plaintiff's primary organizational purpose was "to educate the public about food systems that guarantee safe, wholesome food produced in a sustainable manner." *Id.* at 920. To challenge the decentralization of poultry inspection processes, *id.* at 910-11, the plaintiff's asserted harm was that it "would have to increase the resources that it spends on educating the general public and its members" about the inspection protocols. *Id.* at 920. It also asserted a need to "increase the amount of resources that it spends encouraging its members who wish to continue to eat chicken" from companies utilizing the new system and "purchase poultry at farmers' markets or direct from producers." *Id.* Here the Fund makes a similar assertion, specifically that "each client intake and detention interview takes approximately 20 percent longer." PI Mem. (Dkt. 9-1) at 21. But that "abstract injury to its interests" is insufficient to establish organizational standing. *Food & Water Watch*, 808 F.3d at 920. Although the Fund might need to spend more time on each interview, nothing in the Fund's evidence shows that its operations are "perceptibly impaired in any way." *Id.* at 921; *see also All. for Hippocratic Med.*, 602 U.S. at 395 (broad claims that an organization "divert[ed] its resources in response to a

[government] actions" is insufficient for standing purposes); *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("NTU's self-serving observation that it has expended resources to educate its members and others regarding Section 13208 does not present an injury in fact"). Indeed, the Fund does not claim that the government is blocking access to its current or future clients, and its reliance on *Advocates for Human Rights v. DHS*, 825 F. Supp. 3d 858, 880 (D. Minn. 2026), and *Immigrant Defenders Law Center v. Noem*, 145 F.4th 972, 984–87 (9th Cir. 2025), fails for that reason. PI Mem. (Dkt. 9-1) at 19-20 (citing). In short, the Fund has not established a legally cognizable injury to its interests.

Second, the Fund cannot establish traceability and redressability. If "traceability and redressability depend on third-party conduct, standing . . . is ordinarily substantially more difficult to establish." *Growth Energy v. EPA*, 5 F.4th 1, 33 (D.C. Cir. 2021). "A permissible theory of standing does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Hawkins v. Haaland*, 991 F.3d 216, 225 (D.C. Cir. 2021) (citation modified). "Mere unadorned speculation as to the existence of a relationship between the challenged government action and the third-party conduct will not suffice to invoke the federal judicial power." *Scenic Am., Inc. v. Dep't of Transp.*, 836 F.3d 42, 50 (D.C. Cir. 2016) (citation modified). "The plaintiff must [establish] facts sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Waterkeeper All. v. Regan*, 41 F.4th 654, 660 (D.C. Cir. 2022) (citation modified). And in all events, "standing to challenge" agency action "cannot be founded merely on speculation as to what third parties will do in response to a favorable ruling." *Id.* at 661.

Here, the entire premise of the Fund's injury is that future clients would withhold vital information about their cases, creating a parade of operational horribles for the Fund. PI Mem. (Dkt. 9-1) at 19-21. ICE is not privy to the information the Fund's clients share with the Fund nor can ICE control the contents of communications between the Fund and the Fund's current or future clients. Those communications are presumably privileged and only the Fund and its clients know what was shared. Moreover, the Fund and its clients choose what information to share with the government as part of any asylum applications. In other words, nothing precludes an asylum applicant from being forthcoming with her counsel and then making an informed decision, with the assistance of counsel, about what pertinent information should or should not be included in an asylum application. "When the existence of one or more of the essential elements of standing . . . depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, it becomes substantially more difficult to establish standing." *Scenic Am., Inc.*, 836 F.3d at 50 (citation modified).

Critically, however, the Fund's assertion "lacks record support and is highly speculative," because the Fund has offered no evidence by way of a declaration from a client that she withheld information because of the alleged policy. *All. for Hippocratic Med.*, 602 U.S. at 390. The Fund points to nothing in the hundreds of pages of appended materials stating that a client has declined to be truthful or forthcoming with her attorney because of the alleged policy. It is neither the Court's nor the government's role "to sift and sort through the record" in search of material information. *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996). The Fund has the burden of establishing its standing, and it has patently failed to do so here. *Lujan*, 504 U.S. at 561.

To establish causation and redressability, the Fund cites two conclusory paragraphs from the Rahnama Declaration.  PI Mem. (Dkt. 9-1) at 22 (citing Rahnama 1st Decl. (Dkt. 9-3) ¶¶ 29-30).  Those paragraphs purport to describe how unnamed Fund clients feel or act as a result of the alleged policy.  Rahnama 1st Decl. (Dkt. 9-3) ¶ 29 ("It is the disclosure and the facilitated access, and the well-founded fear they create among IALDF's clients. . ."").  But the purpose of Rahnama's first declaration is "to describe the concrete, ongoing harm that [the Fund] is suffering," *id.* ¶ 6, and offers no basis upon which to testify about how individuals have or may act knowing the alleged policy exists.

The Second Rahnama Declaration fares no better.  It purports to introduce eleven declarations by individual Fund clients.  Rahnama 2d Decl. (Dkt. 9-4) ¶ 4.  But all identifying information has been redacted.  *See id*. at 7-38.  The Fund has offered no authority for anonymizing the exhibits, nor have they sought leave of court to do so.  *Cf*. LCvR 5.4(f) (providing that four categories of "personal identifiers shall be excluded, or redacted": (1) social security numbers, (2) names of minor children, (3) dates of birth, and (4) financial account numbers).  Even at the preliminary injunction stage, which "is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits," *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), the Court may not rely on "pseudonymous hearsay," *Coalition for Humane Immigrant Rights v. Dep't of Homeland Sec.*, 780 F. Supp. 3d 79, 91 (D.D.C. 2025).  That is because "[l]ayered hearsay innately lacks credibility, as it only exacerbates the preexisting veracity issues inherent to typical hearsay" and "[t]his problem becomes even more pronounced when the underlying testimony is presented under pseudonym, leaving the Court and defense completely unable to verify the testimony."  *Id*. at 92.  That is especially problematic

- 10 -

where, as here, this "nameless double hearsay is going towards the Court's jurisdiction." *Id.* In short, the Fund has not established causation or redressability.

b.    The Fund May Not Assert the Rights of Third Parties

The Fund "must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). "Without such limitations—closely related to Art. III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Id*. at 500.

That is precisely what the Fund attempts to do here. It brings claims alleging disclosure of confidential information of third parties – Iranian nationals ordered removed or facing removal from the United States. The Fund does not allege that it is facing removal to Iran or that its own information was impermissibly shared with the Iranian government (or shared at all). And the relief the Fund seeks is for the benefit of third parties, not itself. The Fund simply lacks standing to assert claims on behalf of third parties. *See Warth*, 422 U.S. at 499.

True, the Supreme Court has "not treated this rule as absolute, however, recognizing that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004) (collecting cases). But the Fund has not identified (or attempted to identify) any such applicable exception. Indeed, attorneys lack standing to assert rights of "hypothetical," future clients. *Id*. at 131. The Fund cannot clear that bar here by asserting that its "legal-services model is predicated on confidential intake and asylum screening in the client's language; in-person detention visits to assess claims and build trust;

- 11 -

counseling and safety planning; preparation of declarations and supporting evidence; referrals to local counsel with continuing legal support; and interpretation coordination." PI Mem. (Dkt. 9-1) at 19. Allegedly as "a result, many clients and prospective clients have become more reluctant to disclose asylum-related facts, because they fear that information provided during legal counseling could reach the Iranian Government and endanger themselves, their families, or their associates inside Iran." *Id.* In other words, the alleged policy assertedly hinders the Fund's ability to obtain information from future clients during intake, to evaluate their claims, and prepare representation. But the Fund cannot establish it has a "close relationship" with those asserted future clients. *Kowalski*, 543 U.S. at 131. "[I]ndeed, they have no relationship at all." *Id.*

Nor can the Fund establish that the third parties would be hindered from asserting their own rights. *See id.* at 131-32. Recall that the Fund's asserted violation is the alleged disclosure of confidential immigration information to the Government of Iran. To the extent any one individual may be concerned that such alleged disclosure, if true, creates a greater or new risk of harm from removal to Iran, that individual could assert such claim during the removal proceedings. And if removal proceedings have concluded, she may be entitled to seek to reopen those proceedings based on new facts. *See generally* 8 C.F.R. § 1003.2; *see also Kowalski*, 543 U.S. at 131-32.

