**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IRANIAN AMERICAN LEGAL DEFENSE FUND, <br><br>     *Plaintiff*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State, et al., <br><br>     *Defendants*. | Civil Action No. 26-2375-ACR |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR STAY**
**UNDER 5 U.S.C. § 705 AND FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT...................................................................................................................... 1

    I.      IALDF is likely to prove that the challenged policy exists and is unlawful............ 1

        A.  Defendants have failed to refute IALDF's evidence demonstrating that the
            challenged policy likely exists. ................................................................... 1

        B.  The presence of hearsay in IALDF's declarations does not preclude their
            consideration at the preliminary relief stage. ............................................. 4

    II.     The Court has jurisdiction to hear IALDF's claims.................................................7

        A.  IALDF has standing to challenge the information-sharing policy..........................7

        B.  IALDF's injuries are fairly traceable to the challenged policy and redressable
            by the requested preliminary relief. ......................................................... 10

        C.  Third-party standing doctrine is inapplicable. ....................................................... 12

        D.  The INA does not divest this Court of jurisdiction................................................ 13

            1.  Section 1252(g) does not bar review. ........................................................... 13

            2.  The channeling provisions in §§ 1252(a)(5) and 1252(b)(9) do not apply...... 15

            3.  Section 1252(f)(1) does not bar the requested relief...................................... 17

    III.    IALDF is suffering irreparable harm in the absence of preliminary relief. ........... 18

    IV.   The balance of the equities and the public interest favor preliminary relief. ........ 20

    V.    The Court should not require a bond or stay any injunctive relief. ....................... 21

CONCLUSION................................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

**Pages**

*Advocates for Human Rights v. DHS*,
  825 F. Supp. 3d 858 (D. Minn. 2026)............................................................... 12

*American Anti-Vivisection Society v. USDA*,
  946 F.3d 615 (D.C. Cir. 2020)......................................................................... 10

*Amica Center for Immigrant Rights v. EOIR*,
  822 F. Supp. 3d 119 (D.D.C. 2026)...........................................................9, 12, 16

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................ 7

*Carpenters Industrial Council v. Zinke*,
  854 F.3d 1 (D.C. Cir. 2017)............................................................................. 11

*Catholic Legal Immigration Network, Inc. v. EOIR*,
  2021 WL 3609986 (D.D.C. Apr. 4, 2021)....................................................... 16

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006)......................................................................... 18

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ........................................................................................ 7

*Coalition for Humane Immigrant Rights v. DHS*,
  780 F. Supp. 3d 79 (D.D.C. 2025)..................................................................... 6

*Coalition for Independent Technology Research v. Rubio*,
  No. 26-cv-815, 2026 WL 2030770 (D.D.C. July 14, 2026)................ 6, 8, 12, 13, 14, 15, 16, 20

*Department of Commerce v. New York*,
  588 U.S. 752 (2019) ....................................................................................... 10

*DHS v. Regents of the University of California*,
  591 U.S. 1 (2020) ........................................................................................... 16

*Electronic Privacy Information Center v. FAA*,
  892 F.3d 1249 (D.C. Cir. 2018).......................................................................... 8

*Equal Rights Center v. Post Properties, Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011).......................................................................8, 9

*Escobar Molina v. DHS*,
  811 F. Supp. 3d 1 (D.D.C. 2025) ................................................................. 14, 16

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ............................................................................................. 9

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*,
  82 F.4th 664 (9th Cir. 2023) ............................................................................... 5

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ............................................................................. 9

*Garcia Ramirez v. ICE*,
  812 F. Supp. 3d 86 (D.D.C. 2025) ..................................................................... 17

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) .......................................................................................... 17

*Gutierrez v. Noem*,
  No. 25-cv-1766, 2025 WL 3496390 (D.D.C. Dec. 5, 2025) ............................... 17

*Grace v. Barr*,
  965 F.3d 883 (D.C. Cir. 2020) ........................................................................... 17

*Harris v. Bessent*,
  No. 25-cv-412, 2025 WL 2576527 (D.D.C. Feb. 20, 2025) ............................... 21

*Immigrant Defenders Law Center v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ........................................................................... 12

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) .......................................................................................... 16

*Karem v. Trump*,
  404 F. Supp. 3d 203 (D.D.C. 2019) ..................................................................... 5

*Khalil v. President, United States of America*,
  164 F.4th 259 (3d Cir. 2026) ............................................................................ 16

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ................................................................................ 5

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) .......................................................................................... 12

*Las Americas Immigrant Advocacy Center v. Wolf*,
  507 F. Supp. 3d 1 (D.D.C. 2020).................................................................................. 7

*League of United Latin American Citizens v. Executive Office of the President*,
  780 F. Supp. 3d 135 (D.D.C. 2025)........................................................................... 21

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ...................................................................................... 20

*L.G.M.L. v. Noem,*
  800 F. Supp. 3d 100 (D.D.C. 2025).......................................................................... 17

*Lujan v. National Wildlife Federation*,
  497 U.S. 871 (1990) ................................................................................................... 7

*Luna Gutierrez v. Noem*,
  811 F. Supp. 3d 133 (D.D.C. 2025)..................................................................... 14, 15

*Mahdawi v. Trump*,
  2026 WL 2090981 (2d Cir. July 21, 2026)............................................................... 16

*Make the Road New York v. Mullin*,
  No. 25-5320, 2026 WL 1792978 (D.C. Cir. June 23, 2026) ............................... 17, 20

*Mullins v. City of New York*,
  626 F.3d 47 (2d Cir. 2010) .......................................................................................... 5

*National Archives & Records Admin. v. Favish*,
  541 U.S. 157 (2004) ................................................................................................... 4

*National Treasury Employees Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996)................................................................................... 8

