**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IRANIAN AMERICAN LEGAL DEFENSE FUND,<br><br>*Plaintiff*,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, et al.,<br><br>*Defendants*. | Civil Action No. 26-2375-ACR |

## PLAINTIFF'S PRE-HEARING SUBMISSIONS

The Court has set a hearing for October 15, 2026, to (1) hear testimony on Plaintiff's motion for a stay under 5 U.S.C. § 705 and for a preliminary injunction, *see* ECF No. 9; (2) consider Plaintiff's emergency motion for expedited discovery, *see* ECF No. 31; and (3) conduct a pre-motion conference on Defendants' anticipated motion to dismiss, *see* ECF No. 37. Plaintiff Iranian American Legal Defense Fund (IALDF) provides the following information and attached materials in anticipation of the evidentiary hearing. For the other matters, Plaintiff relies on the documents that were previously filed.

## BACKGROUND

IALDF brought this action under the Administrative Procedure Act (APA) seeking vacatur of Defendants' policy of providing the Iranian government information about Iranian asylum seekers that is protected by 8 C.F.R. §§ 208.6 and 236.1(e), *see* Compl., ECF No. 1, and moved for a stay and for a preliminary injunction, *see* ECF No. 9. Initially, IALDF based its allegation that Defendants have such a policy on (1) declarations from Iranian asylum seekers whose confidential information had been shared with the Iranian government, *see* Rahnama Decl. B,

ECF Nos. 9-4, 9-5; (2) a declaration from Cyrus Mehri describing conversations in which a Senior Official from the Iranian Interest Section told him that, since a meeting at the State Department in March 2025, the United States has been providing the Iranian government with detained Iranians' immigration files, including confidential asylum information, *see* Mehri Decl., ECF No. 9-6; and (3) two New York Times articles that quote an Iranian official who had information about the asylum status of Iranian deportees, *see* Farnaz Fassihi & Hamed Aleaziz, *U.S. Deports Planeload of Iranians After Deal With Tehran, Officials Say*, N.Y. Times, ECF No. 9-15; Farnaz Fassihi, *U.S. Deports Second Planeload of Iranians, Officials Say*, N.Y. Times, ECF No. 9-16.

Defendants denied that the policy exists based solely on a single ICE official's declaration that DHS does not have an agreement with the government of Iran to provide it with protected information. *See* Adams Decl., ECF No. 23-2, ¶ 14. The Adams declaration says nothing about whether the State Department has such an agreement, and it is silent as to whether any Defendant has a policy of providing such information to the Iranian government.

On August 5, 2026, the Court held a hearing on IALDF's motion and concluded that it needed more information as to whether the challenged policy exists before it could rule on the motion for preliminary relief. *See* Hrg. Tr., ECF No. 29, at 42:4–6. Specifically, the Court asked for information regarding:

(1) whether the United States government and the Iranian Interests Section have continued to communicate regarding removals since the beginning of Operation Epic Fury in February 2026, *id.* at 4:5–5:8, 6:4–7, 47:24–48:15;

(2) whether Iranians are being removed to third countries, *id.* at 5:19–23, 48:1–2;

(3) whether the quantity of impairment to IALDF's ability to serve its clients is sufficient to establish organizational standing, *id.* at 16:5–22, 21:15–18;

(4) what Mr. Adams did to investigate the claims and come up with the assertions in his declaration, *id.* at 29:5–24, including whether he spoke to the DHS agents who provided files to the Iranian Interests Section to find out what was transmitted, *id.* at 30:18–22, whether he assessed the information transferred between DHS and the Iranian Interests Section, *id.* at 30:35–31:3; and who he spoke to regarding the detention center visits by Iranian officials, *id.* at 31:12–15;

(5) whether there was a meeting in March of 2025 between DHS or the State Department and the Iranian Interests Section about removals and who participated in it, *id.* at 45:20–23, 46:15–19; and

(6) whether the sharing of confidential information was sufficiently widespread that it amounted to a policy, *id.* at 40:9–41:11.

