UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IRANIAN AMERICAN LEGAL DEFENSE FUND,<br><br>Plaintiff,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, et al.,<br><br>Defendants. | Civil Action No. 26-2375 (ACR)<br>(UNDER SEAL) |

**DEFENDANTS' MOTION TO DISSOLVE**

## TABLE OF CONTENTS


Table of Contents ........ 1

Table of Authorities ........ 2

Introduction ........ 1

Argument ........ 1

I. The *Ex Parte* Order is an Injunction. ........ 1

II. The Injunction Fails to Meet the Heightened Standard. ........ 3

A. The Court Determined that There is No Policy, and therefore Plaintiff Lacks Standing. ........ 4

B. Even Assuming Standing, the INA Bars Review. ........ 5

C. Plaintiff Cannot Succeed on the Merits of their Claims. ........ 10

III. The Court Should Find that Irreparable Harm and Balance of the Equities Favor Defendants. ........ 10

A. Defendants are Irreparably Harmed. ........ 10

B. The Balance of the Equities and Public Interest Weigh in Defendants' Favor. ........ 12

IV. The Court's Order Exceeds its Jurisdiction. ........ 15

CONCLUSION ........ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adair v. England*,
193 F. Supp. 2d 196 (D.D.C. 2002) ........ 15

*All. for Retired Americans v. Bessent*,
770 F. Supp. 3d 79 (D.D.C. 2025) ........ 12

*Am. Foreign Serv. Ass'n v. Trump*,
No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ........ 14

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........ 3

*Biden v. Texas*,
597 U.S. 785 (2022) ........ 9

*Biovail Corp. v. FDA*,
448 F. Supp. 2d 154 (D.D.C. 2006) ........ 12

*Bonhometre v. Gonzales*,
414 F.3d 442 (3d Cir. 2005) ........ 6

*California v. Texas*,
593 U.S. 659 (2021) ........ 5

*California Valley Miwok Tribe v. Haaland*,
Civ. A. No. 24-0947 (TSC), 2024 WL 4345787 (D.D.C. Sep. 30, 2024) ........ 11

*Camarena v. Director, Immigr. and Customs,*
*Enf.*, 988 F.3d 1268 (11th Cir. 2021) ........ 5

*Canning v. Dep't of State*,
453 F. Supp. 3d 332 (D.D.C. 2020) ........ 13

*Chamber of Comm. v. EPA*,
642 F.3d 192 (D.C. Cir. 2011) ........ 5

*Chaplaincy of Full Gospel Churches*,
454 F.3d (D.C. Cir. 2006) ........ 11

*Cheney v. United States Dist. Court for D.C.*,
542 U.S. 367 (2004) ........ 13

*Coalition for Humane Rights v. Mullin*,
185 F.4th 1275, (D.C. Cir. 2026) ..... 5

*Cruz v. Dep't of Homeland Sec.*,
2019 WL 8139805 (D.D.C. Nov. 21, 2019) ..... 12

*Ctr. for Educ. and Legal Servs. v. Mullin*,
174 F.4th 81 (D.C. Cir. 2026) ..... 2

*D.A. v. Noem*,
800 F. Supp. 3d 43 (D.D.C. 2025) ..... 13

*E.F.L. v. Prim*,
986 F.3d 959 (7th Cir. 2021) ..... 5

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ..... 4

*Fiallo v. Bell*,
430 U.S. 787 (1977) ..... 11

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ..... 4

*Frank v. Autovest, LLC*,
961 F.3d 1185 (D.C. Cir. 2020) ..... 4

*Frison v. Principi*,
No. 03-5095, 2003 WL 22097797 (D.C. Cir. Aug. 28, 2003) ..... 15

*Fulbright & Jaworski v. Dep't of Treasury*,
545 F. Supp. 615 (D.D.C. 1982) ..... 13

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) ..... 12

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022) ..... 2, 9

*Haig v. Agee*,
453 U.S. 280 (1981) ..... 15

*Hamama v. Homan,*
912 F.3d 869 (6th Cir. 2018) ..... 5

*Holder v. Humanitarian Law,*
*Proj.*, 561 U.S. 1 (2010) ... 14

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
219 F. Supp. 2d 57 (D.D.C. 2002) ... 14

*I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*,
789 F.2d 21 (D.C. Cir. 1986) ... 2