The Fund relies on two out-of-circuit cases for the proposition that it has standing as a "legal-services organization whose client-facing work is obstructed by government action." PI Mem. (Dkt. 9-1) at 19-20 (citing *Advocs. for Hum. Rts.*, 825 F. Supp. 3d at 880 (D. Minn.) and *Immigrant Defenders Law Ctr.*, 145 F.4th at 984–87 (9th Cir.). Neither case is on point. In *Advocates for Human Rights*, the district court found third-party standing for a legal resources clinic because it established "a close relationship to its clients," 825 F. Supp. 3d at 881 (citing

*Lepelletier*, 164 F.3d at 44), and "hindrance in its clients' ability to protect their own interests," *id.* (citing *Kowalski*, 543 U.S. at 130). Critically, at issue in that case was attorney-client access during Operation Metro Surge in Minneapolis, which allegedly involved rapid transfers out of state and an inability to locate, contact, or visit detainees. *Id.* at 867-74. The Fund here has not alleged any lack of access to its existing clients. Rather, it alleges that potential future clients will be less forthcoming because those hypothetical future clients' confidentiality guarantees may be impacted.

*Immigrant Defenders Law Center* is even more attenuated because it did not analyze third-party standing. Rather, it analyzes whether a legal services organization has standing of its own to bring a challenge to the Remain in Mexico policy, arguing that it needs to expend more resources to stand up operations in Mexico. *Immigrant Defs. L. Cntr.*, 145 F.4th at 987-89. This case has no bearing on the issue of third-party standing. *Lepelletier*, 164 F.3d at 42.

In short, the Fund cannot bring claims of third parties.

### 2. The Court Lacks Subject-Matter Jurisdiction

In its motion for extraordinary relief, the Fund asks this Court for an order "to take all necessary steps to prevent the removal of those individuals until they can be identified, provided with notice that their information was shared, and given the opportunity to reopen their cases and assert a new independent basis for a grant of relief from removal." Proposed Order ¶ 3 (Dkt. 9-17). In its Complaint, the Fund requests that this Court "[e]njoin Defendants from deporting any Iranian ICE detainees until the work of the Special Master is completed." The Fund has revealed its core aim. It is inviting the Court to meddle in the execution of removal orders and in individual removal proceedings. This Court lacks the jurisdiction to do either, however. First, Congress divested courts of the ability to review discretionary decisions to execute removal orders. *See* 8 U.S.C. § 1252(g). Second, Congress made the deliberate choice to channel removal-related

challenges to a petition for review, which is reviewable only by the appropriate court of appeals. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9).

(a)  8 U.S.C. § 1252(g) Bars Review.

Section 1252(g) of the INA, as amended by the REAL ID Act, provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien[.]"  8 U.S.C. § 1252(g).  Although § 1252(g) "does not sweep broadly," *Tazu v. Att'y Gen.*, 975 F.3d 292, 296 (3d Cir. 2020), its "narrow sweep is firm," *E.F.L. v. Prim*, 986 F.3d 959, 964–65 (7th Cir. 2021).  Except as provided by § 1252, courts "cannot entertain challenges to the enumerated executive branch decisions or actions." *Id.*

In enacting § 1252(g), Congress provided that "no court" has jurisdiction over "any cause or claim" arising from the execution of removal orders, "notwithstanding any other provision of law," whether "statutory or nonstatutory," including habeas, mandamus, or the All Writs Act.  *Id.*; *accord Elgharib v. Napolitano,* 600 F.3d 597, 605 (6th Cir. 2010) (holding that § 1252(g) precludes jurisdiction under the All Writs Act); *Sadhvani v. Chertoff,* 460 F.Supp.2d 114, 122 (D.D.C. 2006) (same).  Accordingly, by its terms, § 1252(g) precludes review of claims arising from a decision or action to "execute" a final order of removal.  *See Reno v. American-Arab Anti-Discrimination Committee* ("*AADC*"), 525 U.S. 471, 482 (1999); *see also Singh v. Napolitano*, 500 F. App'x 50, 52 (2d Cir. 2012) (holding that an attempt to "employ[] a habeas petition effectively to challenge the validity and execution of [a] removal order," even "indirectly," is "jurisdictionally barred").  The decision to execute a removal order is committed to the discretion of the Executive Branch, and § 1252(g) was designed to protect that discretion and to avoid the "deconstruction, fragmentation, and hence prolongation of removal proceedings."  *AADC*, 525 U.S. at 487.

- 14 -

Therefore, "[u]nder a plain reading of the text of the statute, the Attorney General's enforcement of long-standing removal orders falls squarely under the Attorney General's decision to execute removal orders and is not subject to judicial review." *Hamama v. Homan*, 912 F.3d 869, 874 (6th Cir. 2018).  Section 1252(g) is meant to foreclose judicial review of such discretionary acts. *See Tazu*, 975 F.3d at 297 (observing that "the discretion to decide *whether* to execute a removal order includes the discretion to decide *when* to do it" and that "[b]oth are covered by the statute") (emphasis added).

Section 1252(g) also applies to constitutional claims arising from the execution of a final order of removal, as the language barring "any cause or claim" made it "unnecessary for Congress to enumerate every possible cause or claim[.]" *AADC*, 525 U.S. at 487; *accord Silva v. United States*, 866 F.3d 938, 940-41 (8th Cir. 2017); *see also Tazu*, 975 F.3d at 298 (cautioning against a rule that would permit artful pleading and incentivize "[f]uture petitioners [to] restyle any challenge to the [covered] actions . . . as a challenge to the Executive's general lack of authority to violate due process, equal protection, the [APA], or some other federal law").

Further, *AADC* established that § 1252(g) is "designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed." *Alvarez v. ICE*, 818 F.3d 1194, 1205 (11th Cir. 2016) (quoting *AADC*, 525 U.S. at 485).  Section 1252(g) therefore precludes "[e]fforts to challenge the refusal to exercise [favorable] discretion on behalf of specific aliens[.]" *Id.* (quoting *AADC*, 525 U.S. at 485).

Here, § 1252(g)'s prohibition is particularly pronounced.  The Fund's action not only seeks to bar execution of unidentified orders of removal, but the remedy it seeks also falls within the

- 15 -

Executive's "plenary and exclusive" authority to speak for the country "in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936). Moreover, the Fund's challenge is nothing more than an attempt to delay the execution of outstanding and unidentified removal orders. Or, in other words, the Fund's challenge is to the government's choice of timing when executing removal orders. But § 1252(g) certainly bars review. *See Tazu*, 975 F.3d at 297 ("The plain text of § 1252(g) covers decisions about whether and when to execute a removal order."); *Arce v. United States*, 899 F.3d 796, 800 (9th Cir. 2018) (indicating that § 1252(g) would bar review of "claim[s] that the Attorney General should have exercised discretion to delay [the individual's] removal").