*National Wrestling Coaches Ass'n v. Department of Education*,
  366 F.3d 930 (D.C. Cir. 2004).................................................................................... 10

*North American Building Trades Unions v. DOD*,
  783 F. Supp. 3d 290 (D.D.C. 2025)........................................................................... 21

*Norton v. SUWA*,
  542 U.S. 55 (2004) ..................................................................................................... 7

*NWDC Resistance v. ICE*,
  493 F. Supp. 3d 1003 (W.D. Wash. 2026) ................................................................ 13

*O.A. v. Trump,*
  404 F. Supp. 3d 109 (D.D.C. 2019)................................................................................ 15, 16

*PETA v. USDA,*
  797 F.3d 1087 (D.C. Cir. 2015)........................................................................................ 8, 12

*Refugee & Immigrant Center for Education & Legal Services v. Mullin,*
  174 F.4th 81 (D.C. Cir. 2026)................................................................................................ 18

*Reno v. American Arab Anti-Discrimination Committee,*
  525 U.S. 471 (1999) ..................................................................................................... 13, 14

*R.I.L.-R. v. Johnson,*
  80 F. Supp. 3d 164 (D.D.C. 2015)............................................................................................. 7

*SPLC v. DHS,*
  No. 18-cv-760, 2020 WL 3265533 (D.D.C. June 17, 2020) ................................................. 4, 5

*Talbott v. United States,*
  775 F. Supp. 3d 283 (D.D.C 2025)............................................................................................. 4

*University of Texas v. Camenisch,*
  451 U.S. 390 (1981) ................................................................................................................ 4, 5

*Warth v. Seldin,*
  422 U.S. 490 (1975) ................................................................................................................... 12

*Wayte v. United States,*
  470 U.S. 598 (1985) ................................................................................................................... 14

**Statutes**

8 U.S.C. § 1252(a)(5)................................................................................................................ 15

8 U.S.C. § 1252(b)(9) ............................................................................................................... 15

8 U.S.C. § 1252(f)(1)................................................................................................................. 18

8 U.S.C. § 1252(g) ............................................................................................................... 13, 14

**Regulations**

8 C.F.R. § 208.6................................................................................................................... 10

v

**INTRODUCTION**

Pursuant to § 705 of the Administrative Procedure Act (APA), Plaintiff Iranian American Legal Defense Fund (IALDF) seeks a stay, pending resolution of this case, of Defendants' policy of providing confidential information about Iranian asylum seekers to the Iranian government. IALDF also seeks a preliminary injunction to allow time for IALDF to provide legal services to those Iranian detainees whose confidential information was shared before it is too late to provide effective assistance. Defendants do not dispute that sharing information from the asylum applications of ICE detainees with a foreign government violates 8 C.F.R. §§ 208.6 and 236.1(e). They argue, however, that because they offered a barebones denial, IALDF is unlikely to be able to prove the existence of the policy. They also raise a litany of supposed jurisdictional issues that, they claim, strip this Court of its ability to restore the status quo ante while this case proceeds. For the reasons explained below, Defendants' arguments fail.

**ARGUMENT**

I.    **IALDF is likely to prove that the challenged policy exists and is unlawful.**

Defendants do not dispute that "a policy of providing confidential information about Iranian asylum seekers to the Islamic Republic of Iran" would violate 8 C.F.R. §§ 208.6 and 236.1(e). Defs. Opp., ECF No. 23, at 1. Rather, they deny that such a policy exists. *Id.* Defendants support their denial with a single, conclusory declaration from an ICE officer and impugn the detailed evidence offered by IALDF. Neither effort is sufficient to show that IALDF is unlikely to prove the existence of the challenged policy.

A.    **Defendants have failed to refute IALDF's evidence demonstrating that the challenged policy likely exists.**

Denying the existence of the challenged policy, Defendants rely on the declaration of an ICE officer who describes the routine exchange of information between ICE and foreign embassies

or consulates to obtain travel documents and coordinate logistics to remove individuals from the United States. *See* Adams Decl., ECF No. 23-2, ¶¶ 6–13. That discussion is irrelevant because IALDF does not challenge the policy of exchanging routine travel document information that is not protected by 8 C.F.R. § 208.6 or § 236.1(e). Rather, IALDF challenges a new policy that began with an agreement between the governments of the United States and Iran reached during a meeting at the State Department in March 2025, pursuant to which the U.S. government has provided information protected by §§ 208.6 and 236.1(e) on a monthly basis. *See* Mehri Decl., ECF No. 9-6, ¶¶ 23, 37–43. The existence of the challenged policy is supported by the Mehri Declaration, which details information provided by a senior Iranian official, *see id.*, and the detailed declarations of seven Iranians in ICE custody who have sworn under penalty of perjury that Iranian consular officials possessed detailed information about their asylum applications. *See* Decl. of P.M., ECF No. 9-4 at 10–13; Decl. of S.O., ECF No. 9-4 at 18–19; Decl. of E.R., ECF No. 9-5 at 5–7; Decl. of A.M., ECF No. 9-5 at 12–13; Decl. of N.Y., ECF No. 9-5 at 17–18; Decl. of N.A., ECF No. 9-5 at 24–25; Decl. of C.Y., ECF No. 9-5 at 37.

By contrast, the Adams declaration asserts in conclusory fashion that the information ICE provides to the Iranian Interest Section "does not include information protected by 8 C.F.R. § 208.6 and 8 C.F.R. § 236.1(e)," Adams Decl., ECF No. 23-2, ¶ 13, and that "DHS does not have an agreement with the Islamic Republic of Iran to provide Iran with information protected by 8 C.F.R. § 208.6 and 8 C.F.R. § 236.1(e)," *id.* ¶ 14. The Adams declaration is silent as to the March 2025 meeting at the State Department where the policy was adopted and the contents of the monthly deliveries of immigration files of Iranian detainees to the Iranian Interest Section. Importantly, the Adams declaration does not attempt to explain how confidential information from the immigration files of Iranians in ICE custody came into the possession of Iranian consular officials.