The Court ordered that Mr. Adams appear live to testify at the hearing, *id.* at 49:10–11, encouraged Plaintiff to seek the appearance and testimony of the Senior Official of the Iranian Interests Section referred to in the First Mehri Declaration, *id.* at 46:24–47:5, and stated that Plaintiff could submit additional evidence in support of its motion, *id.* at 48:23–24.

## EVIDENCE SUBMITTED

Plaintiff submits the following additional evidence.

### I. Declarations of Iranian asylum seekers whose confidential information was shared with the Iranian government.

IALDF previously submitted three forms of evidence documenting the sharing of confidential asylum information with the Iranian government: (1) declarations from Iranian asylum seekers; (2) a declaration from Cyrus Mehri detailing his conversations with a Senior Iranian Official; and (3) two New York Times articles quoting Iranian officials who possessed this information. *See supra* at 1–2.

IALDF now submits supplemental declarations from six of these asylum seekers. These supplemental declarations provide additional clarity about what information was shared with Iranian officials and how these individuals know that the information had been shared. These declarations include:

- **Supplemental Declaration of S.O.** (Ex. 1). S.O.'s previous declaration, ECF No. 9-4 at 15–20 (Ex. 2.B), described that an Iranian official "had specific, detailed knowledge about our immigration cases." *Id.* at 19. S.O.'s supplemental declaration clarifies that the Iranian official specifically knew details of detainees' asylum cases. When an Iranian official met with a group of Iranian detainees, he had a list of names and told detainees: "I know you have applied for asylum." Ex. 1, ¶ 5. He also told the detainees that only one individual had not gone through the immigration court and named that person. *Id.* Further, the declaration describes an ICE official allowing the Iranian official to read information from the ICE system on his phone. *Id.*
- **Supplemental Declaration of E.R.** (Ex. 2). E.R.'s previous declaration, ECF No. 9-5 at 1–8 (Ex. 2.F), described being forced to speak with an Iranian official who "knew about [E.R.'s] asylum claim and where [E.R.] was in [the] asylum process." *Id.* at 5. E.R.'s supplemental declaration adds that the Iranian official stated: "I know that your fear interview has been rejected, and ICE has asked us to issue a travel document for you." Ex 2, ¶ 4.
- **Supplemental Declaration of A.M.** (Ex. 3). A.M.'s previous declaration, ECF No. 9-5 at 9–14 (Ex. 2.G), described that ICE forced thirteen or fourteen Iranian detainees to meet with an Iranian official, who "knew where we are in our asylum process." *Id.* at 12. A.M.'s supplemental declaration elaborates that the Iranian official told the detainees that "based

on the list given to us, I know who has their asylum claim denied and whose asylum claim is still pending." Ex. 3, ¶ 5.

- **Supplemental Declaration of N.Y.** (Ex. 4). N.Y.'s previous declaration, ECF No. 9-5 at 15–20 (Ex. 2.H), described a meeting where an Iranian official told detainees that "he knows about our cases." *Id.* at 18. N.Y.'s supplemental declaration adds detail about this meeting. The Iranian official told detainees "that based on the list given to us, I know that your asylum cases are denied," and then "he even read a few names as examples." Ex. 4, ¶ 5.
- **Supplemental Declaration of N.A.** (Ex. 5). N.A.'s previous declaration, ECF No. 9-5 at 21–26 (Ex. 2.J), described a meeting between Iranian detainees and an Iranian official, during which an ICE officer shared with the Iranian official information about the husband of one of the detainees and his status as an asylum seeker. *Id.* at 24. N.A.'s supplemental declaration explains that the Iranian official had a list of names and the husband was not on the list; nevertheless, the ICE officer "checked on his computer and replied to [the Iranian official] with details of [the asylum seeker husband's] case on the spot." Ex. 5, ¶ 4; *see id.* ¶ 5.
- **Supplemental Declaration of C.Y.** (Ex. 6). C.Y.'s previous declaration, ECF No. 9-5 at 34–38 (Ex. 2.L), described a forced phone call with an Iranian official who "knew my name, my A number, and all the details of my asylum case, including the basis of my asylum claim, where I was in my asylum process, and even … the entire transcript of my fear interview." *Id.* ¶ 6. C.Y.'s supplemental declaration reiterates this information and adds that the Iranian official said that she had "seen your final decision from your asylum case hearing." Ex. 6, ¶ 5. It explains that an Iranian official said "she had my whole case

file in her hands, and that this was all sent to them by ICE." *Id.* And she had information that was available only in the file. *Id.*