*J.E.F.M. v. Lynch*,
837 F.3d 1026 (9th Cir. 2016) ... 6

*Khalil v. President, United States*,
164 F.4th 259 (3d Cir. 2026) ... 7

*Kiobel v. Royal Dutch Petroleum*,
569 U.S. 108 (2013) ... 11

*LA Cnty. Federation of Labor*,
510 U.S. 1301 (1993) ... 14

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ... 3

*Mahdawi v. Trump*,
183 F.4th 103 (2d Cir. 2026) ... 7

*Make the Rd. N.Y. v. Mullin*,
179 F.4th 16 (D.C. Cir. 2026) ... 2, 9

*Mohammed v. Biden*,
2024 WL 2372182 (D.D.C. Apr. 2, 2024) ... 13

*Mylan Pharms., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000) ... 12

*N.S. v. Dixon*,
141 F.4th 279 (D.C. Cir. 2025) ... 8, 9

*Nken v. Holder*,
556 U.S. 418 (2009) ... passim

*Nkrumah v. Pompeo*,
2020 WL 6270754 (D.D.C. Oct. 26, 2020) ... 13

*Olu-Cole v. E.L. Haynes Pub. Charter Sch.*,
930 F.3d 519 (D.C. Cir. 2019) ........ 11

*Principe v. Ault*,
62 F. Supp. 279 (N.D. Ohio 1945) ........ 3

*Rauda v. Jennings*,
55 F.4th 773 (9th Cir. 2022) ........ 6

*Reno v. American-Arab Anti-Discrimination* Committee,
525 U.S. 471 (1999) ........ 6, 7, 14

*Standing Rock Sioux Tribe v. Army Corps of Eng'rs*,
205 F. Supp. 3d 4 (D.D.C. 2016) ........ 12

*Tazu v. Att'y Gen.*,
975 F.3d 292 (3d Cir. 2020) ........ 5, 7

*Tiktok Inc. v. Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020) ........ 14

*Trump v. California*,
No. 26A124, 2026 WL 2473573 (Aug. 24, 2026) ........ 10

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 8, 10

*Trump v. IRAP*,
582 U.S. 571 (2017) ........ 10, 13

*United States v. FCC*,
652 F.2d 72 (D.C. Cir. 1980) ........ 15

*United States v. Martinez-Fuerte*,
428 U.S. 543 (1976) ........ 14

*United States v. United Mine Workers*,
330 U.S. 258 (1947) ........ 3

*United States DOGE Serv. v. Citizens for Resp. & Ethics in Wash.*,
145 S.Ct. 1981 (2025) ........ 13

*Wisc. Gas Co. v. F.E.R.C.*,
758 F.2d 669 (D.C. Cir. 1985) ........ 11, 12

*Wye Oak Tech., Inc. v. Republic of Iran*,
24 F.4th 686 (D.C. Cir. 2024) ... 4

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ... 14

**Statutes**

8 U.S.C. § 1229a(b)(1) ... 7

8 U.S.C. § 1231 ... 8

8 U.S.C. § 1231(a)(1)(A) ... 10

8 U.S.C. § 1252(f)(1) ... 8, 9

8 U.S.C. § 1252(g) ... 5

8 U.S.C. § 1252(a)(5) ... 6

8 U.S.C. § 1252(b)(9) ... 6

28 U.S.C. § 2347(b)(3) ... 7

**Regulations**

8 C.F.R. § 1003.19(b) ... 7

8 C.F.R. § 1240.1(b) ... 7

8 C.F.R. § 1240.10(a)(4) ... 7

8 C.F.R. § 1240.11(c)(3)(ii) ... 7

## INTRODUCTION

Pursuant to Court's October 15, 2026, *ex parte* Order, Defendants respectfully move to dissolve the order and their obligations to provide the Court with: (1) 24-hours-notice of the finalization of a plan to remove Iranians present in the United States to Iran; (2) five-business-days' written notice prior to removing any Iranian to Iran. *See* Order (Dkt. 45). Though the Court has discretion to manage its docket and cases, the order operates as an injunction against Defendants given the possibility of sanctions and contempt dangling overhead. Substantively, there remains nothing left of this case, as the Court alluded to at the conclusion of the evidentiary hearing. Oct. 15, 2026, Hr'g Tr. at 14 ("If anything happens that violates either of those two orders, I will hold every single person associated with violating it -- I will start contempt proceedings."). Plaintiff, an organization, has no standing to bring suit, meaning that this Court lacks subject-matter jurisdiction over the matter. Though the Court has not yet dismissed the matter, it may do so at any time. Finally, even if the case remains ongoing while the parties brief dismissal, issues related to removal, and therefore by extension the Court's order requiring notice, have no bearing on the allegations raised in this case. At a minimum, the Court should dissolve its *ex parte* order.[1]