That the Fund seeks to delay the execution of unidentified removal orders so that individuals may seek relief from removal does not somehow magically vest this Court with jurisdiction. That would be in the nature of invoking the Court's authority under the All Writs Act, which § 1252(g) explicitly mentions when describing the unexhausted list of authorities that courts may not rely on to interfere with the execution of removal orders. *See* 8 U.S.C. § 1252(g) (citing 28 U.S.C. § 1651). Circuit courts around the country have concluded that § 1252(g) bars district courts from delaying removal so that individuals may seek relief from removal. *See Hamama*, 912 F.3d at 874; *Tazu*, 975 F.3d at 298; *E.F.L.*, 986 F.3d at 964; *Camarena v. Director, Immigr. and Customs Enf.*, 988 F.3d 1268, 1274 (11th Cir. 2021); *Rauda v. Jennings*, 55 F.4th 773, 776–78 (9th Cir. 2022).

In *Hamama*, a class of petitioners sought to enjoin their removals while they argued changed country conditions required their removal orders to be reconsidered. 912 F.3d at 873. The Sixth Circuit rather emphatically declared that "[u]nder a plain reading of the text of the statute, the Attorney General's enforcement of long-standing removal orders falls squarely under

the Attorney General's decision to execute removal orders and is not subject to judicial review." *Id*. at 874.

*Tazu* involved a petitioner who filed a habeas action in district court seeking to enjoin his removal while he sought to litigate his motion to reopen and seek other forms of relief. 975 F.3d at 295. The petitioner sought to side-step the petition-for-review process by arguing that he did not "contest the discretion exercised to remove him," but rather challenged the Attorney General's ability to exercise that discretion "*now*." *Id*. at 297 (emphasis in original). Effectively, the government "may thus decide to execute [an alien's] valid removal order when [it] chooses." *Id*.

In *E.F.L.*, the petitioner filed a habeas petition seeking to enjoin her removal while her petition under the Violence Against Women Act was pending. 986 F.3d at 961-62. Relying on prior precedent, the Seventh Circuit concluded that the habeas petition "[fell] directly in § 1252(g)'s path." *Id*. at 964 (relying on *Sharif ex. rel. Sharif v. Ashcroft*, 280 F.3d 786, 787 (7th Cir. 2002), *Gomez-Chavez v. Perryman*, 308 F.3d 796 (7th Cir. 2002), and *Fedorca v. Perryman*, 197 F.3d 234, 240 (7th Cir. 1999)).

In *Camarena*, two individuals filed habeas petitions and emergency motions seeking to halt the execution of their valid removal orders to allow them to seek provisional unlawful presence waivers. 988 F.3d at 1271. The Eleventh Circuit "focus[ed] on the action being challenged" and concluded that "their claims [fell] squarely within § 1252(g)'s jurisdictional bar." *Id*. at 1272 (internal quotations omitted). "No matter how [the petitioners] characterize[d] their claims, they amount[ed] to an attack on the government's execution of their removal orders. That runs afoul of § 1252(g)[.]" *Id*. at 1274.

*Rauda* is not any different. There, a petitioner filed a habeas petition seeking to enjoin his removal, in which he argued that removal before the Board of Immigration Appeals ruled on a

- 17 -

pending motion to reopen would violate his due process rights. *Rauda*, 55 F.4th at 775. The district court ruled that it lacked jurisdiction over the claims, and the petitioner then filed an appeal asking that the Ninth Circuit halt his removal pending appeal. *Rauda v. Jennings*, 8 F.4th 1050, 1053 (9th Cir. 2021), *amended by* 55 F.4th 773 (9th Cir. 2022). The Ninth Circuit unequivocally held that it lacked jurisdiction to grant relief because the petitioner was impermissibly seeking "a stay of removal pending the BIA's resolution of his motion to reopen," and was doing so outside of the petition-for-review context. *Rauda*, 55 F.4th at 778–79. That is because Congress wanted petitions for review to be the sole mechanism to obtain review; thus, seeking to halt removal in a habeas action went beyond Congress's proscribed path. *See id*. at 777–78.

The consensus is clear, and *Hamama*, *Tazu*, and *Rauda* evidence that motions to reopen, or the opportunity to file motions to reopen, specifically cannot serve as the basis for district courts to enjoin removal. Put simply, the claim the Fund raises is outside this Court's control; this Court simply lacks authority to intervene in the execution of removal orders. *See Ghanem v. Lechleitner*, Civ. A. No. 24-2974 (ACR), Min. Order (Feb. 10, 2026) ("The Court cannot hear this case. 8 U.S.C. § 1252(g) deprives this Court of jurisdiction to review removal orders, including their execution." (citation modified)).

(b) The Petition-For-Review Process Channels Removal-Related Questions.

Section 1252(a)(5) and (b)(9) also bar this Court from reviewing the Fund's claims. "[T]he sole and exclusive means for judicial review of an order of removal" is a "petition for review filed with an appropriate court of appeals," that is, "the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." 8 U.S.C. §§ 1252(a)(5), (b)(2). Section 1252(b)(9) is an "unmistakable 'zipper' clause" that "channels judicial review of *all*" claims arising from removal proceedings to a court of appeals in the first instance. *AADC*, 525 U.S. at 483. "Taken together, §[§] 1252(a)(5) and [(b)(9)] mean that *any* issue—whether legal or factual—

- 18 -

arising from *any* removal-related activity can be reviewed *only* through the [petition for review] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016); *see also Bonhometre v. Gonzales*, 414 F.3d 442, 446 (3d Cir. 2005) (highlighting Congress's "clear intent to have all challenges to removal orders heard in a single forum (the courts of appeals)")

Section 1252(b)(9) eliminates this Court's jurisdiction over the Fund's requested relief by channeling "all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien" to the courts of appeals. *See Nken*, 556 U.S. at 424 (explaining how § 1252 "streamlined all challenges to a removal order into a single proceeding: the petition for review"). The Fund cannot short-circuit that process by seeking injunctive relief in this Court while immigration proceedings take their course or have concluded. To hold otherwise would create the very risk of fragmented, duplicative litigation that Congress sought to avoid and could subject Defendants to inconsistent obligations imposed by different courts addressing the same removal procedures. *See Tazu*, 975 F.3d at 296 (explaining that when Congress added § 1252(b)(9) and (g) to the INA, it "aimed to prevent removal procedures from becoming 'fragmented, and hence prolonged'") (cleaned up; quoting *AADC*, 525 U.S. at 487).

Thus, this Court lacks jurisdiction under §§ 1252(a)(5) and (b)(9) to review the Fund's request to stop the execution of a removal order to Iran. *See J.E.F.M.*, 837 F.3d at 1031; *see also Mata v. Dep't of Homeland Sec.*, 426 F. App'x 698, 700 (11th Cir. 2011); *Canal A Media Holding, LLC v. USCIS*, 964 F.3d 1250, 1257-58 (11th Cir. 2020); *Themeus v. Dep't of Just.*, 643 F. App'x 830 (11th Cir. 2016); *Linares v. Dep't of Homeland Sec.*, 529 F. App'x 983 (11th Cir. 2013). As the Supreme Court recently reiterated: "Section 1252 permits individuals to petition for judicial review of 'final orders of removal' and indicates that those petitions supply the *exclusive* means for

- 19 -

securing judicial review of all questions of law." *Monsalvo v. Bondi*, 604 U.S. 712, 723-24 (2025) (emphasis added) (citation modified).