Indeed, the Adams account cannot be squared with the record.  Adams represents that ICE engages the Interest Section only to secure travel documents for nationals subject to final orders of removal, sharing biographical and nationality data alone.  Adams Decl., ECF No. 23-2, ¶¶ 11–13.  But IALDF's declarants describe contacts that occurred while their asylum cases were pending—C.Y. and N.A. were litigating their claims on appeal, and R.T. had been granted withholding of removal—and Iranian officials already possessed the substance of their applications.  C.Y. attests that the Interest Section representative had her "whole case file," including her fear-interview transcript, and stated that "this was all sent to them by ICE."  Decl. of C.Y., ECF No. 9-5 at 37.  And, when speaking to the New York Times, Iranian officials suggested that they were aware of the status of individuals' asylum cases.  *See* Farnaz Fassihi & Hamed Aleaziz, *U.S. Deports Planeload of Iranians After Deal With Tehran, Officials Say*, N.Y. Times, ECF No. 9-15, at 4 ("The [Iranian] officials said that in nearly every case, asylum requests had been denied or the people had not yet had an asylum hearing."); Farnaz Fassihi, *U.S. Deports Second Planeload of Iranians, Officials Say*, N.Y. Times (Dec. 7, 2025), ECF No. 9-16, at 2 ("One of the Iranian officials" said the individuals "had their asylum requests denied.").  Adams's travel-document rationale cannot explain how the Iranian officials obtained protected asylum information about detainees who had no final order of removal and were actively pursuing relief.

Defendants argue that the Court should credit their declarant's denial of the existence of the challenged policy because the Court should "presume that the government has acted within the law."  Defs. Opp., ECF No. 23, at 28.  Essentially, Defendants argue that, because the challenged policy would be unlawful on its face, the Court should presume that it does not exist.  Any such presumption, however, is overcome where, as here, a plaintiff has produced "evidence that would

3

warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004).

Defendants also argue that "the unwillingness of the Iranian government to issue travel documents underscores the lack of agreement between the two countries." Defs. Opp., ECF No. 23, at 30. To the contrary, by its own admission, the United States removed 109 Iranians on three mass deportation flights between September 2025 and January 2026. Adams Decl., ECF No. 23-2, ¶ 16. Such cooperation where there once was none strongly suggests the existence of a new agreement between the two governments and that the new policy allows Iran to select the ICE detainees who will be removed to Iran. *See* Mehri Decl., ECF No. 9-6, ¶¶ 23, 31, 41–42. At any rate, Defendants' argument gets things sideways. Whether the *Iranian* government has issued travel documents says nothing about whether the *United States* government has adopted the challenged policy of sharing protected information.

**B.    The presence of hearsay in IALDF's declarations does not preclude their consideration at the preliminary relief stage.**

Defendants argue that the Court cannot rely on hearsay in the declaration of Cyrus Mehri to establish the existence of the challenged policy. *See* Defs. Opp., ECF No. 23, at 31–32. That argument is not correct. At the preliminary relief stage, before Defendants have produced the administrative record or answered discovery, standards are relaxed. *See, e.g., Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (observing that preliminary injunctions are "customarily granted on the basis of … evidence that is less complete than in a trial on the merits"). As a result, courts in the D.C. Circuit "permit consideration of hearsay evidence in connection with preliminary injunction motions." *SPLC v. DHS*, No. 18-cv-760, 2020 WL 3265533, at *3 n.2 (D.D.C. June 17, 2020) (citation omitted); *see Talbott v. United States*, 775 F. Supp. 3d 283, 300 (D.D.C 2025) (describing how courts "permit hearsay evidence in the form of sworn affidavits"

4

on applications for preliminary injunctions), *aff'd in part & vacated in part on other grounds*, 176 F.4th 720 (D.C. Cir. 2026).

For example, in *SPLC*, a case challenging conditions in immigration detention facilities, the plaintiff submitted multiple declarations from detainees and medical experts in support of its motion for preliminary relief. *See* 2020 WL 3265533, at *2–3. The court granted the motion in part and rejected defendants' objection that "parts of Plaintiff's declarations [were] 'double hearsay.'" *Id.* at *3 n.2 (citing *Camenisch*, 451 U.S. at 395). Similarly, in *Karem v. Trump*, 404 F. Supp. 3d 203, 207–09 (D.D.C. 2019), plaintiff sought a preliminary injunction to have his White House press pass restored after it was suspended for unprofessional conduct. Plaintiff submitted various exhibits and declarations to support his argument that White House press events had long tolerated unruly behavior, including third-party accounts of what other reporters said and did. *Id.* at 214–15. The court explained that the hearsay "evidence [would] be by no means conclusive as this case moves forward," but relied on it for the limited purposes of granting a preliminary injunction. *Id.* at 215 n.3.

Many other circuits do the same. *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("[S]ix of our sister circuits have permitted district courts to rely on hearsay evidence for the limited purpose of determining whether to award a preliminary injunction."); *e.g.*, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 681–82 (9th Cir. 2023) (considering declarations submitted by a school counselor relaying statements from students and stating that the argument "that the declarations are hearsay is irrelevant"); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718–19 (3d Cir. 2004) (certification was adequate basis for preliminary relief even though it "contains multiple levels of hearsay and is not based solely on personal knowledge").