## II. Declaration revealing the identity of the Senior Official and efforts to seek his appearance and testimony.

IALDF previously submitted the Declaration of Cyrus Mehri, ECF No. 9-6, which described, among other things, his direct communications with a Senior Official of Iran's Interest Section in Washington, D.C., whom that declaration referred to only as the "Senior Official." *See id.* ¶¶ 17–66. At the August 5 preliminary injunction hearing, the Court questioned whether it can rely on an anonymous Iranian official speaking through a third party, Hrg. Tr. at 48:21–22, and encouraged IALDF to seek the official's appearance and testimony, *id.* at 46:24–25. IALDF now submits a second declaration from Mr. Mehri that addresses both topics. Ex. 7.

First, the declaration identifies the Senior Official by name and explains his role within the Iranian Interests Section. *See id.* ¶¶ 3–5. Second, the declaration reports two phone calls between Mr. Mehri and the Senior Official, including the Senior Official's refusal to testify at the evidentiary hearing based on his diplomatic status. *See id.* ¶¶ 6–18.

As IALDF explained in support of its motion for a stay and a preliminary injunction, the Court may consider hearsay evidence in connection with Plaintiff's motion for preliminary relief. *See* Pl. Reply, ECF No. 24, at 4–5 (citing *Talbott v. United States*, 775 F. Supp. 3d 283, 300 (D.D.C. 2025); *SPLC v. DHS*, No. 18-cv-760, 2020 WL 3265533, at *3 n.2 (D.D.C. June 17, 2020); *Karem v. Trump*, 404 F. Supp. 3d 203, 207–09 (D.D.C. 2019)). Further, Mr. Mehri's account of the statements made by the Senior Official may be considered under the residual exception to the hearsay rule. *See* Fed. R. Evid. 807. The Senior Official has diplomatic immunity and is not subject to judicial process. *See, e.g.*, *In re Grand Jury Procs., Doe No. 700*, 817 F.2d 1108, 1111 (4th Cir. 1987) (holding that under the Vienna Convention on Diplomatic Relations,

foreign officials with diplomatic status are immune from civil process and are not obliged to give evidence as a witness). Thus, Mr. Mehri's account of the Senior Official's statements is more probative than any other evidence IALDF can obtain through reasonable efforts. Mr. Mehri will be available to testify at the evidentiary hearing on October 15, 2026.

**III. Declaration detailing the quantity of impairment to IALDF's ability to serve its clients.**

In an earlier declaration, IALDF's Interim Executive Director, Ali Rahnama, explained how Defendants' information-sharing policy concretely impacts IALDF and required the organization to make substantial operational changes. *See* Rahnama Decl., ECF No. 9-3, ¶¶ 18–28. In light of Defendants' information-sharing policy, IALDF has been forced to spend substantial time on additional tasks, including advising clients who fear their information has been shared, speaking with detainees and relatives whose information has been shared, and conducting disclosure-risk screening and safety planning. *Id.* ¶ 23. Each client interview now takes approximately 20% longer, and this additional work takes approximately five to ten hours per week. *Id.* ¶ 24.

At the August 5 preliminary injunction hearing, the Court asked IALDF to provide a baseline to contextualize this additional work. Hrg. Tr. at 21:15–18. IALDF now submits a supplemental declaration from Mr. Rahnama providing that information.

Mr. Rahnama's supplemental declaration explains that IALDF is composed of a small team with a small budget. *See* Ex. 8. Through September 2026, it had only two full-time attorneys, two non-attorney staff members, and one attorney who volunteers on a limited pro bono basis. *Id.* ¶¶ 2, 4. Additionally, IALDF consults a team of external advisors, four attorneys serving on its Case Review and Strategy Committee who help guide IALDF's strategy but do not perform any of IALDF's day-to-day legal work. *Id.* ¶ 3. Mr. Rahnama's supplemental declaration underscores

that the burden imposed by the challenged policy is a measurable and significant burden on IALDF's small team. *See id.* ¶¶ 5–7.