## ARGUMENT

### I. <u>The *Ex Parte* Order is an Injunction.</u>

The Court ordered Defendants to provide notice regarding removal related activities coordinated with a foreign sovereign. Defendants are under no independent obligation to do so.

---

[1] Defendants also intend to ask the Court to lift its sealing order related to the transcript. Because the order currently remains under seal, Defendants file this motion under seal for the time being. Defendants do not oppose Plaintiff being provided two weeks from the Court lifting the sealing order to file any response to this instant motion.

The Court informed Defendants that failure to provide notice would lead to contempt proceedings. Therefore, Defendants are subject to an ongoing injunction.

An injunction commands, positively directs an action, or requires a party to abstain or desist from some action. *Make the Rd. N.Y. v. Mullin*, 179 F.4th 16, 31 (D.C. Cir. 2026) (citing *Garland v. Aleman Gonzalez*, 596 U.S. 543, 548 (2022)). When a court issues an injunction, it is directing a party's conduct and is doing so "'with the backing of the court's full coercive powers.'" *Id*. (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009) (citation modified)). Meaning, when a court "'tells someone what to do or not do' and such an order is enforceable by contempt'" that order operates as an injunction. *Refugee and Immigr. Ctr. for Educ. and Legal Servs. v. Mullin*, 174 F.4th 81, 119 (D.C. Cir. 2026) (quoting *Nken*, 556 U.S. at 428 and *I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 24 (D.C. Cir. 1986) (citation modified)).

The Court's notice order checks all of the relevant boxes. It directs Defendants to provide notice to the Court upon finalization of removal plans and prior to any removal actions are taken. In other words, a command to do something. And the Court unequivocally informed Defendants that any potential violations of the Order would result in the initiation of "contempt proceedings." *See* Oct. 15, 2026, Hr'g Tr. at 14. The Court's notice requirement is in effect an operational tool to ensure that Plaintiff's requested relief in the form of halting removals to Iran, *see* Compl., Prayer for Relief, ¶ f ("Enjoin Defendants from deporting any Iranian ICE detainees until the work of the Special Master is completed"), is not adversely impacted and indeed protected. The Court's *ex parte* order is undoubtedly "designed to accord or protect, some or all of the substantive relief sought by a complaint." *I.A.M.*, 789 F.2d at 23-24.

Therefore, the Court should treat the order as an injunction.

## II. The Injunction Fails to Meet the Heightened Standard.

The Court had previously considered keeping this case alive because it had jurisdiction to determine its jurisdiction. *See* Aug. 5, 2026, Hr'g Tr. at 9:15-16. And though courts certainly have jurisdiction to determine their own jurisdiction, *United States v. United Mine Workers*, 330 U.S. 258, 293 (1947), that authority contemplates courts deciding these issues promptly, especially when motions for extraordinary relief are involved. Indeed, the *United Mine Workers* Court decided the open jurisdictional question within days. *See id.* at 267-69. This Court acted and came to the factual conclusion that there was no policy as alleged in the Complaint. Oct. 15, 2026, Hr'g Tr. at 67 ("I'm denying the motion for preliminary relief, I think that there's -- I don't have any basis to find a likelihood of success on the claim. I find the two individuals who testified before me are relevant individuals, who would have knowledge of a policy if it existed. I find them to be entirely credible."). Without jurisdiction over this case, this Court's subsequent orders similarly lack authority. *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations. Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." (cleaned up)); *Principe v. Ault*, 62 F. Supp. 279, 284 (N.D. Ohio 1945) ("As was pointed out by Lord Russell in the case of The Queen v. Spilsbury, we are not to conclude that the court is without power because no power was expressly granted, but we are to conclude that the court has the power to admit to bail unless we find that the exercise of such power is forbidden by statute.").