Indeed, the Fund's allegations regarding the conditions in Iran are precisely the type of claims the immigration courts were designed to adjudicate, and the courts of appeal to review. *See*, *e.g.*, *Riley v. Blanche*, --- F.4th ---, 2026 WL 1902557, at *6-11 (4th Cir. Jul. 2, 2026). In *Riley*, for example, a Jamaican man asserted entitlement to deferral of removal under the Convention Against Torture. *Id*. at *7. An immigration judge granted his application, the Board of Immigration Review reversed, and the Fourth Circuit in turn vacated the BIA. *Id*. at *11. *Riley* reflects the petition-for-review process and the Fund does not explain why it should not be applicable for any individual facing removal to Iran.

To the extent the Fund alleges that any information sharing with Iran resulted in a violation of 8 C.F.R. § 208.6, each individual can seek relief through the immigration courts. *See Dayo v. Holder*, 687 F.3d 653, 657 (5th Cir. 2012) ("Therefore, we join the Second and Fourth Circuits in concluding that although a breach of confidentiality caused by violating 8 C.F.R. § 208.6 does not always require vacating the order of removal, the applicant must be permitted to use the breach for a new claim for asylum, withholding of removal, and relief under the CAT."); *Anim v. Mukasey*, 535 F.3d 243, 253 (4th Cir. 2008) ("if an asylum applicant's confidentiality has been breached in violation of § 208.6, the applicant must be given the opportunity to establish a new claim for asylum, withholding of removal, or relief under CAT based on the breach"); *Lin v. Dep't of Just.*, 459 F.3d 255, 267-68 (2d Cir. 2007) (same).

And an individual can move to reopen proceedings to assert new fear claims regarding removal to that country. *See*, *e.g.*, 8 U.S.C. § 1229a(c)(7) (allowing a motion to reopen within 90 days after removal order becomes administratively final); 8 C.F.R. §§ 1003.2(c), 1003.23(b) (same

after 90 days by way of the immigration court's or BIA's *sua sponte* authority). The Fund does not explain why any individual has been unable to follow that process. *See*, *e.g.*, *Matter of A-S-M*, 28 I&N Dec. 282, 287 (BIA 2021) ("We therefore hold that where, as here, the DHS states that an applicant may be removed to a country pursuant to section 241(b)(2) of the Act, the applicant may seek withholding of removal from that country in withholding-only proceedings, even if that country is different from the country that was originally designated in the reinstated removal order on which the withholding-only proceedings are based."). Rather, it is obvious from the Fund's extensive discussion of the dangers of removal to Iran and its requested relief—halting of removals to Iran—that it simply seeks to subvert the immigration procedures Congress prescribed. *See Kowalski*, 543 U.S. at 132-33 ("It is a fair inference that the attorneys and the three indigent plaintiffs that filed this § 1983 action did not want to allow the state process to take its course. Rather, they wanted a federal court to short circuit the State's adjudication of this constitutional question.").

The Fund cannot avoid the reach of the channeling provisions simply because the Complaint raises a policy challenge. Congress explicitly channeled "all questions of law and fact" into a petition for review. 8 U.S.C. § 1252(b)(9). That statute was enacted in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, and its language tracks specifically from the Supreme Court's decision in *McNary v. Haitian Refugee Ctr., Inc.*, which involved a constitutional pattern-and-practice challenge to the INS's administration of a temporary residence program for special agricultural workers ("SAW"). 498 U.S. 479, 483 (1991). The statute in that case contained a judicial review provision which channeled review "of a determination respecting an application" for SAW status into the courts of appeal, but it did not refer to a "group of decisions or a practice or procedure employed in making decisions." *Id.* at

- 21 -

492. Because the plaintiffs' constitutional pattern-and-practice claims required "factfinding and record-developing capabilities" that the statute would have barred if it applied, the Court concluded that Congress had not intended with that statutory language to bar district court review of such claims. *Id*. at 492, 496-97. In particular, the Court reasoned that Congress "easily could have used broader statutory language" if it had "intended the limited review provisions [at issue] to encompass challenges to INS procedures and practices." *Id*. at 494. And the Court provided two examples of what might constitute language "expansive" enough to remove jurisdiction over SAW status claims: language channeling (1) "all causes … arising under any of the provisions" of the SAW program, or (2) "all questions of law and fact" arising from the program. *Id*. at 494 (emphasis added). Congress listened to the Supreme Court's instructions when it enacted § 1252(b)(9) on how to ensure that the statutory language was clear and sufficient to strip courts of jurisdiction and channel them through the courts of appeal. The Fund cannot circumvent that.

Two circuit courts have recently agreed that policy challenges are covered by the ambit of § 1252(b)(9). First, the Third Circuit in *Khalil v. President, United States* was asked to review a habeas petition in which the individual alleged that "the government had adopted an unlawful policy of targeting immigrants for pro-Palestinian speech" 164 F.4th 259, 267 (3d Cir. 2026). The Third Circuit held that the petitioner could "litigate [that challenge] on a [petition for review]" following a decision from the Board of Immigration Appeals. *Id*. at 276. The appropriate court of appeals "will be able to review those 'legal challenges' once the Board enters a final order of removal.'" *Id*. at 276-77 (quoting *Ozturk v. Hyde*, 155 F.4th 187, 192-93 (2d Cir. 2025) (Menashi, J., concurring in denial of rehearing en banc)). The Second Circuit reviewed a nearly identical challenge in *Mahdawi v. Trump*, again one in which the petitioner had alleged that government had adopted a policy of targeting noncitizens based on pro-Palestinian speech. --- F.4th ---, 2026

- 22 -

WL 2090981, at *2 (2d Cir. July 21, 2026). The *Mahdawi* court held exactly as the *Khalil* court had: the legal questions arise from issues related to removal and therefore were barred by § 1252(b)(9). *See id*. at *9, 12. Both decisions confirm that individuals may raise their policy challenge in individual proceedings and obtain review through the reticulated scheme created by Congress.

Section 1252(b)(9) equally applies to individuals who already have final orders of removal. *See Tazu*, 975 F.3d at 299 (holding that § 1252(b)(9) bars review of claims raised by an alien with a final order of removal). As the Supreme Court recognized, aliens who are removed but nevertheless succeed on their petitions for review have an opportunity to seek facilitation of return to the United States. *See Nken*, 556 U.S. at 435 ("Aliens who are removed may continue to pursue their petitions for review, and those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal."). Procedures to facilitate return do exist. *See* ICE Policy Directive Number 11061.1, *Facilitating the Return to the United States of Certain Lawfully Removed Aliens* (Mar. 5, 2012), https://www.ice.gov/doclib/foia/dro_policy_memos/11061.1_current_policy_facilitating_return. pdf; Frequently Asked Questions (FAQs) on Facilitating Return for Lawfully Removed Aliens (Aug. 29, 2024), https://www.ice.gov/sites/default/files/documents/Document/2017/ facilitatingReturnLawfullyRemovedAliensFAQ.pdf. Generally, it involves contacting the Facilitation of Return team within ICE Enforcement and Removal Operations, Custody Programs Division. *Id.* "The Custody Programs Division will route [the person's] request to the appropriate ICE office(s), which will contact [the person or the person's representative] concerning [his or her] potential return to the United States." *Id.* "The Custody Programs Division will also provide [the

- 23 -

person] with a point of contact for this process." *Id.* Depending on whether the person returns by land or by air, there are different procedures. *Id.*

In the end, this Court should decline the Fund's invitation to intervene in removal proceedings and should instead give effect to Congress's intent. *See Khalil*, 164 F.4th at 281 ("The immigration laws enacted by Congress ordinarily require an alien to challenge his deportation in a [petition for review]—unless he raises questions that a court of appeals could not meaningfully review in that context. That scheme ensures that petitioners get just one bite at the apple—not zero or two.").