Defendants conflate pseudonymity with hearsay in their attempt to discredit the individual detainee declarations submitted by IALDF. These declarants' decision to withhold identifying information from the public docket—protecting themselves from the very retaliation, persecution, torture, and other harm that this action seeks to prevent—does not transform the declarants' first-person accounts into hearsay or deprive them of evidentiary value. The declarations, each of which were signed under penalty of perjury, describe events the declarants personally experienced: being compelled to communicate with Iranian officials, observing the officials' possession of identifying information and details of their asylum cases, and hearing statements concerning about how that information was obtained. *See, e.g.*, Decl. of P.M., ECF No. 9-4 at 10–12; Decl. of C.Y., ECF No. 9-5 at 37. IALDF has separately authenticated the declarations and offered to provide unredacted copies under seal or for in camera review. *See* Rahnama Decl. B, ECF No. 9-4, ¶¶ 6, 14.

Defendants' reliance on *Coalition for Humane Immigrant Rights v. DHS*, 780 F. Supp. 3d 79 (D.D.C. 2025), is misplaced. There, the plaintiff organization filed a declaration in support of associational standing that did not identify any member by name and did not submit any declarations from its members. An organizational official instead recounted, with pseudonyms, what members had reportedly experienced, leaving the court with "hearsay-within-hearsay" and "no sworn testimony from the members themselves." *Id.* at 91–92. But the court distinguished *SPLC*, where the organizational plaintiff's declaration was supported by declarations directly from the organization's client and others. *Id.* at 92 n.4. Recently, this court relied on declarations from persons identified as "Member A" and "Member C" to find organizational injury and causation. *Coal. for Indep. Tech. Rsch. v. Rubio* (*CITR*), No. 26-cv-815, 2026 WL 2030770, at *9–10 (D.D.C. July 14, 2026). The relevant questions here are personal knowledge and reliability, both of which IALDF's declarations supply in sworn, authenticated accounts. Thus, the Court may consider the

6

Mehri and individual detainee declarations at this stage of the litigation to show that IALDF is likely to be successful in establishing the existence of the final agency action it challenges—the policy of providing confidential information about Iranian asylum seekers to the Islamic Republic of Iran.

Finally, the challenged policy is discrete, reviewable final agency action, not the sort of "programmatic" challenge that is unreviewable under the APA. *Contra* Defs. Opp., ECF No. 23, at 32–34. IALDF challenges a specific, identifiable policy, adopted at the March 2025 State Department meeting: providing the Iranian government with protected asylum information. *See* Mehri Decl., ECF No. 9-6, ¶¶ 21, 37–43. That policy "mark[s] the 'consummation' of the agency's decisionmaking process" and is one "by which rights or obligations have been determined." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). It does not ask the Court to superintend the day-to-day management of the removal system, so neither *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990), nor *Norton v. SUWA*, 542 U.S. 55, 62–64 (2004), limits this Court's review. Those cases bar suits seeking wholesale improvement of an agency program; they do not immunize a discrete policy from review. That the policy is carried out through many individual transmittals does not make it any less a reviewable policy. *See R.I.L.-R. v. Johnson*, 80 F. Supp. 3d 164, 184–85 (D.D.C. 2015); *Las Ams. Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 35 (D.D.C. 2020).

## II.    The Court has jurisdiction to hear IALDF's claims.

### A.    IALDF has standing to challenge the information-sharing policy.

Defendants' argument that IALDF lacks standing rests on a fundamental mischaracterization of IALDF's claim. IALDF does not rely on the injuries of Iranian asylum seekers as a substitute for an injury of its own. As IALDF has explained, the challenged policy

directly impairs IALDF's provision of legal services and forces the organization to expend scarce resources to keep those services functioning. *See* Pl. Mem., ECF No. 9-1, at 13–17. That is a conventional organizational injury under the two-part test set forth by the D.C. Circuit, which asks, first, "whether the agency's action or omission to act 'injured the [organization's] interest,'" and, then, "whether the organization 'used its resources to counteract that harm.'" *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (quoting *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)); *see CITR*, 2026 WL 2030770, at *8. IALDF satisfies both parts of this test.

To start, as an organization whose purpose is to provide legal protection to a community of Iranian Americans and Iranian nationals in the United States, IALDF "does not stand at a remove from a policy that takes the community as its object." *CITR*, 2026 WL 203077, at *9; *see also Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (reaffirming that "the presence of a direct conflict between the defendant's conduct and the organization's *mission*" goes to show standing). Defendants' policy of sharing the confidential information of Iranian asylum seekers with the Iranian Government "perceptibly impairs [IALDF]'s ability to provide … services," *PETA*, 797 F.3d at 1100 (citation omitted), "inhibit[s]" its "daily operations," *id.* at 1094, and renders its "activities more difficult," *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). Confidential communication is not incidental to IALDF's work of screening asylum and Convention Against Torture (CAT) claims, preparing declarations and supporting evidence, counseling detained clients, and assisting local counsel. It is the indispensable means by which that work occurs. Rahnama Decl. A, ECF No. 9-3, ¶¶ 11–15. When clients reasonably fear that information disclosed in connection with their asylum claims may reach the government from which they seek protection, the resulting loss of candor prevents

8

IALDF from obtaining the facts necessary to evaluate claims, assess danger, and provide accurate advice. *Id*. ¶¶ 18–20. The injury is to the substance of IALDF's legal work, not simply to the interests or preferences of its clients.

Defendants assert that IALDF has not shown that its operations are "perceptibly impaired." Defs. Opp., ECF No. 23, at 7. As stated in the declaration of Interim Executive Director Ali Rahnama, however, IALDF's client intakes and detention interviews now take approximately 20 percent longer; disclosure-risk screening, safety planning, and emergency communications consume an additional five to ten attorney and staff hours each week; and those burdens have reduced the number of matters IALDF can accept by approximately 20 to 25 percent. *See* Rahnama Decl. A, ECF No. 9-3, ¶¶ 21–27. Since IALDF operates with fixed resources and provides its services pro bono, that added work necessarily displaces detention visits, substantive case preparation, referrals, and development of community legal resources. *See id.* ¶ 25. This is not, as Defendants claim, an "abstract injury to [IALDF]'s interests." Defs. Opp., ECF No. 23, at 7 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015)). It is a measurable reduction in IALDF's capacity to serve clients and perform existing legal-services programs. *See Amica Ctr. for Immigrant Rts. v. EOIR*, 822 F. Supp. 3d 119, 141–49 (D.D.C. 2026) (finding standing where legal-services organizations were required to reorganize operations, expend additional resources, and serve fewer clients).