Indeed, Mr. Rahnama's declarations illustrate that IALDF suffers a materially identical injury to those that have previously given rise to organizational standing: IALDF "will 'be unable to represent the same number of clients that it does currently,' will need to 'spend more resources on each individual case,' and will be 'force[d] ... to divert scarce resources away from other important programs.'" *O.A. v. Trump*, 404 F. Supp. 3d 109, 143 (D.D.C. 2019). Mr. Rahnama will be available to testify at the evidentiary hearing on October 15, 2026.

## IV. Documents indicating that the Iranian government has a role in selecting those to be removed.

In his first declaration, Mr. Mehri indicated that individuals from the Iranian Interests Section and ICE met monthly to review detainee files, and that the Senior Official selected specific individuals for deportation. First Mehri Decl., ECF No. 9-6, ¶¶ 23, 30–31. IALDF has also cited public reporting indicating that Iranian officials worked together with U.S. officials to choose which Iranians were deported. *See* Notice of Factual Developments, ECF No. 36, ¶ 8 n.1.

IALDF now submits additional documents obtained under the Freedom of Information Act that confirm that the Iranian Interests Section was involved in selecting which Iranian individuals would be removed. Ex. 9. These documents include emails among officials at ICE and DHS discussing deportation flights to Iran. For example, three days before the September 29, 2025, deportation flight, one ICE official wrote that "[t]he Iran Embassy … requested that [three individuals] be added to the flight." *Id.* at 8. Similarly, in August 2025, one ICE official states: "Per the request from the Iran Embassy I added a few cases" to a deportation flight. *Id.* at 7.

More broadly, these documents also evidence regular meetings and communications between the Iranian Interests Section and the United States Government concerning removals. *See id.* at 1, 4–6.

## V. Declarations regarding planned mass deportation flights to Iran in July 2026 and continued communication between Iranian officials and detainees.

At the August 5 hearing, the Court asked whether there were ongoing removals of Iranian asylum seekers. Hrg. Tr., ECF No. 29 at 7:21–24. Plaintiff informed the Court that there was a flight scheduled to remove Iranians to Iran in March 2026, but it was canceled due to the war, and that at least one Iranian asylum seeker was removed to the Central African Republic in June 2026. *Id.* at 49:25–50:9. Plaintiff subsequently informed the Court that (1) the United States had removed Iranian asylum seekers to the Central African Republic; and (2) a subsequent deportation flight to Iran had been scheduled for July 2026, and that it was canceled only after hostilities resumed. Notice of Factual Developments, ECF No. 36, ¶¶ 4–6 10.

IALDF now submits additional information about the flight that was planned for July 2026, including from asylum seekers who were scheduled to be on that flight or who had relatives who were scheduled to be on that flight. *See* Decl. of D.K. (Ex. 10) at 1–2; Decl. of F.B. (Ex. 11), ¶¶ 9–10; Decl. of G.W. (Ex. 12), ¶¶ 4–5; Decl. of J.H. (Ex. 13), ¶¶ 13–15.

Further, these declarations underscore that ICE continued to force communications between the Iranian Interests Section and Iranian detainees after February 2026, showing continuing collaboration.

Dated: October 8, 2026

Respectfully submitted,

/s/ Michael T. Kirkpatrick
Michael T. Kirkpatrick (DC Bar No. 486293)
Becca Steinberg (DC Bar No. 1736190)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-7728
mkirkpatrick@citizen.org
bsteinberg@citizen.org

Ali Rahnama (DC Bar No. 1032695)
Bardia Arasteh (admitted pro hac vice)
Iranian American Legal Defense Fund
1901 Pennsylvania Ave NW, Ste. 900
Washington, DC 20006
(202) 339-1255
ali.rahnama@ialdf.org
barasteh@ialdf.org

*Attorneys for Plaintiff Iranian American Legal Defense Fund*