Understanding that the *ex parte* order operates as an injunction, it was issued without the requisite findings. *See League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (requiring a party seeking preliminary relief to make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of

preliminary relief, a balance of the equities in its favor, and accord with the public interest"). The Court should dissolve its *ex parte* order, because the evidentiary hearing confirmed that the organizational Plaintiff lacks standing. Moreover, the Immigration and Nationality Act ("INA") bars judicial review over Plaintiff's claims, nor can the Court order all the relief sought. Without jurisdiction over the claims, this Court cannot exercise its authority to keep this case alive, especially now that there are clear factual findings that confirm that this Court lacks jurisdiction.

### A. The Court Determined that There is No Policy, and therefore Plaintiff Lacks Standing.

This Court perceived the existence of the purported policy at issue as a standing and jurisdictional issue. *See* Aug. 5, 2026, Hr'g. Tr. at 9-10. That is now law-of-the-case for the purposes of standing. *See Wye Oak Tech., Inc. v. Republic of Iran*, 24 F.4th 686, 697 (D.C. Cir. 2024) ("The law-of-the-case doctrine refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided. . . by that court or a higher one in earlier phases." (citation modified)). After the evidentiary hearing, the Court concluded that Defendants do not have a policy of sharing confidential asylum information with the Islamic Republic of Iran. *See* Oct. 15, 2026, Hr'g Tr. at 63:18-23. Without the concrete injury in fact, *see* Aug. 5, 2026, Hr'g. Tr. at 9:6-7, Plaintiff lacks standing on the most basic of showings, *see Frank v. Autovest, LLC*, 961 F.3d 1185, 1186 (D.C. Cir. 2020).

But that is not the only reason that Plaintiff lacks standing. Its entire theory for an injury is that the now-confirmed-nonexistent policy affected how Plaintiff delivers legal services. Pl. Prelim. Inj. Mem. (Dkt. 9-1) at 18-19. But the Supreme Court has rejected such an attenuated theory. *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 391-92 (2024). Nor can the Fund survive on its "substantial operational changes" theory. *Compare* Pl. Prelim. Inj. Mem. (Dkt. 9-1) at 20 *with Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920-21 (D.C. Cir. 2015).

To the extent the Court determines that the nonexistent policy is not a question of injury-in-fact, then it is certainly an issue of redressability. As a threshold matter, Plaintiff cannot succeed with perfunctory allegations about how the government's purported policy has caused structural changes and impacted Plaintiff's ability to provide legal advice. *See Coalition for Humane Rights v. Mullin*, 185 F.4th 1275, (D.C. Cir. 2026) (rejecting similar theory in which an organization failed to show how a favorable order would "likely" redress the purported injuries). But that is not all. The Court does not even think that Plaintiff has plausibly alleged a policy, *see* Oct. 15, 2026, Hr'g Tr. at 64:2-4; 64:23-65:11. With the Court's finding that there is no policy of sharing protected asylum information, an order vacating the nonexistent policy would amount to an advisory opinion. *See California v. Texas*, 593 U.S. 659, 673 (2021) ("To find standing here to attack an unenforceable statutory provision would allow a federal court to issue what would amount to "an advisory opinion without the possibility of any judicial relief.") (citation modified)); *see also Chamber of Comm. v. EPA*, 642 F.3d 192, 213 (D.C. Cir. 2011).

At bottom, Plaintiff lacks Article III standing and the Court is without subject-matter jurisdiction to issue any relief, including the order at issue.

**B. Even Assuming Standing, the INA Bars Review.**

1. <u>8 U.S.C. § 1252(g)</u>

Congress emphatically delineated that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien[.]" 8 U.S.C. § 1252(g). Plaintiff seeks to bar execution of unidentified orders of removal. *See* Compl., Prayer for Relief, ¶ f. That is within the heartland of § 1252(g)'s bar. *See Hamama Homan*, 912 F.3d 869, 874 (6th Cir. 2018).; *Tazu v. Att'y Gen.*, 975 F.3d 292, 298 (3d Cir. 2020); *E.F.L. v. Prim*, 986 F.3d 959, 964 (7th Cir. 2021); *Camarena v. Director, Immigr. and Customs Enf.*, 988 F.3d

1268, 1274 (11th Cir. 2021); *Rauda v. Jennings*, 55 F.4th 773, 776–78 (9th Cir. 2022). The sole purpose of requiring Defendants to inform the Court of finalized plans to execute final orders of removal is to enable the Court to intervene; § 1252(g) divests the Court of that authority.