### 3.    Section 1252(f)(1) Bars Enjoining Removals.

The Fund is seeking to enjoin removals without seeking class-certification and to obtain relief for individuals not currently before the Court. That is improper. *See Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025). Its effort is also an attempted circumvention of the INA, which makes clear that lower federal courts lack "jurisdiction or authority to enjoin or restrain the operation" of certain INA provisions— including the removal provisions in 8 U.S.C. § 1231—"other than with respect to the application of such provisions to an individual alien" in removal proceedings. 8 U.S.C. § 1252(f)(1). The D.C. Circuit has agreed, and this Court should not break from established precedent. *See N.S. v. Dixon*, 141 F.4th 279, 289 (D.C. Cir. 2025).

Section 1252(f)(1) provides: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). The Supreme Court held that § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce,

- 24 -

implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)).  Section 1252(f)(1) thus precludes the Court from issuing orders restraining, even temporarily, operation of § 1231.  As a basic matter, granting the Fund the relief that it seeks would effectively require an order that runs to "an entire class of aliens," *Aleman Gonzalez*, 596 U.S. at 550-51—*i.e.*, every Iranian who has a final order of removal and can be removed—rather than any "individual alien," 8 U.S.C. §1252(f)(1).

In *N.S.*, the D.C. Circuit overturned an injunction entered by the district court restraining the U.S. Marshals from carrying out immigration arrests and detentions pursuant to Forms I-200 Warrants of Arrest issued by the Department of Homeland Security.  141 F.4th at 289.  Despite finding that the U.S. Marshals lacked authority to execute the Form I-200s, the Court held that the injunction "directly and substantially restricts the ability of federal officials to 'carry out' provisions covered by § 1252(f)(1)." *Id.*

So too here. The Fund is requesting that this Court "enjoin[] Defendants from deporting any Iranian ICE detainees[.]"  Compl. Prayer for Relief, ¶ f; *see also* Prop. Order, ¶ 3 (requesting an order to "prevent the removal" of individuals).  These requests clearly fall under the ambit of § 1252(f)(1) because the Fund seeks an order that tells the government "what to do or not to do." *Nken*, 556 U.S. at 428. Put simply, the Fund is requesting an order that "directs the conduct of a party" and is doing so "with the backing of the court's full coercive powers." *Make the Rd. N.Y.*, 179 F.4th at 31.

The Fund cannot avoid the reach of § 1252(f)(1) in this case because it also seeks a stay under 5 U.S.C. § 705.  Here it does not seek a "stay" of removal for individuals because the removal order is not properly before this Court.  *See Nken*, 556 U.S. at 428 (holding that a stay "operates

upon the judicial proceeding itself"). As the Supreme Court and the Federal Rules of Appellate Procedure recognize, a court of appeals may "stay" a district court order pending appeal of the order, and an appellate court may similarly "stay" a federal agency's administrative decision pending review of that decision. *Id.* at 429–30; *see also* Fed. R. App. 8, 18. Therefore, when a court of appeals "block[s]" an alien's removal by staying a removal order *while it adjudicates a petition for review of that order*, it does not "enjoin" removal within the meaning of 8 U.S.C. § 1252(f)(2). *Nken*, 556 U.S. at 425. In the context of a petition for review of a removal order, an order "block[ing]" removal fits into the category of a stay, not an injunction, because it derives from the court's inherent power "to hold an order in abeyance while it assesses the legality of the order," in circumstances where the order at issue is properly before the court for review. *Id.* at 426.

While the D.C. Circuit acknowledged that § 1252(f)(1) does not prohibit § 705 stays, it did so in a very narrow case in which the only way to obtain review of expedited removal policies is through the district court in this district. *See Make the Road N.Y.*, 179 F.4th at 30. In fact, the D.C. Circuit specifically noted that "[g]iven the precision with which § 1252 elsewhere restricts judicial remedies," the expedited removal statute lacked "comparable language." *Id.* In this case, an order "staying" removals under § 705 would be the sort of artful pleading and creative lawyering that courts have warned against. *See Mullin*, 2026 WL 1825840, at *10 (warning against reviewing jurisdiction-stripping provisions in a way that invites "creative pleading or clever lawyering"); *see also Ibarra-Perez v. United States*, 179 F.4th 743, 748 (9th Cir. 2026) (Bea, J., dissenting) (recounting decisions holding that § 1252(g) should not be read in a way to invite gamesmanship); *Tazu*, 975 F.3d at 298 (similar).

- 26 -

In sum, this Court lacks the authority to wholesale block removals.  The Supreme Court has said so. The D.C. Circuit subsequently adopted such a reading of § 1252(f)(1).  And that should be the end of the Fund's improper request to interfere with removal operations.

**B.      Plaintiff Cannot Seek Ultimate Relief in a Preliminary Posture.**

"[I]t is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits."  *Univ. of Tex.*, 451 U.S. at 397.  That is because a preliminary injunction "is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Tex.*, 451 U.S. at 395).  The purpose of preliminary injunctive relief "is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward."  *Trump v. Int'l Refugee Assistance Proj.*, 582 U.S. 571, 579-80 (2017) (citation omitted).  Thus, "[c]ourts in this Circuit have required the party seeking such a mandatory injunction to 'meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction.'"  *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020) (quoting *Singh*, 185 F. Supp. 3d at 17).

The Fund here seeks "to radically transform the status quo, on an expedited basis." *Disability Rts. Council of Greater Wash. v. WMATA*, 234 F.R.D. 4, 7 (D.D.C. 2006).  What they truly seek is to turn this preliminary injunction motion into "the whole ball game."  *Winter*, 555 U.S. at 33.  But preliminary injunctions are meant to be more predictive than they are decisive. *See Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety and Homeland Sec.*, 108 F.4th 194, 201 (3d Cir. 2024) (citing cases).  The Fund seeks a preliminary injunction that enjoins a purported policy and stops the execution of removal orders.  That is essentially the same relief they seek in the Complaint.  Compl. (Dkt. 1) at 12-13.  While the Fund does request in its

Complaint that this Court appoint a special master, the specific relief still remains nearly identical. Put differently, the Fund is effectively seeking to convert this action into a "hasty process" and ask the Court "to jump to conclusions." *Delaware State Sportsmen's Assoc.*, 108 F.4th at 200. That is simply not the purpose of preliminary injunctive relief. *See id.* at 197 (a "preliminary injunction is not a shortcut to the merits"); *see also Appalachian Voices v. FERC*, 139 F.4th 903, 929 (D.C. Cir. 2025) (Henderson, J., concurring) ("The lodestar for interim relief is preserving the status quo—not previewing the merits.").

The Court should deny the Fund's attempt to end-run the system and deny the motion on that basis alone.

### C.    Plaintiff's APA Claim Fails on the Merits

The Fund asserts various APA claims in its Complaint. Compl. (Dkt. 1) ¶¶ 61-63. In its motion for preliminary injunction, it relies only on one – that the alleged policy is contrary to law. PI Mem. (Dkt. 9-1) 22 ("IALDF is likely to succeed on its claim that Defendants' policy violates federal regulations and unequivocal legal obligations."). The Fund says the alleged policy of sharing confidential information is final agency action. PI Mem. (Dkt. 9-1) at 22-23. In addition to the jurisdictional defects already addressed above, those arguments fail for further reasons.