IALDF also satisfies *PETA*'s second prong. IALDF's expenditures are being undertaken "in response to, and to counteract" the challenged policy. *Equal Rts. Ctr.*, 633 F.3d at 1140. Defendants treat all increased operational burdens alike, overreading *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394–95 (2024), which rejected standing based on expenditures for advocacy against the challenged policy. But IALDF's expenditures are not for

advocacy to advance IALDF's preferred policy position; they are the expenditures necessary to maintain a legal-services operation impaired by Defendants' action: IALDF must conduct individualized disclosure-risk screening; revise intake scripts; develop new screening modules; expand staff and volunteer training; research emergency remedies; and modify referral procedures so that it can address the risks created by the challenged policy. Rahnama Decl. A., ECF No. 9-3, ¶¶ 21–27. And the resulting opportunity costs to IALDF further reinforce that the diversion is concrete. *See Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619 (D.C. Cir. 2020) (recognizing expenditures outside normal operations and the consequent drain on organizational resources).

**B.      IALDF's injuries are fairly traceable to the challenged policy and redressable by the requested preliminary relief.**

Defendants next argue that IALDF's injury depends on the independent decisions of clients and prospective clients not to disclose information. Defs. Opp., ECF No. 23, at 9–10. However, the involvement of third-party conduct does not sever causation, and an injury that follows from sufficiently predictable reactions to government action is fairly traceable to that action. *See Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *see also Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004) (holding that plaintiffs suffering impairment due to the conduct of regulated third parties may establish standing by showing "a causal relationship between the government policy and the third-party conduct").

Asylum seekers entrust the United States with intensely sensitive information explaining why they fear the government of their country of origin. Indeed, the U.S. government promises asylum seekers during their credible fear interviews that the information about their claims and cases will never be shared with the government that they are fleeing. *See* 8 C.F.R. § 208.6. IALDF's evidence describes detainees being compelled by ICE to meet or communicate with

10

Iranian officials who knew their names, their status as asylum seekers, the posture of their immigration proceedings, and details relating to their cases. *See, e.g.*, Decl. of S.O., ECF No. 9-4 at 18–19; Decl. of E.R., ECF No. 9-5 at 5–7; Decl. of A.M, ECF No. 9-5 at 12–13; Decl. of N.Y., ECF No. 9-5 at 17–18; Decl. of N.A., ECF No. 9-5 at 24–25; Decl. of C.Y., ECF No. 9-5 at 37. The declarations include an account in which an Iranian representative told a detainee that she had the detainee's "whole case file," including the basis of the detainee's asylum claim and a fear-interview transcript. Decl. of C.Y., ECF No. 9-5 at 37. Against that record, an adverse impact on attorney client communications is all but certain. Reluctance to disclose sensitive information to an attorney is not an unpredictable act of a legally independent third party. It is the natural and foreseeable consequence of the information-sharing policy. The same is true of the added time and resources that IALDF must spend restoring trust, determining whether an Iranian official has contacted a detainee, assessing safety risks, and preparing protective or emergency filings. This chilling effect is documented, not speculative: Mr. Rahnama, who conducts intake in Persian, attests that since IALDF learned of the Interest Section's visits, clients and prospective clients have become markedly more reluctant to share asylum-related facts with IALDF's attorneys and staff. Rahnama Decl. A, ECF No. 9-3, ¶¶ 18–19.

Redressability follows directly from causation. As the D.C. Circuit has explained, "if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017). A stay of the policy creating the disclosure risk would permit IALDF to advise clients that the challenged information-sharing is no longer operative, restore the confidentiality necessary for meaningful intake and counseling, bolster confidence in the U.S. legal system, return screening and detention-visit procedures toward their prior form, and redirect attorney and staff time to regular legal services.

11

The record specifically identifies those operational consequences of relief. *See* Rahnama Decl. A., ECF No. 9-3, ¶¶ 29–30.

### C. Third-party standing doctrine is inapplicable.

Defendants devote substantial attention to *Warth v. Seldin*, 422 U.S. 490 (1975), and *Kowalski v. Tesmer*, 543 U.S. 125 (2004), which address a third-party standing theory not at issue in this case. IALDF does not claim standing as a representative of hypothetical future clients. It has suffered injury to its own legal-services operations, traceable to Defendants' policy and redressable by a stay of that policy. Once an organization establishes standing in its own right, a court has no reason to decide whether it could also assert the rights of members, clients, or other third parties. *See CITR*, 2026 WL 203077, at *8 (noting that plaintiff need only show one satisfactory route to standing, not several).

The fact that staying Defendants' policy would also protect asylum seekers does not convert IALDF's claim into an assertion of third-party rights. Organizational standing routinely arises where government conduct directly impairs an organization's work through its effects on the population the organization serves. *See, e.g.*, *PETA*, 797 F.3d at 1094; *Amica Ctr.*, 822 F. Supp. 3d at 141–49; *see also Immigrant Defenders Law Ctr. v. Noem*, 145 F.4th 972, 987–89 (9th Cir. 2025) (finding organizational—not third-party—standing for a legal services organization whose capacity to counsel and advise asylum seekers was impaired by agency policy); *Advocs. for Hum. Rts. v. DHS*, 825 F. Supp. 3d 858, 880 (D. Minn. 2026) (finding that legal services clinic had both organizational *and* third-party standing).