2. Channeling Provisions

Even if the Order could be construed as an information-gathering tool to permit individuals subject to a final order of removal to pursue other relief, those are questions of law and fact that would arise out of proceedings or the action to remove aliens to Iran. Those challenges are bound up in challenges to removal orders and therefore must be channeled by individual aliens in their removal proceedings.

"[T]he sole and exclusive means for judicial review of an order of removal" is a "petition for review filed with an appropriate court of appeals," that is, "the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." 8 U.S.C. §§ 1252(a)(5), (b)(2). Section 1252(b)(9) is an "unmistakable 'zipper' clause" that "channels judicial review of all" claims arising from removal proceedings to a court of appeals in the first instance. *Reno v. American-Arab Anti-Discrimination Committee* ("*AADC*"), 525 U.S. 471, 483 (1999). "Taken together, §[§] 1252(a)(5) and [(b)(9)] mean that any issue—whether legal or factual—arising from any removal-related activity can be reviewed only through the [petition for review] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016); *see also Bonhometre v. Gonzales*, 414 F.3d 442, 446 (3d Cir. 2005) (highlighting Congress's "clear intent to have all challenges to removal orders heard in a single forum (the courts of appeals)").

Plaintiff is seeking relief that unquestionably impacts removal proceedings and individual aliens' ability to obtain relief from removal in some form or fashion. *See* Compl., Prayer for Relief, ¶¶ d, e, f. That is precisely why § 1252(b)(9) eliminates this Court's jurisdiction over those claims. *See Nken*, 556 U.S. at 424 (explaining how § 1252 "streamlined all challenges to a removal order

into a single proceeding: the petition for review"). Plaintiff cannot short-circuit that process by seeking injunctive relief in this Court while immigration proceedings take their course or have concluded. To hold otherwise would create the very risk of fragmented, duplicative litigation that Congress sought to avoid and could subject Defendants to inconsistent obligations imposed by different courts addressing the same removal procedures. *See Tazu*, 975 F.3d at 296 (explaining that when Congress added § 1252(b)(9) and (g) to the INA, it "aimed to prevent removal procedures from becoming 'fragmented, and hence prolonged'") (cleaned up; quoting *AADC*, 525 U.S. at 487).

To the extent that Plaintiff seeks to obtain information that may prove helpful in other removal proceedings, that is a backdoor attempt to alleviate their obligation from developing the factual record through the normal course. *See* 8 U.S.C. § 1229a(b)(1); *see also* 8 C.F.R. §§ 1003.19(b); 1240.1(b); 1240.10(a)(4); 1240.11(c)(3)(ii). If individual aliens believe that process has not necessarily succeeded, Congress created a mechanism by which courts of appeals on a petition for review may remand matters to district court for factual and record development. *See* 28 U.S.C. § 2347(b)(3). Aliens request this process through the normal course of proceedings. *See Khalil v. President, United States*, 164 F.4th 259, 280-81 (3d Cir. 2026) (recognizing that § 2347 permits for factual development, including a court's ability to appoint a special master); *Mahdawi v. Trump*, 183 F.4th 103, 122-23 (2d Cir. 2026) (same).

As the Supreme Court recognized, aliens who are removed but nevertheless succeed on their petitions for review have an opportunity to seek facilitation of return to the United States. *See Nken*, 556 U.S. at 435 ("Aliens who are removed may continue to pursue their petitions for review, and those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal."). Procedures to facilitate return

do exist. *See* ICE Policy Directive Number 11061.1, *Facilitating the Return to the United States of Certain Lawfully Removed Aliens* (Mar. 5, 2012), https://www.ice.gov/doclib/foia/dro_policy_memos/11061.1_current_policy_facilitating_return.pdf; Frequently Asked Questions (FAQs) on Facilitating Return for Lawfully Removed Aliens (Aug. 29, 2024), https://www.ice.gov/sites/default/files/documents/Document/2017/facilitatingReturnLawfullyRemovedAliensFAQ.pdf. Generally, it involves contacting the Facilitation of Return team within ICE Enforcement and Removal Operations, Custody Programs Division. *Id.* "The Custody Programs Division will route [the person's] request to the appropriate ICE office(s), which will contact [the person or the person's representative] concerning [his or her] potential return to the United States." *Id.* "The Custody Programs Division will also provide [the person] with a point of contact for this process." *Id.* Depending on whether the person returns by land or by air, there are different procedures. *Id.*