As an initial matter, "courts presume that public officers have properly discharged their official duties[.]" *Colindres v. Dep't of State*, 71 F.4th 1018, 1025 (D.C. Cir. 2023) (citation modified); *see also United States v. Chemical Found.*, 272 U.S. 1, 6 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *Laughlin v. Cummings*, 105 F.2d 71, 73 (D.C. Cir. 1939) ("There is a strong presumption that public officers exercise their duties in accordance with law."). The Court is well justified to presume that the government has acted within the law. Indeed, DHS does not share confidential information with

the Iranian Interests Section.  Ex. 2, Declaration of Noah Adams ("Adams Decl.") ¶¶ 12, 13 (attached hereto).  There is no agreement with the Islamic Republic of Iran to provide Iran with confidential information.  *Id.* ¶ 14.  ICE does engage with the Islamic Republic to obtain travel documents and coordinate logistics for removals.  *Id.* ¶¶ 6-14.  Such communications include providing the Interests Section with basic biographical information necessary to confirm Iranian citizenship and to obtain required travel documents.  *Id.* ¶¶ 12-13.  A file may include "biographical information, immigration history, documents supporting nationality or identity, travel document applications, photographs, and fingerprints."  *Id.* ¶ 12.  It may also include "name, date and place of birth, available identity or civil documents, photographs, fingerprints, prior passport information, family information relevant to nationality verification, birth certificates, and other documentation supporting the individual's Iranian citizenship."  *Id.* ¶ 13.  The file does not include "information protected by 8 C.F.R. § 208.6 and 8 C.F.R. § 236.1(e)."  *Id.* ¶¶ 13, 14.  "These discussions are routine in removal operations regardless of the country involved."  *Id.* ¶ 11.  Indeed, there is nothing inappropriate about these routine, government-to-government information exchanges designed to facilitate a removal.  *See La v. Holder*, 701 F.3d 566, 573-74 (8th Cir. 2012).  The Court affords the Adams declaration "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  *Cf. SafeCard Srvs, Inc. v. SEC*, 926 F.2d 1297, 1200 (D.C. Cir. 1991).

The Fund fails to offer "clear evidence of bad faith" sufficient to overcome the presumption of regularity.  *Colindres*, 71 F.4th at 1025.  In fact, the Fund cannot even establish that ICE shares confidential information with the Iranian Government.  The Fund speculates in its Complaint that records provided to the Iranian Government "include detainees' immigration records, such as final orders of removal, applications for relief, and asylum applications and related information,"

Compl. (Dkt. 1) ¶ 27, and information protected by regulation, *id*. ¶ 30. It further alleges that, "[a]ccording to Iranian detainees who met with an Iranian Interests Section official, the official had knowledge of their immigration cases, including the details of their asylum applications." *Id*. ¶ 35. Based on these allegations, the Fund says the U.S. Government adopted a policy of sharing confidential information with Iran "in March 2025." *Id*. ¶ 49. But the Fund offers nothing to support these conclusory allegations, which are based on hearsay, and the Court should disregard them as "unsupported factual allegations[.]" *Gulf Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 128 (D.C. Cir. 2017).

The Fund might respond that the policy of sharing confidential information is part-and-parcel of the engagements between the United States and Iran to facilitate removals to Iran. Compl. (Dkt. 1) ¶¶ 22-50. Those engagements initiated in March 2025, *id*. ¶ 22-24, led to an agreement to share information about Iranian citizens ordered removed, *id*. ¶ 25, including diplomatic access to Iranians in immigration detention, *id*. ¶¶ 31-32, and led to three specialized flights removing individuals to Iran, *id*. ¶¶ 37-40. But such sovereign-to-sovereign engagement is necessary to execute any removal order, including obtaining travel documents and securing the receiving country's agreement to receive the person ordered removed. *See*, *e.g.*, Ex. 1., Detention and Deportation Officer's Field Manual Chapter 16 (attached hereto) at 9 (Obtaining Travel Documents); 16 (Liaison with Foreign Consular Officials); 17 (Making Travel Arrangements).

Dozens of habeas petitions across the country seeking release from immigration detention of Iranians ordered removed because of the unwillingness of the Iranian government to issue travel documents underscores the lack of agreement between the two countries. *See*, *e.g.*, *Sadeghe Menar v. English*, 2026 WL 2066139, *3 (N.D. Ind. Jul. 17, 2026) (granting petition for habeas corpus and ordering release of Iranian national ordered removed because of inability to obtain travel

- 30 -

documents to Iran); *Samiei v. Blanche*, 2026 WL 1971266, at *3 (E.D. Va. Jul. 8, 2026) (same); *Vijdani v. Mattos*, 2026 WL 560209, at *4, 6 (D. Nev. Feb. 27, 2026) (same); *Ban v Marin*, 2026 WL 562140, at *2 (C.D. Cal. Feb. 24, 2026); *Ghafouri v. Noem*, 2025 WL 3085726, at *5-6 (S.D. Cal. Nov. 4, 2025) (same); *Momennia v. Bondi*, 2025 WL 3006045, at *1-2 (W.D. Okla. Oct. 27, 2025) (same).

In support of its allegations of the existence of a policy, the Fund proffers the Mehri Declaration (Dkt. 9-6). The Court, however, cannot rely on the parts of that declaration that are not based on personal knowledge but rather are "[l]ayered hearsay," which "innately lacks credibility, as it only exacerbates the preexisting veracity issues inherent to typical hearsay" and "leav[es] the Court and defense completely unable to verify the testimony." *Coalition for Humane Immigrant Rights*, 780 F. Supp. 3d at 92. For example, Mehri recounts a meeting between "Iranian asylum seekers detained by ICE" and "a senior official from the Islamic Republic of Iran's Interests Section in Washington D.C." Mehri Decl. (Dkt. 9-6) ¶ 16. "According to these detainees" the Iranian official "knew their names and possessed specific information about their detention status, immigration proceedings, and court cases." *Id.* But Mehri does not say he witnessed the meeting himself. Nor does he say that the detainees told him about that meeting. The source of the information is "Mr. Rahnama," who "met with individuals who reported" the information – in other words, triple hearsay.

Mehri recounts the details of his communications with an unnamed official from the Iranian Interests Section. *Id.* ¶¶ 17-66. But the Court cannot rely on that part of the declaration because the Court may not rely on "pseudonymous hearsay." *Coalition for Humane Immigrant Rights*, 780 F. Supp. 3d at 91. And even if the Court were to credit the Mehri declaration, nothing in that declaration indicates that the supposed Iranian official confirmed that the United States is

providing confidential information to the Islamic Republic.  *See generally* Mehri Decl. (Dkt. 9-6).  At most, the Iranian official confirms that the two governments have engaged on individual cases, consistent with DHS's mandate to enforce the immigration laws and execute removal orders.

Indeed, references to "confidential information" or "confidential case information" appear in the declaration by way of Mehri's own commentary, not as a statement attributable to the Iranian official.  *Id.* ¶¶ 23, 25, 34, 67.  In paragraph 23, Mehri conveys an agreement between the United States and Iran to hold monthly meetings to facilitate removals to Iran.  *Id.* ¶ 23.  According to the Iranian official, Iran is receiving "the names and detailed information of Iranian asylum seekers[.]"  *Id.*  Mehri then comments that those asylum seekers are "individuals who had sought protection from the very government now receiving their confidential case information."  *Id.*  But he does not attribute that commentary to the Iranian official.  In paragraph 25 Mehri similarly states that the Iranian official receives "copies of [aliens'] final removal orders" and comments that "[f]inal removal orders often contain sensitive confidential information about asylum claims."  *Id.*  And paragraphs 34 and 67 contain Mehri's own, baseless conclusions that the United States government shares confidential information.  *Id.* ¶¶ 34, 67.  At no point does Mehri declare—under oath and under penalty of perjury—that the Iranian official told him Iran is receiving confidential information from the United States government.