Finally, Defendants argue that affected asylum seekers are not "hindered from asserting their own rights" by asserting disclosure-related claims during removal proceedings or motions to reopen based on new facts. Defs. Opp., ECF No. 23, at 12. But in fact, Defendants are hindering

12

such individualized claims. No Iranian asylum seeker has received notice from Defendants that their information was disclosed to the Iranian Government. Individual asylum seekers therefore have no meaningful way of seeking immigration relief or effective review before removal.

> ### D. The INA does not divest this Court of jurisdiction.

IALDF challenges Defendants' information-sharing policy, not any removal order, removal decision, or visa revocation. Accordingly, no provision of the INA deprives this Court of jurisdiction or restricts the available relief, and none of provisions cited by Defendants have any bearing on this case.

> #### 1. Section 1252(g) does not bar review.

Defendants first invoke § 1252(g), which strips courts of jurisdiction over "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g). But § 1252(g), which is "narrow[]" in scope, *Reno v. Am. Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 482 (1999), does not apply in this case.

Section 1252(g) "is limited twice over, both in what it covers and in whose claims it channels." *CITR*, 2026 WL 2030770, at *12. It applies only to the "decision or action" to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders." *AADC*, 525 U.S. at 482. It does not apply to "all claims arising from deportation proceedings." *Id.* And it applies "only when the challenge comes from or on behalf of the noncitizen those actions target." *CITR*, 2026 WL 2030770, at *12.

Most basically, IALDF "is not a noncitizen in or facing removal proceedings." *CITR*, 2026 WL 2030770, at *12; *see NWDC Resistance v. ICE*, 493 F. Supp. 3d 1003, 1011 (W.D. Wash. 2026). And as discussed above in section II.C., IALDF is not bringing this action on behalf of any noncitizen. That alone moves this case outside the scope of § 1252(g).

13

In addition, the type of claim at issue is not covered by § 1252(g). IALDF "challenges a policy rather than any decision to commence, adjudicate, or execute removal." *CITR*, 2026 WL 2030770, at *13. "[T]o trigger Section 1252(g), it is insufficient that a decision is 'part of the deportation process.'" *Luna Gutierrez v. Noem*, 811 F. Supp. 3d 133, 149 (D.D.C. 2025) (quoting *AADC*, 525 U.S. at 482–83). Instead, a claim must target one of those three types of decisions. *Id.* at 148–49.

To fit this case within § 1252(g)'s narrow scope, Defendants attempt to transform IALDF's claim into something that it is not: a challenge to the decision to remove Iranian citizens. Notably, Defendants' discussion of § 1252(g) does not even *mention* the claim for relief that IALDF actually brings, which challenges "Defendants' policy of providing to the Iranian Government confidential information protected by 8 C.F.R. § 208.6 and 8 C.F.R. § 236(e)." Compl., ECF No. 1, ¶¶ 60–63; *see id.* ¶ 64. Section 1252(g) is about prosecutorial decisions because those decisions are "particularly ill-suited to judicial review." *AADC*, 525 U.S. at 490 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)); *see Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 41 (D.D.C. 2025). By contrast, IALDF's claims "turn on legal questions"—namely whether the information-sharing policy violate the operative regulations—that lie 'well within courts' normal purview.'" *CITR*, 2026 WL 2030770, at *2 (quoting *Escobar Molina*, 811 F. Supp. 3d at 41).

To be sure, one aspect of the requested relief is to pause the removal of individuals whose information has been shared until those individuals have received notice and been given the opportunity to seek relief in the immigration courts. *See* Mot. for Stay and Prelim. Inj., ECF No. 9, at 1. Nonetheless, IALDF's *claim* is about information sharing, not about deportations. In the words of the statute, the "cause or claim" does not "aris[e] from the decision or action … to … execute removal orders," 8 U.S.C. § 1252(g); it instead arises from the decision to share

14

information with the Iranian government.  In addition, this aspect of the requested relief does not go to the decision to deport any individual.  It instead goes to the "manner" of deportations, *see Luna Gutierrez*, 811 F. Supp. 3d at 149—here, deporting swaths of Iranians after giving confidential information about the basis for their feared persecution to the very government that they fear.  In any event, even if this particular form of relief were barred, that would not strip this Court of jurisdiction over IALDF's claim that Defendants' policy of sharing confidential information with the Iranian Government is unlawful.

**2.  The channeling provisions in §§ 1252(a)(5) and 1252(b)(9) do not apply.**

Defendants next turn to §§ 1252(a)(5) and 1252(b)(9) to argue that IALDF's claims must be channeled to the court of appeals.  But both provisions involve judicial review of removal orders.  Again, IALDF is not asking this Court to review any removal order.

More specifically, § 1252(a)(5) says that "a petition for review filed with an appropriate court of appeals … shall be the sole and exclusive means for judicial review of an order of removal."  8 U.S.C. § 1252(a)(5).  This provision "merely reaffirms that Congress has provided a single means for obtaining judicial review of removal orders."  *O.A. v. Trump*, 404 F. Supp. 3d 109, 129 (D.D.C. 2019).  "Because Plaintiffs do not seek review of a removal order—or, indeed, of any decision or action taken in the course of a removal proceeding—§ 1252(a)(5) has no bearing on the Court's statutory jurisdiction."  *Id.*; *see CITR*, 2026 WL 2030770, at *14.