3. The Court Cannot Enjoin Removals.

The Court cannot award the relief that Plaintiff seeks by enjoining all removals to Iran. *See* Compl. Prayer for Relief, ¶ f. First, such relief would enjoin removals without seeking class-certification and obtain relief for individuals not currently before the Court. That is improper. *See Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025). Plaintiff's effort is also an attempted circumvention of the INA, which makes clear that lower federal courts lack "jurisdiction or authority to enjoin or restrain the operation" of certain INA provisions— including the removal provisions in 8 U.S.C. § 1231—"other than with respect to the application of such provisions to an individual alien" in removal proceedings. 8 U.S.C. § 1252(f)(1). The D.C. Circuit has agreed, and this Court should not break from established precedent. *See N.S. v. Dixon*, 141 F.4th 279, 289 (D.C. Cir. 2025).

Section 1252(f)(1) provides: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). The Supreme Court held that § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (quoting *Aleman Gonzalez*, 596 U.S. at 544). Section 1252(f)(1) thus precludes the Court from issuing orders restraining, even temporarily, operation of § 1231.

In *N.S.*, the D.C. Circuit overturned an injunction entered by the district court restraining the U.S. Marshals from carrying out immigration arrests and detentions pursuant to Form I-200 Warrants of Arrest issued by the Department of Homeland Security. 141 F.4th at 289. Despite finding that the U.S. Marshals lacked authority to execute the Form I-200s, the Court held that the injunction "directly and substantially restricts the ability of federal officials to 'carry out' provisions covered by § 1252(f)(1)." *Id.*

So too here. Plaintiff requests that this Court "enjoin[] Defendants from deporting any Iranian ICE detainees[.]" Compl. Prayer for Relief, ¶ f; *see also* Prop. Order (Dkt. 9-17) ¶ 3 (requesting an order to "prevent the removal" of individuals). These requests clearly fall under the ambit of § 1252(f)(1) because the Fund seeks an order that tells the government "what to do or not to do." *Nken*, 556 U.S. at 428. Put simply, the Fund is requesting an order that "directs the conduct of a party" and is doing so "with the backing of the court's full coercive powers." *Make the Rd. N.Y.*, 179 F.4th at 31.

In sum, this Court lacks the authority to wholesale block removals. The Supreme Court has said so. The D.C. Circuit subsequently adopted such a reading of § 1252(f)(1). And that should be the end of Plaintiff's improper request to interfere with removal operations.

### C. Plaintiff Cannot Succeed on the Merits of their Claims.

There is no policy for Plaintiff to challenge. *See* Oct. 15, 2026, Hr'g Tr. at 64:2-4. With no policy to challenge, the Court cannot find a likelihood that Plaintiff would succeed on the merits of its claims. Indeed, the Court already found so when it denied Plaintiff's motion for a preliminary injunction. *Id*. at 67 ("I don't have any basis to find a likelihood of success on the claim.").

## III. The Court Should Find that Irreparable Harm and Balance of the Equities Favor Defendants.

### A. Defendants are Irreparably Harmed.

Whenever a court issues broad relief against an Executive Branch policy, the United States suffers a form of irreparable harm. *See CASA*, 606 U.S. at 860-861; *Trump v. IRAP*, 582 U.S. 571, 578-579 (2017) (per curiam); *see also Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (Aug. 24, 2026) (lower-court errors that "deal 'a serious setback' to the Executive's 'goals'" constitute "irreparable harm" warranting a stay). The harm to the Executive is especially acute where the Court interferes with the execution of lawful orders of removal. *See* 8 U.S.C. § 1231(a)(1)(A) ("Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."). Indeed, "[t]here is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permits and prolongs a continuing violation of United States law." *Nken*, 556 U.S. at 436 (citation modified). "The interest in prompt removal may be heightened by the

circumstances as well—if, for example, the alien is particularly dangerous, or has substantially prolonged his stay by abusing the processes provided to him." *Id.*

And that harm is even more pronounced where, as here, a judicial order seeks to infringe on the Executive Branch's constitutional and statutory authority over immigration and the removal of aliens, thus reflecting an "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013). Indeed, the Constitution envisions that "the Government's political departments [will be] largely immune from judicial control" in the immigration sphere. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977).