In short, the United States does not have a policy to provide information protected by 8 C.F.R. § 208.6 or 8 C.F.R. § 236.1(e) to the Islamic Republic of Iran, does not provide such information to the Islamic Republic of Iran, and the Fund's purported allegations to the contrary come nowhere close to rebutting the presumption of regularity.  *Colindres*, 71 F.4th at 1025.

What remains are a number of alleged legitimate government actions intended to facilitate the execution of removal orders.  Any claim, thus, is a textbook example of a programmatic

challenge that is unreviewable under the APA. Instead of presenting the court with a "narrow question to resolve," *Cobell v. Kempthorne*, 455 F.3d 301, 307 (2006), the Fund launches a broad challenge to a host of individual actions and seeks broad relief, Compl. (Dkt. 1) ¶¶ 25-35. The Fund's allegations reveal that it does not seek judicial review of a discrete agency action. To the contrary, it simply seeks to stop removals of Iranian nationals who have been ordered removed.

The Fund identifies several alleged agency actions: (1) a March 2025 meeting between the United States government and the Iranian Interests Section, Compl. (Dkt. 1) ¶ 22; (2) an agreement between the two governments "under which ICE and Iranian Government officials have been holding monthly meetings to share the immigration files and information of Iranians in ICE custody," *id*. ¶ 25; (3) monthly meetings between ICE and the Iranian Interests Section, *id*. ¶ 26; (4) furnishing of records about individuals ordered removed, *id*. ¶ 26-28; and (5) ICE facilitating in-person meeting with Iranian detainees, *id*. ¶ 31. Based on these events, the Fund alleges that "the Trump administration adopted a policy of providing the Islamic Republic of Iran (Iranian Government) with confidential information from the immigration files of Iranians seeking asylum in the United States." *Id*. ¶ 1. According to the Fund, that alleged policy is contrary to law, *id*. ¶ 61 (citing 8 C.F.R. § 208.6 and 8 C.F.R. § 236.1(e)), and the Fund seeks broad relief to enjoin information sharing between the United States and Iran and removals to Iran, *id*. at 12-13. In other words, the Fund seeks "'wholesale' improvement to agency operations under the APA by bundling together a collection of discrete actions, presenting them as facets of a single event, and then challenging that event instead of the individual actions." *Assoc. for Ed. Finance & Policy, Inc. v. McMahon*, 786 F. Supp. 3d 13, 23 (D.D.C. 2025) (citation modified).

Addressing these types of claims would require the Court to supervise all of the agency's activities related to removal operations to Iran—an even more extreme kind of supervisory claim

than was at issue and rejected by the Supreme Court in *Lujan*. *See Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 892-93 (1990). Such claims entirely circumvent the purpose of the APA's discrete agency action requirement, which is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004).

The Fund certainly may direct its grievances to "the offices of the [Department] or the halls of Congress." *Lujan*, 497 U.S. at 891 (citation modified). But the APA does not provide for "general judicial review of [an agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, like "constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). "Because an on-going program or policy is not, in itself, a final agency action under the APA, [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell*, 455 F.3d at 307 (citation modified).

## II.    Plaintiff Has Failed to Establish it Suffers Irreparable Harm

Even if the Fund could show a likelihood of succeeding on the merits—and as shown it cannot—it fails to establish that it will suffer irreparable harm absent immediate relief. The Fund asserts time-sensitive operational impairment because the Fund "ordinarily receives only a few days' notice, if any, before an Iranian asylum seeker is placed on a mass deportation or commercial flight to Iran." PI Mem. (Dkt. 9-1) at 25. Even if that alleged injury could be sufficient to establish standing and third-party standing, it falls far short of establishing that it is so significant and irreparable as to require this Court's immediate intervention. *Santos v. Collins*, Civ. A. No. 24-1759 (JDB), 2025 WL 1823471, at *6 (D.D.C. Feb. 26, 2025) ("while standing and irreparable harm overlap, they are far from the same").

- 34 -

"[T]he degree of proof required for 'irreparable harm' is 'high,' and . . . a failure to surmount it provides 'grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.'" *California Valley Miwok Tribe v. Haaland*, Civ. A. No. 24-0947 (TSC), 2024 WL 4345787, at *3 (D.D.C. Sept. 30, 2024) (quoting *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019)). To meet the "high standard for irreparable injury," the D.C. Circuit has required a movant to show that the injury is "both certain and great; it must be actual and not theoretical," and that "[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (D.C. Cir. 2006) (emphasis in original) (quoting *Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674, 2 (D.C. Cir. 1985) (per curiam)). Importantly, the movant must "substantiate the claim that irreparable injury is 'likely' to occur." *Id.* "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur." *Id.* Rather, "[t]he movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.* Thus, where the movant has premised its motion "upon unsubstantiated and speculative allegations of [redressable] injury," the court must deny the motion. *Id.* Courts in this Circuit "must faithfully and fairly apply that standard in all cases, regardless of how high the stakes or how worthy the cause." *All. for Retired Americans v. Bessent*, 770 F. Supp. 3d 79, 111 (D.D.C. 2025) (quoting *Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 34 (D.D.C. 2016)).

The Fund asserts that the injury is imminent, requiring this Court's immediate intervention because "IALDF ordinarily receives only a few days' notice, if any, before an Iranian asylum seeker is placed on a mass deportation or commercial flight to Iran." PI Mem. (Dkt. 9-1) at 24.

- 35 -

"Every hour IALDF must divert to address the harm of the federal government's disclosure of protected asylum information to the Iranian Government," the Fund says, "is an hour taken from the narrow window in which IALDF can still act to protect a detainee from removal." *Id*. at 24-25. But the Fund's fears are misplaced because "[t]here have been no removals to Iran since the beginning of Operation Epic Fury which started on February 28, 2026" and, "[a]t present, there are no planned to removals to Iran in the foreseeable future." Ex. 2, Adams Decl. ¶ 17. As such, the Fund cannot establish "imminence" requiring "a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy*, 454 F.3d at 297 (citation modified).

Nor does the Fund explain the mismatch between the asserted injuries and the requested relief. Vacating the alleged policy—the Fund's requested relief—would not necessarily redress the Fund's alleged injuries—mistrust by its future clients. But even if it did, the Fund does not allege that it has any current clients facing immediate removal to Iran. Nor could it. The Fund readily admits that Operation Epic Fury affected the ability to remove individuals to Iran. PI Mem. (Dkt. 9-1) at 9 ("A fourth flight planned for the end of March 2026 did not occur because of the war between the United States and Iran that began on February 28, 2026."); *see also Sharifi v. Raycraft*, 2026 WL 1970782, at *3 (E.D. Mich. Jul. 8, 2026) (granting petition for habeas corpus and ordering release of Iranian national because the government had not removed the person "since December and have paused removals to Iran in light of the ongoing conflict with Iran"); *Babakhani v. Gantt*, 2026 WL 1822995, at *5-6 (W.D. Okla. Jun. 24, 2026) (same). But even in the absence of Operation Epic Fury, as explained above, removals to Iran are time-consuming and hardly guaranteed. As such the Fund has failed to show an imminent injury "that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy*, 454 F.3d at 297.