Under § 1252(b)(9), "[j]udicial review of all questions of law and fact … arising from any action taken or proceeding brought to remove an alien … shall be available only in judicial review of a final order."  8 U.S.C. § 1252(b)(9).  This section "does not sweep in every claim that has some connection to removal." *CITR*, 2026 WL 2030770, at *13.  Thus, § 1252(b)(9) does not apply when a plaintiff is "not asking for review of an order of removal," "not challenging the decision to detain them in the first place or to seek removal," and not "challenging any part of the process

15

by which their removability will be determined." *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018); *accord DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 19 (2020).  This provision "is certainly not a bar where, as here, the parties are not challenging any removal proceedings."  *Id.*  Thus, "[c]ourts in this circuit … consistently have concluded that section 1252(b)(9)'s zipper clause is inapplicable when a rule of general applicability is challenged outside the context of a removal proceeding."  *Cath. Legal Immigr. Network, Inc. v. EOIR*, 513 F. Supp. 3d 154, 167 (D.D.C. 2021) (collecting cases); *see also Escobar Molina*, 811 F. Supp. 3d at 40 (collecting cases).

Defendants argue that § 1252(b)(9)'s jurisdictional bar kicks in because individuals whose information is shared could seek relief through the immigration courts.  *See* Defs. Opp., ECF No. 23, at 20–21.  Here, though "[t]he question is not whether an issue *could* be raised in removal proceedings, but rather whether it 'arise[s]' from those proceedings."  *O.A.*, 404 F. Supp. 3d at 133 (quoting 8 U.S.C. § 1252(b)(9)); *see Cath. Legal. Immigr. Network*, 513 F. Supp. 3d at 167–68.  It does not.

Defendants also point to two decisions that do not bear on this case.  *See* Defs. Opp., ECF No. 23, at 22–23.  Both cases involve individuals who were (1) in removal proceedings and (2) "challenging the government's very basis for trying to remove" them.  *Khalil v. President, United States of America*, 164 F.4th 259, 274 (3d Cir. 2026); *accord Mahdawi v. Trump*, 2026 WL 2090981, at *8 (2d Cir. July 21, 2026).  By contrast, IALDF "is not in removal proceedings, cannot file a petition for review, and cannot obtain review of its organizational claims in a proceeding to which it is not a party."  *CITR*, 2026 WL 2030770, at *14; *see Amica Ctr.*, 822 F. Supp. 3d at 150 n.5.

### 3.  Section 1252(f)(1) does not bar the requested relief.

Finally, Defendants turn to § 1252(f)(1).  As an initial matter, this provision "does not speak to the Court's *jurisdiction*" but instead "limits the *relief* a court may grant."  *CITR*, 2026

16

WL 2030770, at *14; *see Gutierrez v. Noem*, No. 25-cv-1766, 2025 WL 3496390, at *12 (D.D.C. Dec. 5, 2025). Thus, even if the Court agrees with Defendants on this score, it would nevertheless retain jurisdiction over IALDF's claims.

Moreover, Defendants' argument is squarely foreclosed by precedent. Just last month, the D.C. Circuit held that "Section 1252(f)(1) does not bar stays issued under § 705." *Make the Rd. New York v. Mullin*, 179 F.4th 16, 31 (D.C. Cir. 2026). Defendants argue that *Make the Road* applies only in a narrow context, *see* Defs. Opp., ECF No. 23, at 26, but the opinion's language and reasoning apply to all § 705 stays, which ensure that agencies cannot "implement challenged policies immediately and proceed with removals while litigation proceeds." *Make the Rd.*, 179 F.4th at 32. Defendants' effort to cabin *Make the Road* to the expedited-removal context cannot be reconciled with the case's reasoning. The court held that a § 705 stay does not "enjoin or restrain the operation of" any provision covered by § 1252(f)(1) because a § 705 stay simply suspends a challenged policy. *Id.* at 31–32. This rationale turns on the nature of § 705 relief, not on any feature unique to expedited removal.

Even as to IALDF's request for an injunction, 1252(f)(1) does not apply. "Section 1252(f)(1) applies to orders concerning certain specified statutory provisions." *Garcia Ramirez v. ICE*, 812 F. Supp. 3d 86, 110 (D.D.C. 2025), *opinion clarified*, No. 18-cv-508, 2026 WL 1557609 (D.D.C. June 2, 2026); *see L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 123 (D.D.C. 2025). "[A] court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022). Section 1252(f)(1) "refers only to 'the operation of the provisions'—i.e., the statutory provisions themselves, and thus places no restriction on the district court's authority to enjoin *agency action* found to be unlawful." *Grace v. Barr*, 965 F.3d 883, 907

17

(D.C. Cir. 2020) (quoting 8 U.S.C. § 1252(f)(1)). Here, the unlawful agency action is information sharing, not removal. In fact, the D.C. Circuit recently affirmed an injunction prohibiting "removing any individual plaintiffs or class members without complying with the asylum statute." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 117 (D.C. Cir. 2026). IALDF seeks the same thing in a different context: Defendants should not be permitted to remove individuals harmed by the unlawful information-sharing policy until they have received notice and an opportunity to seek relief by reopening their asylum cases in immigration court.

## III.    IALDF is suffering irreparable harm in the absence of preliminary relief.

Defendants' irreparable-harm argument addresses the wrong injury. Defendants focus almost entirely on whether a removal flight to Iran is presently scheduled. Defs. Opp., ECF No. 23, at 36–37. But IALDF's injury is an ongoing impairment of its core activity of providing confidential legal services to Iranian asylum seekers. That harm is "certain and great," "actual and not theoretical," and sufficiently imminent to create a "clear and present" need for equitable relief, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006), because it exists now, each day the challenged disclosure and access practices remain in effect, regardless of whether Defendants have placed any particular individual on a removal flight.