But even if the Court considers that judicial interference with the Executive's law enforcement and foreign relations authorities is not irreparable harm, the Court should still dissolve the Order because the Court did not make the requisite findings that Plaintiff itself is irreparably harmed absent the Court's injunctive order. Nor could it because Plaintiff never established irreparable harm in its motion. "[T]he degree of proof required for 'irreparable harm' is 'high,' and . . . a failure to surmount it provides 'grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.'" *California Valley Miwok Tribe v. Haaland*, Civ. A. No. 24-0947 (TSC), 2024 WL 4345787, at *3 (D.D.C. Sep. 30, 2024) (quoting *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019)). To meet the "high standard for irreparable injury," the D.C. Circuit has required a movant to show that the injury is "both certain and great; it must be actual and not theoretical," and that "[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (D.C. Cir. 2006) (emphasis in original) (quoting *Wisc. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674, 2 (D.C. Cir. 1985) (per curiam)).

Importantly, the movant must "substantiate the claim that irreparable injury is 'likely' to occur." *Id.* "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur." *Id.* Rather, "[t]he movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.* Thus, where the movant has premised its motion "upon unsubstantiated and speculative allegations of [redressable] injury," the court must deny the motion. *Id.* Courts in this Circuit "must faithfully and fairly apply that standard in all cases, regardless of how high the stakes or how worthy the cause." *All. for Retired Americans v. Bessent*, 770 F. Supp. 3d 79, 111 (D.D.C. 2025) (quoting *Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 34 (D.D.C. 2016)). Plaintiff failed to establish this high bar, *see* Defs' Opp'n (Dkt. 23) at 34-38, and it certainly cannot meet it on the same record now.

Finally, Plaintiff's delay in bringing suit and seeking a preliminary injunction should weigh in favor of Defendants; it also further underscores Plaintiff's failure to establish irreparable harm. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding that a forty-four day delay in seeking injunctive relief is inexcusable and bolsters the finding that no irreparable harm exists); *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay in bringing action "militates against a finding of irreparable harm"); *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 165 (D.D.C. 2006) ("The delay in filing this suit further undermines any showing of irreparable injury"); *Cruz v. Dep't of Homeland Sec.*, 2019 WL 8139805, at *6 (D.D.C. Nov. 21, 2019) (same); *see also* Defs' Opp'n (Dkt. 23) at 37-38.

**B. The Balance of the Equities and Public Interest Weigh in Defendants' Favor.**

Requiring Defendants to provide notice when they finalize plans and then intend to operationalize plans to remove aliens with final orders of removal infringes on the Executive Branch's communications internally and with foreign sovereigns, which is well outside the

purview of Article III courts. *See United States DOGE Serv. v. Citizens for Resp. & Ethics in Wash.*, 145 S.Ct. 1981, 1982 (2025) ("judicial deference and restraint" is required when "internal Executive Branch communications" are involved) (citing *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 385 (2004)); *Fulbright & Jaworski v. Dep't of Treasury*, 545 F. Supp. 615, 620 (D.D.C. 1982) (discussing the particular sensitivity around disclosure where the decision in question implicates foreign relations); *see also D.A. v. Noem*, 800 F. Supp. 3d 43, 52-53 (D.D.C. 2025) (declining to order relief that would effectively require the United States to coordinate with a foreign sovereign); *Canning v. Dep't of State*, 453 F. Supp. 3d 332, 337-38 (D.D.C. 2020) ("Diplomatic communications are often nuanced, moreover, where minor changes between drafts can carry significant import and where those asked to prepare drafts for review by more senior officials may worry that disclosure of drafts not yet signed by the principal could have significant foreign affairs consequences.").

Moreover, the Court's notice requirement certainly impacts foreign relations as it could require Defendants to implicate sensitive information related to communications with foreign governments; that certainly weighs in Defendants' favor. *See Mohammed v. Biden*, 2024 WL 2372182, at *2 (D.D.C. Apr. 2, 2024); *see also Nkrumah v. Pompeo*, 2020 WL 6270754, at *4 (D.D.C. Oct. 26, 2020) ("The Executive Branch has a strong interest in conducting foreign relations and managing the admission of foreign nationals in the United States without judicial second-guessing.").