Additionally, individuals seeking relief from removal are not without recourse.  *See supra* § I.A.4.  If relief from removal can be afforded later, then there is no irreparable harm for the purpose of awarding extraordinary relief.  *See Chaplaincy*, 454 F.3d at 297-98 (citing *Va. Petro. Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *Nken*, 556 U.S. at 434.  *Chaplaincy* is instructive and dispositive in this case.  There, a group of current and former Navy chaplains alleged that the Navy had "established, promoted, and maintained religious quotas and other discriminatory practices in the Navy Chaplain Corps in violation of the First and Fifth Amendments."  454 F.3d at 295 (citation modified).  Reviewing the denial of a preliminary injunction, the D.C. Circuit concluded that the appellants had not met their burden on irreparable harm because they had not "articulate[d] a tangible injury that is either certain and great" or irreparable.  *Id*. at 298.  The Court found the injury allegations speculative because the ultimate relief sought would only result in the *possibility* of plaintiffs' injuries being rectified.  *See id*.  The Court also rejected proffered irreparable harm theories because the plaintiffs could seek redress through other means.  *See id*.  So too for Iranian nationals with removal orders.  Indeed, the Fund's own motion confirms that an avenue exists by way of a motion to reopen.  *See* PI Mem. at 25 (requesting that the Court order ICE to halt removals so that individuals may "reopen their cases and assert a new independent basis for a grant of relief from removal").

The Fund's delay in bringing suit and seeking a preliminary injunction further underscores its failure to establish irreparable harm.  *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding that a forty-four day delay in seeking injunctive relief is inexcusable and bolsters the finding that no irreparable harm exists); *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay in bringing action "militates against a finding of irreparable harm"); *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 165 (D.D.C. 2006) ("The delay in

filing this suit further undermines any showing of irreparable injury"); *Cruz v. DHS*, 2019 WL 8139805, at *6 (D.D.C. Nov. 21, 2019) (same).  The alleged communications between the Fund and the Iranian Interests Section occurred on March 24, 2026, and March 26, 2026.  Mehri Decl. (Dkt. 9-6) ¶¶ 19, 35.  Yet the Fund waited until July 7, 2026, to bring this case, *see generally* Compl. (Dkt. 1), and until July 15, 2026, to move for preliminary relief, *see generally* PI Mot. (Dkt. 9).

The Fund attempts to justify its delay in seeking relief because "counsel was necessarily required to investigate and verify" the unnamed Iranian official's claims.  Pl's. Opp'n to Mot. to Extend (Dkt. 18) at 4. Yet the Mehri declaration offers no details about what, if any steps, the Fund took to investigate.  Mehri does not assert that the Fund contacted its clients' deportation officers, sought clarification from the State Department or the Department of Homeland Security, or even attempted to verify that the individual was indeed an Iranian diplomat, nor does he allege that he or the Fund conducted any other factfinding whatsoever.  Mehri Decl (Dkt. 9-6) ¶¶ 1-67.  In short, Mehri does not explain or otherwise justify the delay between March and July.

Moreover, it appears the Fund suspected coordination between the United States and Iran as early as November 2025.  Rahnama avers that it collected declarations "[b]egining in November 2025, in light of what IALDF had learned about Defendants' practice of sharing Iranian asylum seekers' confidential information with, and facilitating access by, officials of the Islamic Republic of Iran[.]"  Rahnama 2d Decl. (Dkt. 9-4) ¶ 4.  Indeed, the Fund collected two of the eleven declarations in December 2025.  *Id*. at 5.  The Fund offers nothing to justify that months-long delay.  The Fund's own lack of urgency in pursuing this case confirms the lack of irreparable harm.

III.    **The Balance of the Equities and Public Interest Favor Denying Injunctive Relief.**

Finally, where the government is a party, the balance of equities and public interest factors

merge. *Nken*, 556 U.S. at 435. Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991). Here, the balance of the equities and public interest tips decisively in Defendants' favor.

"The interest in preserving national security is an urgent objective of the highest order." *Int'l Refugee Assistance Project*, 582 U.S. at 581. A court order that controls substantive communications with a foreign sovereign would intrude on the "deference to the Executive Branch's evaluation of the facts and the sensitive and weighty interests of national security and foreign affairs, including the timing of those . . . decisions," and therefore, the public interest favors Defendants. *Tiktok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (citation modified) (citing *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 33-34 (2010), *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002)). Halting the execution of outstanding removal orders would also "inflict[] irreparable harm on the [Secretary of Homeland Security] by interfering with the national-security" and national interest "determinations entrusted to him by Congress." *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *3 (D.C. Cir. June 20, 2025).

Additionally, the significance of the public interest in the enforcement of the United States' immigration laws is well settled. *See, e.g., United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Nken*, 556 U.S. at 435. The execution of outstanding removal orders is meant to advance the enforcement of those laws, such as ending the unlawful presence of aliens who would remain in the United States in violation of law. *See Nken*, 556 U.S. at 436 ("There is always a public interest in the prompt execution of removal orders." (relying on *AADC*, 525 U.S., at 490)). There would also be a "heightened" public interest in executing removal orders of individuals who

- 39 -

are "particularly dangerous, or [have] substantially prolonged [their] stay by abusing the processes[.]"). *Id*. Moreover, preserving the political branches' authority to control the border serves "the obvious necessity that the Nation speak with one voice" on such matters. *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001).

Halting removals and censoring communications with a foreign sovereign would be "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assist. Proj. of LA Cnty. Federation of Labor*, 510 U.S. 1301, 1305-06 (1993). Enjoining either action would be extreme on its own, but, in tandem, the Court would be encroaching on the Executive Branch's determination of what facts and judgments to make and subsequently convey to Iran, all of which sound in matters of public interest and national security. Imposing judicial restraints on such actions would be inappropriate at the very least. *See United States v. FCC*, 652 F.2d 72, 96 (D.C. Cir. 1980) ("In summary, we cannot interfere with the agency's latitude not merely to find facts and make judgments, but also to select the policies deemed in the public interest." (internal quotations omitted)); *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

## IV.     The Court Should Require Plaintiff to Post Security.

For the reasons stated above, the Court should deny the Fund's motion in its entirety. Nevertheless, should the Court issue any injunctive relief, the Court should also order the Fund to post security. Under Rule 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by the Government if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require the Fund to post an appropriate bond commensurate with the scope

of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (a district court has "broad discretion . . . to determine the appropriate amount of an injunction bond").

**V.      The Court Should Stay Any Injunctive Relief.**

To the extent the Court issues any injunctive relief—and it should not—Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or, at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized. "[T]he factors regulating the issuance of a stay are . . . (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). These factors are substantially similar to the preliminary injunction factors and thus for the same reasons that the Fund's preliminary injunction should be denied, any preliminary injunction should be stayed pending an appeal.

*     *     *

**CONCLUSION**

For these reasons, Defendants respectfully request that the Court deny the Fund's request

for preliminary relief.

Dated: July 29, 2026                              Respectfully submitted,

                                                  JEANINE FERRIS PIRRO
                                                  United States Attorney

                                                  PETER C. PFAFFENROTH, D.C. Bar # 496632
                                                  Chief, Civil Division


                                          By:  _____*/s/ Dimitar P. Georgiev*_____
                                                  DIMITAR P. GEORGIEV, D.C. Bar # 1735756
                                                  DHRUMAN Y. SAMPAT
                                                  Assistant United States Attorneys
                                                  601 D Street, NW
                                                  Washington, DC 20530
                                                  (202) 252-2500 (main)

                                                  *Attorneys for the United States of America*

- 42 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IRANIAN AMERICAN LEGAL DEFENSE
FUND,

   Plaintiff,

  v.

MARCO RUBIO, in his official capacity as
Secretary of State, et al.,

   Defendants.

Civil Action No. 26-2375 (ACR)

## [PROPOSED] ORDER

UPON CONSIDERATION of Plaintiff's motion for provisional relief, Defendants'

opposition, and the entire record herein, it is hereby

ORDERED that Plaintiff's motion is DENIED.

SO ORDERED:

_____
Date              ANA C. REYES
                United States District Judge