Defendants do not state that they have suspended the challenged information-sharing policy, stopped transmitting confidential detainee materials, ceased facilitating Iranian officials' nonconsensual access to asylum seekers held at ICE facilities, notified affected individuals, or restored the confidentiality on which IALDF's services depend. The absence of a scheduled removal flight does not shorten IALDF's intakes, restore client candor, return diverted attorney time, or eliminate the need for counseling and safety planning prompted by possible disclosures. That is especially true because IALDF's clients are not just concerned for themselves—they also credibly fear that the shared information could harm their family and friends back in Iran. *See,*

18

*e.g.*, Decl. of R.T, ECF No. 9-5 at 32; Decl. of C.Y., ECF No. 9-5 at 37.  The harms to IALDF therefore continue, regardless of future flights.

Defendants attempt to turn IALDF's requested relief upside down by arguing that affected asylum seekers are "not without recourse" because they may file motions to reopen.  Defs. Opp., ECF No. 23, at 37.  But that argument assumes the very notice that Defendants have withheld (and IALDF requests).  An individual asylum seeker cannot seek reopening based on an unlawful disclosure that the individual does not know occurred.  The challenged policy operates through nonpublic communications, document transfers, and government-facilitated encounters with Iranian officials.  The identities of affected persons and the scope of any disclosures therefore remain within Defendants' control.  For that reason, IALDF's proposed relief seeks notice to affected individuals, so that they may be afforded the opportunity to reopen their cases and assert any new basis for asylum, withholding, or CAT protection.

Last, Defendants contend that IALDF's investigation into the challenged policy before filing this case demonstrates a lack of urgency.  Defs. Opp., ECF No. 23, at 37–38.  As explained by IALDF in its motion opposing Defendants' motion for an extension to reply, Defendants' argument ignores the ongoing, secret nature of the challenged policy.  Contrary to Defendants' assertion that the record identifies no investigative steps on the part of IALDF, the Mehri declaration explains that IALDF submitted Freedom of Information Act (FOIA) requests to the Department of State, U.S. Customs and Border Protection (CBP), and ICE seeking records concerning the coordination underlying removals of Iranian nationals to Iran.  Mehri Decl., ECF No. 9-6, ¶ 11.  After the agencies failed to provide the requested records, IALDF filed a federal FOIA action in April 2026 seeking declaratory and injunctive relief.  That action, *IALDF v. Department of State*, No. 26-cv-1444 (D.D.C.), remains pending.  In addition, IALDF

19

representatives visited detention facilities in multiple States, interviewed Iranian asylum seekers, worked with local counsel, investigated threatened removals, and collected firsthand declarations. *See* Rahnama Decl. B, ECF No. 9-4, ¶¶ 4–6. These declarations were collected over time as access to detained individuals permitted, including several in June 2026 and one on July 14, 2026—the day before IALDF's motion was filed. The Government cannot invoke the time consumed by this investigation as proof that no emergency exists.

## IV.    The balance of the equities and the public interest favor preliminary relief.

Defendants argue that there is a public interest in preserving national security and enforcing U.S. immigration laws. *See* Defs. Opp., ECF No. 23, at 39–40. But they fail to explain how sharing confidential asylum application files with a hostile government notorious for abusing the human rights of its citizens preserves national security. And Defendants cannot claim to be enforcing immigration laws when their policy violates those laws instead. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The Court should stay Defendants' policy under § 705 and issue appropriate injunctive relief to prevent further harm during the pendency of this case.

Further, Defendants are wrong to argue that IALDF improperly seeks ultimate relief. Defs. Opp., ECF No. 23, at 27–28. "A [§ 705] stay is just the preliminary form of vacatur—much like a preliminary injunction is the preliminary form of a permanent injunction." *Make the Rd.*, 179 F.4th at 32. IALDF makes a modest request: that Defendants not be permitted to continue their unlawful information-sharing policy until this Court has a chance to fully evaluate the merits.

## V.    The Court should not require a bond or stay any injunctive relief.

The Court should reject Defendants' request for a bond, *see* Defs. Opp., ECF No. 23, at 40–41, or require only a nominal one. IALDF seeks a § 705 stay, which "carries no security requirement." *CITR*, 2026 WL 2030770, at *26 (collecting cases). And although IALDF also

seeks a preliminary injunction, that does not change matters.  Courts in this district have repeatedly "declin[ed] to require bonds in public interest litigation," where, as here, the "government is the enjoined party and no concrete economic injury is established," and "[w]here a bond would have a chilling effect on access to justice." *N. Am.'s Bldg. Trades Unions v. DOD*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025); *see also League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 224–25 (D.D.C. 2025).

The Court should not stay any injunctive relief.  As Defendants acknowledge, the stay factors "are substantially similar to the preliminary injunction factors."  Defs. Opp., ECF No. 23, at 41; *see Harris v. Bessent*, No. 25-cv-412, 2025 WL 2576527, at *1 (D.D.C. Feb. 20, 2025). Thus, for all reasons that an injunction is proper, any injunctive relief should not be stayed.

## CONCLUSION

For the foregoing reasons, the Court should grant IALDF's motion and enter a stay under § 705 of the APA, as well as appropriate injunctive relief.

Dated: July 31, 2026                                        Respectfully submitted,

                                                            /s/ Michael T. Kirkpatrick
Ali Rahnama (DC Bar No. 1032695)         Michael T. Kirkpatrick (DC Bar No. 486293)
Bardia Arasteh (pro hac vice forthcoming)   Hoyeon Kelly Lew (DC Bar No. 90028415)
Iranian American Legal Defense Fund       Becca Steinberg (DC Bar No. 1736190)
1901 Pennsylvania Ave NW, Ste. 900          (admission to DDC pending)
Washington, DC 20006                     Public Citizen Litigation Group
(202) 339-1255                           1600 20th Street, NW
ali.rahnama@ialdf.org                    Washington, DC 20009
barasteh@ialdf.org                       (202) 588-7728
                                         mkirkpatrick@citizen.org
                                         klew@citizen.org
                                         bsteinberg@citizen.org

*Attorneys for Plaintiff Iranian American Legal Defense Fund*