"The interest in preserving national security is an urgent objective of the highest order." *Int'l Refugee Assistance Project*, 582 U.S. at 581. A court order that controls substantive communications with a foreign sovereign would intrude on the "deference to the Executive Branch's evaluation of the facts and the sensitive and weighty interests of national security and

foreign affairs, including the timing of those . . . decisions," and therefore, the public interest favors Defendants. *Tiktok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (citation modified) (citing *Holder v. Humanitarian Law Proj.*, 561 U.S. 1, 33-34 (2010), *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002)). Halting the execution of outstanding removal orders—the logical purpose for ordering the government to provide information on its plans to do so—would also "inflict[] irreparable harm on the [Secretary of Homeland Security] by interfering with the national-security" and national interest "determinations entrusted to him by Congress." *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *3 (D.C. Cir. June 20, 2025).

Additionally, and as discussed above, the significance of the public interest in the enforcement of the United States's immigration laws is well settled. *See, e.g., United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Nken*, 556 U.S. at 435. The execution of outstanding removal orders is meant to advance the enforcement of those laws, such as ending the unlawful presence of aliens who would remain in the United States in violation of law. *See Nken*, 556 U.S. at 436 ("There is always a public interest in the prompt execution of removal orders." (relying on *AADC*, 525 U.S., at 490)). There would also be a "heightened" public interest in executing removal orders of individuals who are "particularly dangerous, or [have] substantially prolonged [their] stay by abusing the processes[.]"). *Id.* Moreover, preserving the political branches' authority to control the border serves "the obvious necessity that the Nation speak with one voice" on such matters. *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001).

Halting removals and interfering in the Executive Branch's coordination of removals with a foreign sovereign would be "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assist. Proj. of LA Cnty. Federation*

*of Labor*, 510 U.S. 1301, 1305-06 (1993). Enjoining either action would be extreme on its own, but, in tandem, the Court would be encroaching on the Executive Branch's determination of what facts and judgments to make and subsequently convey to foreign governments, all of which sound in matters of public interest and national security. Imposing judicial restraints on such actions would be inappropriate at the very least. *See United States v. FCC*, 652 F.2d 72, 96 (D.C. Cir. 1980) ("In summary, we cannot interfere with the agency's latitude not merely to find facts and make judgments, but also to select the policies deemed in the public interest." (internal quotations omitted)); *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

## IV. <u>The Court's Order Exceeds its Jurisdiction.</u>

Finally, the Court's notice requirement does not have bear relevance to the threshold question of whether there was a policy of sharing confidential asylum information in the first place. The failure to meet that low threshold is amplified by the Court's finding that there is no policy. Specifically, notifying the Court of upcoming removals would no longer be tethered to the facts or legal theory of the complaint and is therefore beyond the Court's jurisdiction. *See Adair v. England*, 193 F. Supp. 2d 196, 200 (D.D.C. 2002) ("Even when a motion for a preliminary injunction is predicated on a complaint, if the motion raises issues different from those presented in the complaint, the court has no jurisdiction over the motion."); *accord* Feb. 3, 2026, Min. Order, *Fisher v. Yellen*, Civ. A. No. 23-0329 (D.D.C. Feb. 2, 2026); *Frison v. Principi*, No. 03-5095, 2003 WL 22097797, at *1 (D.C. Cir. Aug. 28, 2003) ("To the extent the claims against Christian for injunctive relief seek review of the VA's actions related to the determination of disability benefits, the district court lacked jurisdiction because underlying the claims is an allegation that the VA unjustifiably denied a veteran's benefit.").

## CONCLUSION

Accordingly, the Court should dissolve the October 15, 2026, Order.

Dated: November 4, 2026
Washington, D.C.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: *s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
DIMITAR P. GEORGIEV
Assistant United States Attorneys
601 D Street, NW
Washington, DC 20530
(202) 252-2500 (main)

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IRANIAN AMERICAN LEGAL DEFENSE FUND,<br><br>Plaintiff,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, et al.,<br><br>Defendants. | Civil Action No. 26-2375 (ACR) |

**[PROPOSED] ORDER**

UPON CONSIDERATION of Defendants' motion to dissolve, it is hereby

ORDERED that Defendants' motion is GRANTED; and it is further

ORDERED that the Court's October 15, 2026, Order (Dkt. 45) is hereby DISSOLVED.

SO ORDERED:

__________________
Date

__________________________________
ANA C. REYES
United States District Judge